# EXHIBIT A

1  THE HONORABLE JOHN C. COUGHENOUR

2

3

4

5

6

7  UNITED STATES DISTRICT COURT
   WESTERN DISTRICT OF WASHINGTON
8  AT SEATTLE

9  YIM, et al.,                              No. 2:18-cv-736-JCC

10            Plaintiffs,                    BRIEF OF GRE DOWNTOWNER LLC AS
                                             *AMICUS CURIAE* IN SUPPORT OF
11  v.                                       PLAINTIFFS' MOTION FOR SUMMARY
                                             JUDGMENT AND IN OPPOSITION TO
12                                           DEFENDANT'S CROSS-MOTION FOR
    CITY OF SEATTLE,                         SUMMARY JUDGMENT
13
              Defendant.
14

15                        **CONTENTS**

16                                                              **P**age

17  I. INTRODUCTION ..........……………………………………………2

18  II.STATEMENT OF FACTS.........................................................2

19  III. ARGUMENT .......................................................................7
20

21      A.   The Ordinance Inhibits a Landlord's Ability to Provide Safe and
             Affordable Housing for Low-Income Individuals Living in Downtown
22           Seattle and Is Unduly Oppressive and Irrational. ...........................7

23      B.   The Ordinance Violates the First Amendment and Is Vague and
24           Unworkable...................................................................7

25  IV. CONCLUSION...........................................................8

26

BRIEF OF GRE DOWNTOWNER LLC - 1
2:18-cv-736-JCC

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

# I.     INTRODUCTION

*Amicus curiae* GRE Downtowner LLC ("GRE")[1] appreciates the Court's permission to submit an *amicus* brief in this matter and the opportunity to share information with the Court about its experience owning and operating a federally assisted housing project in downtown Seattle for the last six and one-half years.  As detailed below, its experience since the City of Seattle's Fair Chance Housing Ordinance, SMC 14.09 (the "Ordinance") went into effect has been drastically different than its experience during the prior years.

# II.     STATEMENT OF FACTS

The Addison on Fourth ("the Addison") is an apartment building located in Seattle's Chinatown-International District.  Built in 1911 as a hotel, the building was closed in the early 1960s and then reopened in 1969 as housing for low-income residents. In 2012, GRE purchased the property for $12 million.  It invested $27 million more in major renovations to convert the property to 254 apartment homes,[2] artist lofts, and musician studios. GRE's goal with the renovations was to maintain the historic character of the building, while bringing the systems and finishes up to current code and standards.[3]

Although the acquisition and renovations were financed primarily with tax exempt bonds issued by the Washington State Housing Finance Commission, the project is federally subsidized. Provided the project continues to comply with certain requirements of the Internal Revenue Code, interest on the bonds will remain exempt from federal income tax.  The requirements include limits on the income of apartment residents and limits on the amount of rent that can be charged for an apartment.

---

[1] Simultaneously with the filing of its motion for leave to submit an *amicus curiae* brief, GRE filed a Corporate Disclosure Statement as required by LCR 7.1.
[2] 25 of the apartment homes are reserved for tenants with disabilities.
[3] The renovation project qualified for federal historic and solar energy tax credits.

BRIEF OF GRE DOWNTOWNER LLC - 2
2:18-cv-736-JCC

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1    Compliance with substantially identical restrictions on income levels and maximum rent

2    amounts allows the project also to qualify for federal low-income housing tax credits.  The Addison

3    currently provides housing for Seattle residents earning up to 60 percent of the area's median

4    income ($45,600 for one person).  The monthly rent for a studio apartment is capped at $1,162,

5    while the maximum monthly rent for a one-bedroom unit is $1,245.  The income and rent limits

6    are tied to the Area Median Income calculations set by the U.S. Housing and Urban Development

7    ("HUD") for the Seattle-Bellevue, WA HUD Metro Fair Market Rent Area. Rental payments for

8    many of the apartments are subsidized with federal Housing Choice Vouchers (formerly Section

9    8) and other rental assistance programs.

10    When the renovations were completed, the Addison re-opened in November 2013 under

11    the management of American Management Services Northwest LLC ("American"), a third-party

12    manager. American served as manager of the property until mid-May 2019, when GRE

13    Management LLC ("GRE Management") took over.[4]  GRE Management is affiliated with

14    Goodman Real Estate, Inc., a privately held real estate investment company that specializes in

15    multifamily, retail and commercial real estate and has been headquartered in Seattle for 30 years.

16    The goal of the Addison's owner and management teams is, and always has been, to provide safe,

17    clean, comfortable, stable, and affordable housing for the Addison's residents.

18    During the first years after the Addison's reopening, that goal was met.  New and long-

19    term residents were happy with the renovations and respectful of the rules for occupancy.  The

20    project was economically viable and a going concern.

21    But six months into 2018, there was a noticeable change. Uncertain whether the Ordinance,

22    which went into effect in February 2018, applied to the Addison at all or in part,[5] management

23    

24    [4] When GRE bought the property, the building was called The Downtowner.  GRE renamed it The Addison on
Fourth.  During the renovations, GRE's management team worked closely with tenants to keep as many of them in

25    place as possible.  The building officially re-opened in November 2013 when the City issued a new Certificate of
Occupancy.
[5] As discussed further below, the Ordinance does not define the term "federally assisted housing," which is found in

26    SMC 14.09.115.B.

BRIEF OF GRE DOWNTOWNER LLC - 3
2:18-cv-736-JCC

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1    elected to abide by the new prohibition against obtaining criminal background information for

2    existing and prospective new tenants.  Before that change in procedure, to determine an

3    individual's eligibility to become a tenant, management had in place an application process that

4    included a criminal background check by a reporting agency.[6]  If the applicant had a history of

5    criminal convictions, the agency would look at the type of crime and length of time since the crime

6    was committed and determine whether the applicant satisfied pre-established criteria (which were

7    tied to an assessment as to whether the criminal conduct indicated a demonstrable risk to resident

8    safety and/or property).  Then, without including any underlying information about the criminal

9    history, the reporting agency would notify management whether an applicant was "approved" (i.e.,

10   passed the screening process), should be "declined" (did not pass the screening process), or might

11   be "approved with conditions" (such as an increased deposit).  The procedure was intended to

12   eliminate bias, but also allowed some protection of the landlord.[7] With the discontinuation of that

13   procedure, living conditions at the Addison declined precipitously.

14          Over the past two years, the number of 911 calls from the Addison has more than doubled.

15   Fights are breaking out in the lobby of the building; used needles, trash, and feces are left in

16   stairways and hallways; fire alarms are being set off repeatedly in the middle of the night. In

17   response, the Addison's management has installed cameras in the hallways on every floor and in

18   other public areas, upgraded door hardware, installed a controlled access system for the elevator,

19   given residents fobs that allow them access only to their floor, and replaced the main lobby door.

20   It has hired additional janitors and armed security guards.  These new security measures have

21   _____

22   [6] Alternatively, if the applicant was a referral from the Seattle Housing Authority, the applicant was pre-screened by
     the agency pursuant to a memorandum of understanding between the agency and the Addison's management. That
     agreement between the agency and the Addison's management has been discontinued, however, and the agency now

23   screens only for lifetime sex offender registration and conviction of manufacturing or producing methamphetamines
     on the premises of federally assisted housing.

24   [7] Cf.  U.S. HUD Office of General Counsel Application of Fair Housing Act Standards to the Use of Criminal
     Records by Providers of Housing and Real-Estate Related Transactions (April 4, 2016), available at

25   https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDARD.PDF (acknowledging that a housing
     provider's use of criminal history to deny housing to particular prospective tenants may not constitute unlawful

26   intentional discrimination if necessary to achieve a substantial, legitimate, nondiscriminatory interest of the landlord,
     such as protecting property and the safety of other residents).

BRIEF OF GRE DOWNTOWNER LLC - 4
2:18-cv-736-JCC

1   greatly increased operating costs, yet problems remain rampant and the Addison's annual

2   insurance deductible has climbed from $5,000 to $100,000.

3       Building managers started to keep a growing list of individuals banned from the building

4   for starting fights or damaging property. A staff member was assaulted. Employees are afraid to

5   work alone, so they now work in teams.  Turnover is 400 percent.

6       In November 2019, a resident who had been living at the Addison for six months stabbed

7   his guest in the chest during an argument.  It was only after the resident was arrested that building

8   managers learned the resident had several outstanding arrest warrants.  Other residents have sold

9   drugs out of their apartments.  Over 500 people have lived in the Addison over the past two years,

10  but management finds out about a resident's criminal past only when the police arrive and arrest

11  someone on the premises.

12      Evictions have tripled in the past two years, but that, too, has not solved the problems.

13  While it would seem a simple matter to evict a problem tenant who is endangering others,

14  damaging property, and violating the lease agreement, the process can take several months. Costs

15  associated with a single eviction can easily climb to $4,000, not including lost rents and the

16  expense of refurbishing a trashed apartment.  In the last 12 months alone, the Addison has had to

17  pursue judicial evictions of tenants in 42 of its apartments. That is more than 16 percent of the

18  apartments in the building.  Thirty of the 42 evictions were for behavioral issues: a stabbing;

19  allowing drug dealers to take over the apartment; bringing trespassers into the building;

20  harassing/assaulting staff; being aggressive with neighbors; damaging the building; and

21  prostitution.

22      All the problems are leading longtime residents to move out. One example is "A," an

23  African American woman just reaching retirement age.  She has lived at the Addison since 2004,

24  when it was the Downtowner.  She was thrilled with the changes made after GRE's acquisition

25  and renovations. Her apartment was completed updated, and the lobby was modernized and

26  decorated with plants, art, sofas, armchairs, and a television.  She felt safe.  That is no longer the

BRIEF OF GRE DOWNTOWNER LLC - 5
2:18-cv-736-JCC

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

case and she is planning to leave soon.  "B" is a 70-year-old man who works in housekeeping at T-Mobile Park.  A former counselor for homeless veterans, he has lived at the Addison for five years and has seen the changes.  He says he doesn't know the people who live on his floor anymore because the turnover is so high.  In his view, the "good people" are leaving. Online reviews show the Addison's reputation for being a safe, clean, and comfortable place to live has suffered greatly. Tenant turnover has averaged 50 percent during each of the last two years.

It is telling to examine comparative metrics for the periods two years before and two years after the Ordinance went into effect:

- Negative social media reviews increased 186 percent

- The average occupancy declined over 5 percent

- The average monthly number of evictions climbed from 1.48 to 3.96 (168 percent)

- The average monthly evictions expense climbed from $1,442 to $2,983 (107 percent)

- The average monthly total security costs climbed from $2,350 to $9,581 (308 percent)

- The average monthly non-recurring capital expenditures climbed from $4,573 to $15,704 (243 percent)

- The project has moved from cash flow positive to cash flow negative – a drop of over 400 percent

Over the same four-year period, average monthly rents increased only three percent per year, or about $30.  This is a rent-controlled project and expenses must be managed in relationship to the rents.  The expenses are out of control because of the Ordinance and the project is rapidly becoming unsustainable.

BRIEF OF GRE DOWNTOWNER LLC - 6
2:18-cv-736-JCC

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1            III.    ARGUMENT

2       A.      The Ordinance Inhibits a Landlord's Ability to Provide Safe and Affordable
Housing for Low-Income Individuals Living in Downtown Seattle and Is Unduly Oppressive
3       and Irrational.

4           The City of Seattle is refusing to let private landlords screen applicants for criminal history

5   to ensure that new tenants will not threaten the health, safety, or right to peaceful enjoyment of the

6   community by other tenants or threaten physical damage to property. That refusal is imposing an

7   unduly oppressive and irrational burden on Seattle landlords and thereby violating the substantive

8   due process rights of those landlords.  *See* authorities cited in Plaintiffs' motion for summary

9   judgment (Dkt. No. 23) at 17-21, Plaintiffs' opposition to the City's cross motion and reply (Dkt.

10  No. 48) at 27-30, and Plaintiffs' supplemental brief (Dkt. No. 66) at 1-8; *see also* Amicus Brief of

11  the National Apartment Association (Dkt. No. 39-1) at 12-18.

12      B.      The Ordinance Violates the First Amendment and Is Vague and Unworkable.

13          The Ordinance's ban on inquiring about an individual's criminal background violates the

14  free speech protections of the First Amendment.  *See* authorities cited in Plaintiffs' motion for

15  summary judgment (Dkt. No. 23) at 5-17 and Plaintiffs' opposition to the City's cross motion and

16  reply (Dkt. No. 48) at 2-22.

17          The Ordinance also is unconstitutionally vague because it lacks specific information

18  regarding the core conduct that is supposed to be prohibited. *See* Brief of the National Consumer

19  Reporting Association as Amicus Curiae (Dkt. No. 44-1) at 10-16. And it lacks specific

20  information as to the parties to whom it is to be applied.  It says it "does not apply to an adverse

21  action taken by landlords of federally assisted housing subject to regulations that require denial of

22  tenancy," SMC 14.09.115.B, but it contains no definition of "landlords of federally assisted

23  housing," *see id.*; *see also* SMC 14.09.010.  Is the exemption applicable when a landlord owns an

24  apartment building that is financed with tax exempt bonds? When the landlord was granted federal

25  historic and solar energy tax credits?  When the project qualifies for federal low-income housing

26  tax credits? When rental payments made by tenants are subsidized with federal Housing Choice

BRIEF OF GRE DOWNTOWNER LLC - 7
2:18-cv-736-JCC

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1    Vouchers?  When most tenants in the building, but not all, receive subsidies from federal Housing

2    Choice Vouchers or other rental assistance programs?  Is the exemption applicable only when the

3    landlord receives a Housing Choice Voucher for a specific tenant, and with respect to the apartment

4    occupied or to be occupied by that tenant? Or is the exemption applicable only when a public

5    housing authority is the landlord?

6            The Ordinance not only is vague, it also is unworkable. The City is taking the position that

7    the Ordinance's exemption for "providers of federally-assisted housing" is "limited to their

8    decisions to deny tenancy (or take other 'adverse actions') where federal regulations require that

9    decision," but providers of federally-assisted housing "remain subject to the Ordinance's other

10   requirements."  *See* City of Seattle's Combined Opp'n to Pls.' Mot. for Summ. J and Cross Mot.

11   for Summ. J. (Dkt. No. 48) at 15-16. In other words, landlords of federally assisted housing may

12   deny tenancies to individuals convicted of manufacturing or producing methamphetamines on the

13   premises of federally assisted housing, but these landlords are not allowed to make any inquiries

14   (on their own or through third party reporting agencies) that would elicit information telling them

15   whether individuals had ever been convicted of that crime.  Obviously, a landlord cannot reject a

16   prospective tenant on this ground if the landlord does not know of the conviction.

17                                  **IV.      CONCLUSION**

18           The Addison is in serious jeopardy.  The five on-site managers are not social

19   workers.  They are persons trying to meet GRE's goal of providing safe, clean, comfortable, stable,

20   and affordable housing for low-income Seattle residents. The Ordinance is unlawfully hindering

21   achievement of that goal.

22           GRE respectfully urges the Court to grant Plaintiffs' motion for summary judgment and

23   deny the City of Seattle's cross motion for summary judgment.

24

25

26

BRIEF OF GRE DOWNTOWNER LLC - 8
2:18-cv-736-JCC

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1
       DATED:  May 7, 2020.

2
                                      STOEL RIVES LLP

3

4
                                      *s/ Jill D. Bowman*

5
                                      Jill D. Bowman, WSBA No. 11754
                                      jill.bowman@stoel.com

6
                                      STOEL RIVES LLP
                                      600 University Street, Suite 3600

7
                                      Seattle, WA  98101
                                      Telephone:  206.624.0900

8
                                      Facsimile:  206.386.7500

9
                                      *Attorneys for GRE Downtowner LLC*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BRIEF OF GRE DOWNTOWNER LLC - 9
2:18-cv-736-JCC

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1

## CERTIFICATE OF SERVICE

2

    I certify that on this day I electronically filed this document with the Clerk of the Court

3

using the CM/ECF system which will send notification of such filing to:

4

Brian T. Hodges
Melissa R. Lee

5

Ethan W. Blevins
Robert S. Chang

Pacific Legal Foundation
Ronald A. Peterson Law Clinic

6

255 South King Street, Ste. 800
1112 E. Columbia St.

Seattle, WA 98104
Seattle, WA 98122

7

425-576-0484
206-398-4394

leeme@seattleu.edu

8

bth@pacificlegal.org
changro@seattleu.edu

eblevins@pacificlegal.org
*Attorneys for* Amici Curiae *Fred T. Korematsu*

9

*Attorneys for Plaintiffs*
*Center for Law and Equality and ACLU-WA*

10

Hillary Madsen
Michael J. Saltz

Kimberlee L. Gunning
Jacobsen, Russell, Saltz, Nassim & De La

11

Nicholas Brian Allen
Torre, LLP

Columbia Legal Services
1880 Century Park East, Suite 900 Los

12

101 Yesler Way, Ste. 300
Angeles, CA 90067 msaltz@jrsnd.com

Seattle, WA 98104-2552
310-446-9900

13

206-464-0838
*and* Jeffrey E. Bilanko

hillary.madsen@columbialegal.org
Carroll, Biddle, & Bilanko, PLLC 801

14

kim.gunning@columbialegal.org
2nd Avenue, Suite 800

nick.allen@columbialegal.org
Seattle, WA 98104

15

*Attorneys for Amici Curiae Pioneer Human*
206-489-5549

*Services and Tenants Union of Washington*
jbilanko@cbblegal.com

16

*Attorneys for* Amicus Curiae *NCRA*

17

Eric Dunn

National Housing Law Project
Douglas E. Smith Littler

18

919 E. Main Street, Ste. 610
Mendelson, P.C.

Richmond, VA 23219
600 University Street, Suite 3200

19

415-546-7000 ext. 3102
Seattle, WA 98101-3122

edunn@nhlp.org
206-623-3300

20

*Attorney for Amici Curiae National Housing*
desmith@littler.com

*Law Project and Sargent Shriver National*
*Attorneys for* Amici Curiae *CDIA/NAPBS*

21

*Center on Poverty Law*

22

23

    Dated May 7, 2020.

24

25

    *s/ Karrie Fielder*

Legal Assistant

26

BRIEF OF GRE DOWNTOWNER LLC - 10
2:18-cv-736-JCC

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900