The Honorable John C. Coughenour

1

2

3

4

5

6

7

8

9

10

11

12

13

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHONG and MARILYN YIM, *et al.*,

                                        Plaintiffs,

            vs.

CITY OF SEATTLE,

                                        Defendant.

CASE NO. 2:18-cv-736-JCC

DEFENDANT'S NOTICE OF
SUPPLEMENTAL AUTHORITY

14          Defendant City of Seattle wishes to notify the Court of decisions relevant to this dispute

15  that issued since the City completed its summary judgment briefing.  The decisions are attached

16  for the Court's reference.

17          With respect to the threshold question of whether the First Amendment applies to the

18  regulation of conduct with an incidental expressive element,[1] and the regulation of illegal activity,[2]

19  see *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685-86 (9th Cir. 2019).  **[Exhibit**

20  **A]**

21          With respect to the application of intermediate scrutiny and not strict scrutiny to a

22  commercial speech inquiry restriction,[3] see *Greater Philadelphia Chamber of Commerce v. City of*

23  *Philadelphia*, 949 F.3d 116, 136-57 (3rd Cir. 2020).  **[Exhibit B]**

24

25

26

---

[1] *See* City's Combined Opp'n to Pls.' MSJ & Cross MSJ, Dkt #33 at p. 8.

[2] *Id.* at pp. 13-14.

[3] *Id.* at pp. 10-19.

DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY - 1
CASE NO. 2:18-cv-736 JCC

1    With respect to the threshold question of whether the First Amendment applies to the

2  regulation of conduct with an incidental expressive element,[4] see *Miura Corp. v. Davis*, No. 2:20-

3  cv-05497-SVW-ADS, 2020 WL 5224348, \*3-\*4 (C.D. Cal. June 25, 2020).  **[Exhibit C]**

4    With respect to the threshold question of whether the First Amendment applies to the

5  regulation of conduct with an incidental expressive element,[5] and the regulation of illegal activity,[6]

6  see *Tran v. Dep't of Planning for the Cnty. of Maui*, Civil No. 19-00654 JAO-RT, 2020 WL

7  3146584, \*8-\*9 (D. Haw. June 12, 2020).  **[Exhibit D]**

8    DATED this 30th day of June, 2021.

9                                          Respectfully submitted,

10                                         SUMMIT LAW GROUP PLLC
                                           *Attorneys for Defendant City of Seattle*
11

12                                         By s/ Jessica L. Goldman
                                              Jessica L. Goldman, WSBA #21856
13                                            315 Fifth Avenue South, Suite 1000
                                              Seattle, WA  98104
14                                            Telephone: (206) 676-7000
                                              Email: *jessicag@summitlaw.com*
15
                                           PETER S. HOLMES
16                                         Seattle City Attorney

17                                         By s/ Roger D. Wynne
                                              Roger D. Wynne, WSBA #23399
18                                            Sara O'Connor-Kriss, WSBA #41569
                                              Seattle City Attorney's Office
19                                            701 Fifth Avenue, Suite 2050
                                              Seattle, WA 98104
20                                            Telephone (206) 233-2177
                                              Email: *Roger.Wynne@seattle.gov*
21                                                   *Sara.OConnor-Kriss@seattle.gov*

22

23

24
     ────────────────────
      [4] *Id.* at p. 8.
25
      [5] *Id.*
26
      [6] *Id.* at pp. 13-14.

DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY - 2
CASE NO. 2:18-cv-736 JCC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties or record.

DATED this 30th day of June, 2021.

*s/ Karen M. Lang*
Karen M. Lang, *Legal Assistant*

DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY - 3
CASE NO. 2:18-cv-736 JCC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

# EXHIBIT A

HomeAway.com, Inc. v. City of Santa Monica, 918 F.3d 676 (2019)

19 Cal. Daily Op. Serv. 2271, 2019 Daily Journal D.A.R. 2064

KeyCite Yellow Flag - Negative Treatment

Distinguished by Dyroff v. Ultimate Software Group, Inc., 9th Cir.(Cal.), August 20, 2019

**918 F.3d 676**
**United States Court of Appeals, Ninth Circuit.**

HOMEAWAY.COM, INC.; Airbnb Inc., Plaintiffs-Appellants,
v.
CITY OF SANTA MONICA, Defendant-Appellee.
HomeAway.com, Inc., Plaintiff-Appellant,
and
Airbnb Inc., Plaintiff,
v.
City of Santa Monica, Defendant-Appellee.
Airbnb Inc., Plaintiff-Appellant,
v.
City of Santa Monica, Defendant-Appellee.

No. 18-55367, No. 18-55805, No. 18-55806
|
Argued and Submitted October 12, 2018
Pasadena, California
|
Filed March 13, 2019

**Synopsis**

**Background:** Online platforms for rental accommodations filed actions against city alleging that ordinance prohibiting short-term housing rentals was preempted by Communications Decency Act (CDA) and impermissibly infringed upon their First Amendment rights. After actions were consolidated, the United States District Court for the Central District of California, Nos. 2:16-cv-06641-ODW-AFM, 2:16-cv-06645-ODW-AFM, Otis D. Wright II, J., denied plaintiffs' motion for preliminary injunction, 2018 WL 1281772, and dismissed complaints, 2018 WL 3013245. Plaintiffs appealed, and appeals were consolidated.

**Holdings:** The Court of Appeals, Nguyen, Circuit Judge, held that:

[1] CDA did not preempt ordinance;

[2] ordinance did not implicate platforms' First Amendment rights; and

[3] incidental burden imposed on platforms by ordinance

was not substantial restriction on freedom of speech that would necessitate scienter requirement.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim; Motion for Preliminary Injunction.

West Headnotes (9)

**[1]**    **Federal Courts**⟜Dismissal or nonsuit in general
**Federal Courts**⟜Pleadings;  Dismissal

Court of Appeals reviews district court's order of dismissal de novo, accepting all factual allegations in complaint as true and construing them in light most favorable to nonmoving party.

1 Cases that cite this headnote

**[2]**    **Telecommunications**⟜Persons and entities liable;  immunity

Communications Decency Act (CDA) extends immunity to (1) provider or user of interactive computer service (2) whom plaintiff seeks to treat, under state law cause of action, as publisher or speaker (3) of information provided by another information content provider. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

10 Cases that cite this headnote

**[3]**    **Telecommunications**⟜Persons and entities liable;  immunity

Immunity under Communications Decency Act (CDA) does not attach any time legal duty might

19 Cal. Daily Op. Serv. 2271, 2019 Daily Journal D.A.R. 2064

lead provider or user of interactive computer service to respond with monitoring or other publication activities; rather, duty must necessarily require provider or user to monitor third-party content. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

9 Cases that cite this headnote

**[4]** **Innkeepers**—Statutory and municipal regulations
**Municipal Corporations**—Political Status and Relations

City ordinance prohibiting unlicensed short-term housing rentals did not proscribe, mandate, or discuss content of listings that online platforms for rental accommodations displayed on their websites, and thus Communications Decency Act (CDA) did not preempt ordinance as applied to platforms, even though ordinance required platforms to cross-reference bookings against city's property registry to determine whether rentals were permitted under ordinance's exception of licensed home-shares, where platforms had no editorial control over registry. 47 U.S.C. § 230(b)(1).

3 Cases that cite this headnote

**[5]** **Constitutional Law**—Conduct, protection of
**Constitutional Law**—Trade or Business

First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech. U.S. Const. Amend. 1.

4 Cases that cite this headnote

**[6]** **Constitutional Law**—Conduct, protection of

To determine whether First Amendment applies

to law regulating conduct, court must first ask threshold question of whether conduct with significant expressive element drew legal remedy or whether law has inevitable effect of singling out those engaged in expressive activity. U.S. Const. Amend. 1.

6 Cases that cite this headnote

**[7]** **Constitutional Law**—Landlord and tenant; leased premises

City ordinance prohibiting unlicensed short-term housing rentals did not implicate First Amendment rights of online platforms for rental accommodations; ordinance did not target conduct with significant expressive element, did not require that platforms monitor or screen advertisements, was not intended to regulate speech, and did not single out those engaged in expressive activity. U.S. Const. Amend. 1.

9 Cases that cite this headnote

**[8]** **Constitutional Law**—Advertising

Any First Amendment interest that might be served by advertising commercial activity is absent when commercial activity itself is illegal and restriction on advertising is incidental to valid limitation on economic activity. U.S. Const. Amend. 1.

1 Cases that cite this headnote

**[9]** **Constitutional Law**—Landlord and tenant; leased premises

Incidental burden imposed on online platforms for rental accommodations by city ordinance prohibiting unlicensed short-term housing rentals was not substantial restriction on freedom of speech that would necessitate

scienter requirement. U.S. Const. Amend. 1.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*678** Donald B. Verrilli, Jr. (argued) and Chad Golder, Munger, Tolles & Olson LLP, Washington, D.C.; Joseph W. Cotchett and Alexandra P. Summer, Cotchett, Pitre & McCarthy, LLP, Santa Monica, California; Jonathan H. Blavin and Joshua Patashnik, Munger, Tolles & Olson LLP, San Francisco, California; John B. Major, Munger, Tolles & Olson, Los Angeles, California; for Plaintiff-Appellant Airbnb, Inc.

Stephen M. Rummage and Ambika K. Doran, Davis Wright Tremaine LLP, Seattle, Washington, for Plaintiff-Appellant HomeAway.com, Inc.

George S. Cardona (argued), Deputy City Attorney; Lane Dilg, City Attorney; Yibin Shen, Chief Deputy City Attorney; Heidi Von Tongeln and Michael R. Cobden, Deputy City Attorneys; Santa Monica City Attorney's Office, Santa Monica, California, for Defendant-Appellee.

David Salmons, Bryan Killian, and James Nelson, Morgan, Lewis & Bockius LLP, Washington, D.C., for Amici Curiae Chris Cox and NetChoice.

Catherine R. Gellis, Esq., Sausalito, California, for Amicus Curiae Floor64, Inc. d/b/a The Copia Institute.

Ian C. Ballon and Lori Chang, Greenberg Traurig, LLP, Los Angeles, California, for Amici Curiae Ebay Inc., Glassdoor, Inc., Lyft, Inc., Offerup, Inc., Taskrabbit, Inc., Thumbtack, Inc., Uber Technologies, Inc., and Upwork, Inc.

Christi Hogin, Best Best & Krieger LLP, Manhattan Beach, California, for Amici Curiae League of California Cities, International Municipal Lawyers Association, and California State Association of Counties.

Jeremy B. Rosen, Eric S. Boorstin, and Ryan C. Chapman, Horvitz & Levy LLP, Burbank, California; Michael T. Williams and Allison R. Mclaughlin, Wheeler Trigg O'Donnell LLP, Denver, Colorado; David C. Frederick, Brendan J. Crimmins, and Rachel P. May, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, D.C., for Amicus Curiae Apartment

Investment and Management Company.

Heidi Palutke, Sacramento, California, for Amicus Curiae California Apartment Association.

Edward M. Schulman, Ballston Tower, Arlington, Virginia, for Amicus Curiae AvalonBay Communities, Inc.

Gary S. Kessler, Kulik Gottesman Siegel & Ware LLP, Sherman Oaks, California, for Amicus Curiae Community Associations Institute.

Abbey R. Stemler and Matthew C. Turk, Indiana University Kelley School of Business, Bloomington, Indiana; Jahan C. Sagafi and Relic Sun, Outten & Golden LLP, San Francisco, California; Peter Romer-Friedman, Outten & Golden LLP, Washington, D.C., for Amici Curiae Internet, Business, and Local Government Law Professors.

Richard G. McCracken and Paul L. More, McCracken, Stemerman & Holsberry, LLP, San Francisco, California, for Amicus Curiae UNITE HERE International Union.

Dennis J. Herrera, San Francisco City Attorney; Christine Van Aken, Chief of Appellate Litigation; Yvonne R. Meré, Chief of Complex and Affirmative Litigation; Sara J. Eisenberg, Deputy City Attorney; San Francisco, California for Amicus Curiae City and County of San Francisco.

Karl A. Racine, Attorney General for the District of Columbia, Washington, D.C., for Amicus Curiae District of Columbia.

Andre M. Davis, City Solicitor, City of Baltimore, Baltimore, Maryland, for Amicus Curiae Mayor and City Council of Baltimore.

Zach Klein, Columbus City Attorney, Columbus, Ohio, for Amicus Curiae City of Columbus.

Barbara J. Parker, Oakland City Attorney; Maria Bee, Special Counsel; Erin Bernstein, Supervising Deputy City Attorney; Oakland, California; for Amicus Curiae City of Oakland.

Peter S. Holmes, Seattle City Attorney, Seattle, Washington, for Amicus Curiae City of Seattle.

Jill E. Habig, Founder & President; Joanna Pearl, Legal Director; Oakland, California; for Amicus Curiae Public Rights Project, A Project of Tides Center.

Appeal from the United States District Court for the

HomeAway.com, Inc. v. City of Santa Monica, 918 F.3d 676 (2019)
19 Cal. Daily Op. Serv. 2271, 2019 Daily Journal D.A.R. 2064

Central District of California, Otis D. Wright II, District Judge, Presiding, D.C. Nos. 2:16-cv-06641-ODW-AFM, 2:16-cv-06645-ODW-AFM, 2:16-cv-06645-ODW-AFM

Before: Mary M. Schroeder and Jacqueline H. Nguyen, Circuit Judges, and Michael H. Simon,* District Judge.

## OPINION

NGUYEN, Circuit Judge:

**\*679** Located on the coast of Southern California, the city of Santa Monica consists of only about eight square miles but serves 90,000 residents and as many as 500,000 visitors on weekends and holidays. Similar to other popular tourist destinations, Santa Monica is struggling to manage the disruptions brought about by the rise of short-term rentals facilitated by innovative startups such as Appellants HomeAway.com, Inc. and Airbnb Inc. (the "Platforms"). Websites like those operated by the Platforms are essentially online marketplaces that allow "guests" seeking accommodations and "hosts" offering accommodations to connect and enter into rental agreements with one another.[1] As of February 2018, Airbnb had approximately 1,400 listings in Santa Monica, of which about 30 percent are in the "coastal zone" covered by the California Coastal Act, while HomeAway.com had approximately 300 live listings in Santa Monica, of which approximately 40 percent are in the coastal zone.

Santa Monica's council reported that the proliferation of short-term rentals had negatively impacted the quality and character of its neighborhoods by "bringing commercial activity and removing residential housing stock from the market" at a time when California is already suffering from severe housing shortages. In response, the city passed an ordinance regulating the short-term vacation rental market by authorizing licensed "home-sharing" (rentals where residents remain on-site with guests) but prohibiting all other short-term home rentals of 30 consecutive days or less.

The Platforms filed suit, alleging that the city ordinance is preempted by the Communications Decency Act and impermissibly infringes upon their First Amendment rights. The district court denied preliminary injunctive relief, and dismissed **\*680** the Platforms' complaints for failure to state a claim under the Communications Decency Act and the First Amendment. We affirm.

## BACKGROUND

In May 2015, Santa Monica passed its initial ordinance regulating the short-term vacation rental market by authorizing licensed "home-sharing" (rentals where residents remain on-site with guests) but prohibiting all other forms of short-term rentals for 30 consecutive days or less. Santa Monica Ordinance 2484 (May 12, 2015), *codified as amended*, Santa Monica Mun. Code §§ 6.20.010–6.20.100. The ordinance reflected the city's housing goals of "preserving its housing stock and preserving the quality and character of its existing single and multi-family residential neighborhoods." *Id.* As originally enacted, the ordinance prohibited hosting platforms from acting to "undertake, maintain, authorize, aid, facilitate or advertise any Home-Sharing activity" that was not authorized by the city. Hosting platforms also were required to collect and remit taxes, and to regularly disclose listings and booking information to the city.

The Platforms each filed a complaint in the Central District of California challenging the initial ordinance, and the district court consolidated the cases for discovery and pretrial matters. On September 21, 2016, the parties stipulated to stay the case while the city considered amendments to the local ordinance. During the stay period, the district court for the Northern District of California denied a preliminary injunction requested by the plaintiffs in a separate case challenging a similar ordinance in San Francisco. *See Airbnb Inc. v. City & County of San Francisco*, 217 F.Supp.3d 1066 (N.D. Cal. 2016). That case ended in a settlement in which the Platforms agreed to comply with an amended version of San Francisco's ordinance that prohibited booking unlawful transactions but provided a safe harbor wherein any platform that complies with the responsibilities set out in the Ordinance will be presumed to be in compliance with the law.

In January 2017, Santa Monica likewise amended its own ordinance. The version challenged here, Ordinance 2535 (the "Ordinance"), retains its prohibitions on most types of short-term rentals, with the exception of licensed home-shares. In addition, the Ordinance imposes four obligations on hosting platforms directly: (1) collecting and remitting "Transient Occupancy Taxes," (2) disclosing certain listing and booking information regularly, (3) refraining from completing any booking transaction for properties not licensed and listed on the

City's registry, and (4) refraining from collecting or receiving a fee for "facilitating or providing services ancillary to a vacation rental or unregistered home-share." If a housing platform operates in compliance with these obligations, the Ordinance provides a safe harbor by presuming the platform to be in compliance with the law. Otherwise, violations are punishable by a fine of up to $500 and/or imprisonment for up to six months.

After the district court lifted the stay, the Platforms amended their complaint to challenge the revised ordinance and moved for a preliminary injunction. Santa Monica moved to dismiss the amended complaint. The court denied the Platforms' motion for preliminary injunctive relief and subsequently granted Santa Monica's motion to dismiss on the ground that the Platforms failed to state a claim under federal law, including the Communications Decency Act of 1996 and the First Amendment. The district court also declined to exercise supplemental jurisdiction over their remaining **681 state-law claims.[2] The Platforms timely appealed these decisions, and we consolidated the appeals.

## JURISDICTION AND STANDARD OF REVIEW

[1]We have jurisdiction under 28 U.S.C. § 1291. We review the district court's order of dismissal de novo, "accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Yagman v. Garcetti*, 852 F.3d 859, 863 (2017) (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016) ).

## DISCUSSION

## I. Communications Decency Act

The Communications Decency Act of 1996 ("CDA" or the "Act"), 47 U.S.C. § 230, provides internet companies with immunity from certain claims in furtherance of its stated policy "to promote the continued development of the Internet and other interactive computer services." *Id.* § 230(b)(1). Construing this immunity broadly, the Platforms argue that the Ordinance requires them to monitor and remove third-party content, and therefore violates the CDA by interfering with federal policy protecting internet companies from liability for posting third-party content. Santa Monica, on the other hand, argues that the Ordinance does not implicate the CDA because it imposes no obligation on the Platforms to monitor or edit any listings provided by hosts. Santa Monica contends that the Ordinance is simply an exercise of its right to enact regulations to preserve housing by curtailing "incentives for landlords to evade rent control laws, evict tenants, and convert residential units into *de facto* hotels."

We begin our analysis with the text of the CDA. *See BP America Prod. Co. v. Burton*, 549 U.S. 84, 91, 127 S.Ct. 638, 166 L.Ed.2d 494 (2006). Section 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). The CDA explicitly preempts inconsistent state laws: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).

[2]We have construed these provisions to extend immunity to "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). Only the second element is at issue here: whether the Ordinance treats the Platforms as a "publisher or speaker" in a manner that is barred by the CDA. Although the CDA does not define "publisher," we have defined "publication" in this context to "involve[ ] reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* at 1102 (citing **682 *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc)).

The Platforms offer two different theories as to how the Ordinance in fact reaches "publication" activities. First, the Platforms claim that the Ordinance is expressly preempted by the CDA because, as they argue, it implicitly requires them "to monitor the content of a third-party listing and compare it against the City's short-term rental registry before allowing any booking to proceed." Relying on *Doe v. Internet Brands*, 824 F.3d 846, 851 (9th Cir. 2016), the Platforms take the view that CDA immunity follows whenever a legal duty

"affects" how an internet company "monitors" a website.

However, the Platforms read *Internet Brands* too broadly. In that case, two individuals used the defendant's website to message and lure the plaintiff to sham auditions where she was drugged and raped. *Id.* at 848. We held that, where the website provider was alleged to have known independently of the ongoing scheme beforehand, the CDA did not bar an action under state law for failure to warn. *Id.* at 854. We observed that a duty to warn would not "otherwise affect how [the defendant] publishes or monitors" user content. *Id.* at 851. Though the defendant did, in its business, act as a publisher of third-party content, the underlying legal duty at issue did not seek to hold the defendant liable as a "publisher or speaker" of third-party content. *Id.* at 853; *see* 47 U.S.C. § 230(c)(1). We therefore declined to extend CDA immunity to the defendant for the plaintiff's failure-to-warn claim. *Internet Brands*, 824 F.3d at 854.

[3] We do not read *Internet Brands* to suggest that CDA immunity attaches any time a legal duty might lead a company to respond with monitoring or other publication activities. It is not enough that third-party content is involved; *Internet Brands* rejected use of a "but-for" test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content. *Id.* at 853. We look instead to what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor third-party content. *See id.* at 851, 853.

[4] Here, the Ordinance does not require the Platforms to monitor third-party content and thus falls outside of the CDA's immunity. The Ordinance prohibits processing transactions for unregistered properties. It does not require the Platforms to review the content provided by the hosts of listings on their websites. Rather, the only monitoring that appears necessary in order to comply with the Ordinance relates to incoming requests to complete a booking transaction—content that, while *resulting from* the third-party listings, is distinct, internal, and nonpublic. As in *Internet Brands*, it is not enough that the third-party listings are a "but-for" cause of such internal monitoring. *See* 824 F.3d at 853. The text of the CDA is "clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content." *Barnes*, 570 F.3d at 1100. To

provide broad immunity "every time a website uses data initially obtained from third parties would eviscerate [the CDA]." *Barnes*, 570 F.3d at 1100 (quoting *Roommates.com*, 521 F.3d at 1171 (9th Cir. 2008) (en banc)). That is not the result that Congress intended.

Nor could a duty to cross-reference bookings against Santa Monica's property registry give rise to CDA immunity. While keeping track of the city's registry is "monitoring" third-party content in the most basic sense, such conduct cannot be fairly classified as "publication" of third-party **\*683** content. The Platforms have *no* editorial control over the registry whatsoever. As with tax regulations or criminal statutes, the Ordinance can fairly charge parties with keeping abreast of the law without running afoul of the CDA.

Second, the Platforms argue that the Ordinance "in operation and effect ... forces [them] to *remove* third-party content." Although it is clear that the Ordinance does not expressly mandate that they do so, the Platforms claim that "common sense explains" that they cannot "leave in place a website chock-full of un-bookable listings." For purposes of our review, we accept at face value the Platforms' assertion that they will choose to remove noncompliant third-party listings on their website as a consequence of the Ordinance.[3] Nonetheless, their choice to remove listings is insufficient to implicate the CDA.

On its face, the Ordinance does not proscribe, mandate, or even discuss the content of the listings that the Platforms display on their websites. *See* Santa Monica Mun. Code §§ 6.20.010–6.20.100. It requires only that transactions involve licensed properties. We acknowledge that, as the Platforms explain in Airbnb's complaint and in the briefing on appeal, removal of these listings would be the best option "from a business standpoint." But, as in *Internet Brands*, the underlying duty "could have been satisfied without changes to content posted by the website's users." *See* 824 F.3d at 851. Even assuming that removing certain listings may be the Platforms' most practical compliance option, allowing internet companies to claim CDA immunity under these circumstances would risk exempting them from most local regulations and would, as this court feared in *Roommates.com*, 521 F.3d at 1164, "create a lawless no-man's-land on the Internet." We hold that the Ordinance is not "inconsistent" with the CDA, and is therefore not expressly preempted by its terms. *See* 47 U.S.C. § 230(e)(3).

Finally, the Platforms argue that, even if the Ordinance is not expressly preempted by the CDA, the Ordinance

imposes "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See* Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372–73, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Reading the CDA expansively, they argue that the Ordinance conflicts with the CDA's goal "to preserve the vibrant and competitive free market that presently exists for the Internet ... unfettered by Federal or State regulation." *See* § 230(b)(2). We have consistently eschewed an expansive reading of the statute that would render unlawful conduct "magically ... lawful when [conducted] online," and therefore "giv[ing] online businesses an unfair advantage over their real-world counterparts." *See* Roommates.com, 521 F.3d at 1164, 1164–65 n.15. For the same reasons, while we acknowledge the Platforms' concerns about the difficulties of complying with numerous state and local regulations, the CDA does not provide internet companies with a one-size-fits-all body of law. Like their brick-and-mortar counterparts, internet companies must also comply with any number of local regulations concerning, for example, employment, tax, or zoning. Because the Ordinance would not pose **\*684** an obstacle to Congress's aim to encourage self-monitoring of third-party content, we hold that obstacle preemption does not preclude Santa Monica from enforcing the Ordinance.

Fundamentally, the parties dispute how broadly to construe the CDA so as to continue serving the purposes Congress envisioned while allowing state and local governments breathing room to address the pressing issues faced by their communities. We have previously acknowledged that the CDA's immunity reaches beyond the initial state court decision that sparked its enactment. *See* Fair Hous. Council v. Roommates.com, LLC, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc) (discussing Stratton Oakmont, Inc. v. Prodigy Servs. Co., which held an internet company liable for defamation when it removed some, but not all, harmful content from its public message boards, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (unpublished)). As the Platforms correctly note, the Act's policy statements broadly promote "the vibrant and competitive free market that presently exists for the Internet ... unfettered by Federal or State regulation." *See* 47 U.S.C. § 230(b)(2). "[A] law's scope often differs from its genesis," and we have repeatedly held the scope of immunity to reach beyond defamation cases. *See* Barnes, 570 F.3d at 1101 (quoting Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 671 (7th Cir. 2008), *as amended* (May 2, 2008)) (citing cases applying immunity for causes of action including discrimination, fraud, and negligence).

At the same time, our cases have hewn closely to the statutory language of the CDA and have limited the expansion of its immunity beyond the protection Congress envisioned. As we have observed, "the [relevant] section is titled 'Protection for "good Samaritan" blocking and screening of offensive material.' " Roommates.com, 521 F.3d at 1163–64 (quoting 47 U.S.C. § 230(c)); *see also* Internet Brands, 824 F.3d at 852. Congress intended to "spare interactive computer services [the] grim choice" between voluntarily filtering content and being subject to liability on the one hand, and "ignoring all problematic posts altogether [to] escape liability." Roommates.com, 521 F.3d at 1163–64. In contrast, the Platforms face no liability for the content of the bookings; rather, any liability arises only from unlicensed bookings. We do not discount the Platforms' concerns about the administrative burdens of state and local regulations, but we nonetheless disagree that § 230(c)(1) of the CDA may be read as broadly as they advocate, or that we may ourselves expand its provisions beyond what Congress initially intended.

In sum, neither express preemption nor obstacle preemption apply to the Ordinance. We therefore affirm the district court's dismissal for failure to state a claim under the CDA.

## II. First Amendment

The Platforms also contend that the district court erred in dismissing their First Amendment claims. They argue that, even if the plain language of the Ordinance only reaches "conduct," *i.e.*, booking unlicensed properties, the law effectively imposes a "content-based financial burden" on commercial speech and is thus subject to First Amendment scrutiny. The district court concluded that the Ordinance "regulates conduct, not speech, and that the conduct banned ... does not have such a 'significant expressive element' as to draw First Amendment protection." We agree.

[5]That the Ordinance regulates "conduct" is not alone dispositive. The Supreme Court has previously applied First Amendment scrutiny when " 'speech' and **\*685** 'nonspeech' elements are combined in the same course of conduct." *See* United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). But "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on

HomeAway.com, Inc. v. City of Santa Monica, 918 F.3d 676 (2019)

19 Cal. Daily Op. Serv. 2271, 2019 Daily Journal D.A.R. 2064

nonexpressive conduct." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011). While the former is entitled to protection, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.*

[6] [7]To determine whether the First Amendment applies, we must first ask the "threshold question [of] whether conduct with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect of 'singling out those engaged in expressive activity.' " *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) ). A court may consider the "inevitable effect of a statute on its face," as well as a statute's "stated purpose." *Sorrell*, 564 U.S. at 565, 131 S.Ct. 2653. However, absent narrow circumstances, a court may not conduct an inquiry into legislative purpose or motive beyond what is stated within the statute itself. *See O'Brien*, 391 U.S. at 383 n.30, 88 S.Ct. 1673. Because the conduct at issue—completing booking transactions for unlawful rentals—consists only of nonspeech, nonexpressive conduct, we hold that the Ordinance does not implicate the First Amendment.

First, the prohibitions here did not target conduct with "a significant expressive element." *See Arcara*, 478 U.S. at 706, 106 S.Ct. 3172. Our decision in *International Franchise Ass'n* is analogous. There, the plaintiff challenged a minimum wage ordinance that would have accelerated the raising of the minimum wage to $ 15 per hour for franchise owners and other large employers. 803 F.3d at 389. In denying a preliminary injunction, the district court held that the plaintiffs were not likely to succeed on their First Amendment argument that the ordinance treated them differently based on their "speech and association" decisions to operate within a franchise relationship framework. *Id.* at 408–09. We agreed, concluding that the "business agreement or business dealings" were not conduct with a "significant expressive element." *Id.* at 408. Instead, "Seattle's minimum wage ordinance [was] plainly an economic regulation that [did] not target speech or expressive conduct." *Id.*

Similarly, here, the Ordinance is plainly a housing and rental regulation. The "inevitable effect of the [Ordinance] on its face" is to regulate nonexpressive conduct—namely, booking transactions. *Sorrell*, 564 U.S. at 565, 131 S.Ct. 2653. As in *International Franchise Ass'n*, the "business agreement or business dealings" associated with processing a booking is not conduct with a "significant expressive element." *See* 803 F.3d at 408 (citation and quotation marks omitted). Contrary to the Platforms' claim, the Ordinance does not "require" that they monitor or screen advertisements. It instead leaves them to decide how best to comply with the prohibition on booking unlawful transactions.

Nor can the Platforms rely on the Ordinance's "stated purpose" to argue that it intends to regulate speech. The Ordinance itself makes clear that the City's "central and significant goal ... is preservation of its housing stock and preserving the quality and nature of residential neighborhoods." As such, with respect to the Platforms, the only inevitable effect, and the stated purpose, of the Ordinance is to prohibit **\*686** them from completing booking transactions for unlawful rentals.

As for the second prong of our inquiry, whether the Ordinance has the effect of "singling out those engaged in expressive activity," *Arcara*, 478 U.S. at 706–07, 106 S.Ct. 3172, we conclude that it does not. As the Platforms point out, websites like Craigslist "advertise the very same properties," but do not process transactions. Unlike the Platforms, those websites would not be subject to the Ordinance, underscoring that the Ordinance does not target websites that post listings, but rather companies that engage in unlawful booking transactions.

[8]Moreover, the incidental impacts on speech cited by the Platforms raise minimal concerns. The Platforms argue that the Ordinance chills commercial speech, namely, advertisements for third-party rentals. But even accepting that the Platforms will need to engage in efforts to validate transactions before completing them, incidental burdens like these are not always sufficient to trigger First Amendment scrutiny. *See Int'l Franchise Ass'n*, 803 F.3d at 408 ("[S]ubjecting every incidental impact on speech to First Amendment scrutiny 'would lead to the absurd result that any government action that had some conceivable speech inhibiting consequences ... would require analysis under the First Amendment.' " (quoting *Arcara*, 478 U.S. at 708, 106 S.Ct. 3172 (O'Connor, J., concurring))). Furthermore, to the extent that the speech chilled advertises unlawful rentals, "[a]ny First Amendment interest ... is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973).

Finally, because the Ordinance does not implicate speech protected by the First Amendment, we similarly reject the Platforms' argument that the Ordinance is unconstitutional without a scienter requirement. In most cases, there is no "closed definition" on when a criminal statute must contain a scienter requirement. *See Morissette v. United States*, 342 U.S. 246, 260, 72 S.Ct. 240, 96 L.Ed. 288 (1952). However, the Supreme Court has drawn a bright line in certain contexts, such as holding that the First Amendment requires statutes imposing criminal liability for obscenity or child pornography to contain a scienter requirement. *See New York v. Ferber*, 458 U.S. 747, 765, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Such a requirement prevents "a severe limitation on the public's access to constitutionally protected matter" as would result from inflexible laws criminalizing "bookshops and periodical stands." *Smith v. California*, 361 U.S. 147, 153, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

[9]Here, even assuming that the Ordinance would lead the Platforms to voluntarily remove some advertisements for lawful rentals, there would not be a "severe limitation on the public's access" to lawful advertisements, especially considering the existence of alternative channels like Craigslist. *Id.* Such an incidental burden is far from "a substantial restriction on the freedom of speech" that would necessitate a scienter requirement. *Id.* at 150, 80 S.Ct. 215. Otherwise, "[t]here is no specific constitutional inhibition against making the distributors of good[s] the strictest censors of their merchandise." *Id.*

at 152, 80 S.Ct. 215.

### III. Remaining Claims

On appeal, the Platforms do not challenge dismissal of their other federal law claims "in light of the district court's interpretation of the Ordinance as only requiring **\*687** disclosure of information pursuant to requests that comply with the Fourth Amendment and Stored Communications Act." Similarly, the parties specified that they would "not challenge the district court's decision to decline supplemental jurisdiction if all the Platforms' federal claims were properly dismissed." Accordingly, we need not consider the remaining claims.

\* \* \*

Because the district court properly dismissed the Platforms' complaints for failure to state a claim, we dismiss as moot the appeals from the denial of preliminary injunctive relief.

**AFFIRMED in part, DISMISSED in part.**

### All Citations

918 F.3d 676, 19 Cal. Daily Op. Serv. 2271, 2019 Daily Journal D.A.R. 2064

### Footnotes

\*      The Honorable Michael H. Simon, United States District Judge for the District of Oregon, sitting by designation.

1      The Platforms do not own, lease, or manage any of the properties listed on their websites, nor are they parties to the rental agreements. Instead, the content provided alongside the listings—such as description, price, and availability—are provided by the hosts. For their services, the Platforms collect a fee from each successful booking.

2      The Platforms do not appeal the district court's dismissal of other federal claims brought under the Fourth Amendment and the Stored Communications Act. Similarly, they do not challenge the court's decision not to exercise supplemental jurisdiction over the state-law claims under the California Coastal Act if we affirm the dismissal of their federal claims. Because we affirm the district court's dismissal, we need not consider the state-law claims. We deny Santa Monica's motion for judicial notice of its prior enforcement actions because the dispute as to its prior actions relates only to the state-law claims.

3      The Platforms argued below that the district court must accept as true their allegation that they would "have to" monitor and screen listings. As a matter of law, the Ordinance does not require them to do so. Courts are "not

**HomeAway.com, Inc. v. City of Santa Monica, 918 F.3d 676 (2019)**

19 Cal. Daily Op. Serv. 2271, 2019 Daily Journal D.A.R. 2064

bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ).

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT B

KeyCite Yellow Flag - Negative Treatment

Distinguished by International Outdoor, Inc. v. City of Troy, Michigan, 6th Cir.(Mich.), September 4, 2020

949 F.3d 116
United States Court of Appeals, Third Circuit.

GREATER PHILADELPHIA CHAMBER OF COMMERCE, Individually and on behalf of its members, Appellant in No. 18-2176
v.
CITY OF PHILADELPHIA; Philadelphia Commission on Human Relations, Appellants in No. 18-2175

Nos. 18-2175 & 18-2176
|
Argued on March 15, 2019
|
(Opinion filed: February 6, 2020)

**Synopsis**

**Background:** Local organization of businesses brought action alleging that city ordinance prohibiting employers from inquiring about prospective employee's wage history and from relying on wage history to determine salary violated employers' First Amendment free speech rights. The United States District Court for the Eastern District of Pennsylvania, Mitchell S. Goldberg, J., 319 F.Supp.3d 773, granted in part organization's motion for preliminary injunction. Parties filed cross-appeals.

**Holdings:** The Court of Appeals, McKee, Circuit Judge, held that:

[1] provision of ordinance making it illegal for employers to rely on prospective employee's wage history in determining wages did not regulate speech;

[2] provision of ordinance prohibiting employers from asking job applicants about their wage history regulated commercial speech;

[3] speech at issue in inquiry provision did not concern unlawful activity;

[4] inquiry provision sufficiently advanced city's substantial interest in mitigating racial and gender-based pay gap to comply with First Amendment; and

[5] inquiry provision was sufficiently narrowly tailored to comply with First Amendment.

Affirmed in part, vacated in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

West Headnotes (24)

**[1]    Injunction** ⟜ Extraordinary or unusual nature of remedy

Preliminary injunction is extraordinary remedy, which should be granted only in limited circumstances.

12 Cases that cite this headnote

**[2]    Injunction** ⟜ Grounds in general; multiple factors

To get preliminary injunction, moving party must establish: (1) likelihood that it will prevail on merits at final hearing; (2) extent to which it is being irreparably harmed by conduct complained of; (3) extent to which non-movant will suffer irreparable harm if preliminary injunction is issued; and (4) that public interest weighs in favor of granting injunction.

18 Cases that cite this headnote

**[3]    Civil Rights** ⟜ Preliminary Injunction

On motion for preliminary injunction in First Amendment cases, government bears burden of proving that law is constitutional; thus, plaintiff must be deemed likely to prevail if government fails to show law's constitutionality. U.S. Const.

Greater Philadelphia Chamber of Commerce v. City of Philadelphia, 949 F.3d 116 (2020)

170 Lab.Cas. P 62,023

Amend. 1.

2 Cases that cite this headnote

**[4]    Injunction**—Presumptions and burden of proof

Burdens at preliminary injunction stage track burdens at trial.

1 Cases that cite this headnote

**[5]    Civil Rights**—Preliminary Injunction

To obtain preliminary injunction in First Amendment free speech case, moving party must first make colorable claim that law restricts some form of speech, and government must then justify its restriction on speech under whatever level of scrutiny is appropriate—intermediate or strict—given restriction in question, and if government succeeds in showing constitutionality, then motion for preliminary injunction fails because there is no likelihood of success on merits, but if government cannot establish that law is constitutional, challenger must still demonstrate irreparable harm, though that is generally presumed where moving party's freedom of speech right is being infringed. U.S. Const. Amend. 1.

5 Cases that cite this headnote

**[6]    Federal Courts**—Preliminary injunction; temporary restraining order

Court of Appeals reviews grant or denial of preliminary injunction for abuse of discretion, error of law, or clear mistake in consideration of proof.

3 Cases that cite this headnote

**[7]    Federal Courts**—Preliminary injunction; temporary restraining order

In evaluating grant or denial of preliminary injunction, Court of Appeals reviews de novo lower court's conclusions of law, but reviews its findings of fact for clear error.

2 Cases that cite this headnote

**[8]    Constitutional Law**—Labor and Employment in General
**Labor and Employment**—Other particular issues

Provision of city ordinance making it illegal for employers to rely on prospective employee's wage history from any current or former employer in determining wages for such individual at any stage in employment process, including negotiation or drafting of any employment contract, did not regulate speech, and thus was not subject to First Amendment scrutiny; only activity regulated by provision was act of relying on wage history to set salary, and any speech component of negotiation process was left intact. U.S. Const. Amend. 1.

**[9]    Constitutional Law**—Labor and Employment in General

Provision of city ordinance prohibiting employers from asking job applicants about their wage history regulated commercial speech for First Amendment purposes, and thus intermediate scrutiny under *Central Hudson* was appropriate level of review; provision pertained only to communications between employer and prospective employee, implicated no interests beyond contract of employment, and did not focus on any particular viewpoint or favor any particular employer or job. U.S. Const. Amend. 1.

Greater Philadelphia Chamber of Commerce v. City of Philadelphia, 949 F.3d 116 (2020)

170 Lab.Cas. P 62,023

**[10]** **Constitutional Law**—What is "commercial speech"
**Constitutional Law**—Advertising

In deciding whether speech is commercial for First Amendment purposes, and thus subject to intermediate scrutiny under ☐ *Central Hudson*, court should consider whether: (1) speech is advertisement; (2) speech refers to specific product or service; and (3) speaker has economic motivation for speech; affirmative answers to all three questions provide strong support for conclusion that speech is commercial, but all three characteristics need not be present for given expression to qualify as commercial speech. U.S. Const. Amend. 1.

2 Cases that cite this headnote

**[11]** **Constitutional Law**—Difference in protection given to other speech
**Constitutional Law**—Reasonableness; relationship to governmental interest

Because commercial speech is linked inextricably with commercial arrangement it proposes, state's interest in regulating underlying transaction may give it concomitant interest in expression itself, and First Amendment therefore accords lesser protection to commercial speech than to other constitutionally guaranteed expression. U.S. Const. Amend. 1.

1 Cases that cite this headnote

**[12]** **Constitutional Law**—Reasonableness; relationship to governmental interest

In deciding whether particular commercial speech regulation is permissible under First Amendment, court must determine whether: (1)

speech concerns lawful activity and is not misleading; (2) asserted governmental interest is substantial; (3) regulation directly advances governmental interest asserted; and (4) regulation is not more extensive than is necessary to serve that interest. U.S. Const. Amend. 1.

**[13]** **Constitutional Law**—Strict or exacting scrutiny; compelling interest test

Speaker-based laws demand strict scrutiny under First Amendment when they reflect government's preference for substance of what favored speakers have to say or aversion to what disfavored speakers have to say. U.S. Const. Amend. 1.

**[14]** **Constitutional Law**—False, untruthful, deceptive, or misleading speech
**Constitutional Law**—Unlawful speech or activities

Under ☐ *Central Hudson*, commercial speech at least must concern lawful activity and not be misleading to qualify for protection under First Amendment. U.S. Const. Amend. 1.

**[15]** **Constitutional Law**—Strict or exacting scrutiny; compelling interest test

To uphold regulation restricting speech under strict scrutiny standard of review under First Amendment, government must show that regulation is necessary to serve compelling state interest, and that regulation is least restrictive means of achieving that interest. U.S. Const. Amend. 1.

1 Cases that cite this headnote

**[16]    Constitutional Law**🔑Labor and Employment in General
**Labor and Employment**🔑Other particular issues

Commercial speech at issue in provision of city ordinance prohibiting employers from asking job applicants about their wage history did not concern unlawful activity, for purposes of determining whether provision violated employers' First Amendment rights, even if wage history could be relied upon in fashioning salary that had effect of discriminating against women and minorities. U.S. Const. Amend. 1.

**[17]    Constitutional Law**🔑Reasonableness; relationship to governmental interest

To demonstrate that regulation of commercial speech directly advances government's interest in direct and material way, as required to comply with First Amendment, government must show that harms it recites are real and that its restriction will in fact alleviate each of them to material degree; speculation or conjecture cannot satisfy this burden. U.S. Const. Amend. 1.

**[18]    Constitutional Law**🔑Reasonableness; relationship to governmental interest

In deciding whether regulation of commercial speech directly advances government's interest in direct and material way, as required by First Amendment, court's inquiry is not license to reweigh evidence de novo, or to replace legislators' factual predictions with its own; rather, court's task is merely to determine whether legislature has drawn reasonable inferences based on substantial evidence. U.S. Const. Amend. 1.

**[19]    Constitutional Law**🔑Labor and Employment in General
**Labor and Employment**🔑Other particular issues

Provision of city ordinance prohibiting employers from asking job applicants about their wage history sufficiently advanced city's substantial interest in mitigating racial and gender-based pay gap to comply with First Amendment, even if many studies cited by city did not conclusively prove that discrimination was sole cause of wage gap; record before city council contained substantial evidence that wage gap was substantial and real, that wage gap was most likely result of discrimination, that existing civil rights laws had been inadequate to close wage gap, and that relying on wage history could perpetuate gender and race discrimination. U.S. Const. Amend. 1.

1 Cases that cite this headnote

**[20]    Constitutional Law**🔑Reasonableness; relationship to governmental interest

Under 🔖 *Central Hudson*, scope of law restricting commercial speech must be in proportion to interest served. U.S. Const. Amend. 1.

**[21]    Constitutional Law**🔑Reasonableness; relationship to governmental interest

Under 🔖 *Central Hudson*, legislation restricting commercial speech must provide fit that is not necessarily perfect, but reasonable; one that represents not necessarily the single

170 Lab.Cas. P 62,023

best disposition, but proportionate one. U.S. Const. Amend. 1.

**[22]** **Constitutional Law**—Labor and Employment in General
**Labor and Employment**—Other particular issues

Provision of city ordinance prohibiting employers from asking job applicants about their wage history was sufficiently narrowly tailored to city's substantial interest in mitigating racial and gender-based pay gap to comply with First Amendment; provision only prohibited employers from inquiring about single topic, while leaving employers free to ask wide range of other questions, and did not prohibit employers from obtaining market salary information from other sources, but simply prohibited employers from inquiring about wage history at specific point in time when city determined that risk was greatest for conduct that perpetuated discrimination. U.S. Const. Amend. 1.

**[23]** **Constitutional Law**—Commercial Speech in General

📄 *Central Hudson* does not require that restriction on commercial speech redress harm completely; government may choose to regulate only part of speech that causes harm. U.S. Const. Amend. 1.

**[24]** **Constitutional Law**—Reasonableness; relationship to governmental interest

Intermediate scrutiny of restriction on commercial speech under First Amendment does not require that government adopt such

regulatory measures only as last alternative or that it demonstrate that legislation is the least restrictive response. U.S. Const. Amend. 1.

1 Cases that cite this headnote

**\*119** On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. No. 2-17-cv-01548) District Judge: Honorable Mitchell S. Goldberg

**Attorneys and Law Firms**

Benjamin H. Field, Jane L. Istvan, Nicole S. Morris, Marcel S. Pratt, Esquire (Argued), City of Philadelphia, Law Department, 1515 Arch Street, Philadelphia, PA 19102, Counsel for Appellants/Cross-Appellees

Adam R. Pulver, Scott L. Nelson, Public Citizen Litigation Group, 1600 20th Street NW, Washington, DC 20009, Counsel for Amicus Public Citizen Inc.

Maura Healey, Elizabeth N. Dewar, Genevieve Nadeau, Erin K. Staab, Office of Attorney General Massachusetts, One Ashburton Place, McCormack Building, Boston, MA 02108, Counsel for Amicus Commonwealth of Massachusetts; District of Columbia; Commonwealth of Puerto Rico; Commonwealth of Virginia; State of Connecticut; State of Delaware; State of Illinois; State of New Jersey; State of New Jersey; State of New York; State of Vermont; State of Washington

Zachary W. Carter, Richard Dearing, Devin Slack, Eric Lee, Jamison Davies, New York City Law Department, Room 6-178, 100 Church Street, New York, NY 10007, Counsel for Amicus City of New York; City of Berkeley; City of Columbus; City of Oakland; County of Santa Clara; City and County of San Francisco; City of Seattle; City of South Bend

Terry L. Fromson, Amal Bass, Women's Law Project, 125 South 9th Street, Suite 300, Philadelphia, PA 19107, Counsel for Amicus Womens Law Project; 36 Organizations Dedicated to Gender Wage Equity

Richard A. Samp, Cory L. Andrews, Washington Legal Foundation, 2009 Massachusetts Avenue, N.W., Washington, DC 20036, Counsel for Amicus Washington Legal Foundation

Kellam M. Conover, Miguel A. Estrada (Argued), Amir C. Tayrani, Gibson, Dunn & Crutcher LLP, 1050

Connecticut Avenue, N.W., Washington, D.C. 20036

Franco A. Corrado, Marc J. Sonnenfeld, Morgan, Lewis & Bockius, 1701 Market Street, Philadelphia, PA 19103

Kevin M. Siegel, Suite 201, 10000 Lincoln Drive East, Marlton, NJ 08053, Counsel for Appellee/Cross-Appellant

Michael L. Kichline, Michael H. McGinley, Dechert, 2929 Arch Street, 18th Floor, Cira Centre, Philadelphia, PA 19104, Counsel for Amicus African American Chambers of Commerce of Pennsylvania., New Jersey and Delaware

Robert L. Byer, John E. Moriarty, Robert M. Palumbos, Andrew R. Sperl, Duane Morris, 30 South 17th Street, Philadelphia, PA 19103, Counsel for Amicus Chamber of Commerce of the United States of America; National Federation of Independent Business Small Business Legal Center; Pennsylvania Chamber of Business & Industry; Pennsylvania Manufacturers Association

Before: McKEE, ROTH, and FUENTES, Circuit Judges.

OPINION OF THE COURT

McKEE, Circuit Judge

**\*120 Table of Contents**

I. BACKGROUND...121
A. The Disparity And The Ordinance...122

B. Legislative Background...123

1. Testimony Before the City Council...123

a. Barbara Price...123

b. Terry Fromson...124

c. Marianne Bellesorte...126

d. Rue Landau...127

\*121 2. Other Testimony Before the City Council...127
C. The Legal Challenge...128

1. The Madden Affidavit...128

2. Declarations Filed by Chamber Members...131
D. The District Court Opinion...132

II. DISCUSSION...133
A. The Reliance Provision...134

1. The District Court Correctly Concluded an Injunction as to the Reliance Provision Fails Because the Provision does not Implicate Speech...134

2. None of the Chamber's Arguments Call into Question the District Court's Conclusions...135
B. The Inquiry Provision...136

1. The Legal Standard...136

a. Commercial Speech...137

b. Intermediate Scrutiny Under *Central Hudson* is Appropriate...137

c. Strict Scrutiny is Inappropriate Here...138

2. The Inquiry Provision Satisfies *Central Hudson* Intermediate Scrutiny...140

a. The Speech at Issue is not "Related to Illegal Activity"...141

b. The City has a Substantial Interest in Closing the Wage Gap...142

c. The Inquiry Provision Directly Advances the City's Interest in Pay Equity...142

i. Caselaw Considering Whether a Legislature Relied on Substantial Evidence to Support a Speech Restriction Under Central Hudson Demonstrates that the City Presented Sufficient Evidence to Support the Ordinance...144

ii. The Evidence Here is Stronger Than the Evidence Supporting the Restrictions in Florida Bar and King...150

d. The Inquiry Provision is not More Extensive than

Necessary...154

## III. CONCLUSION...157
This appeal requires us to decide whether a Philadelphia Ordinance that prohibits employers from inquiring into a prospective employee's wage history in setting or negotiating that employee's wage violates the First Amendment. The district court held the Ordinance unconstitutional insofar as it prohibits that inquiry. However, the court upheld the provision of the Ordinance that prohibits reliance on wage history based on the court's conclusion that such reliance did not implicate protected speech.

For the reasons that below, we affirm the court's order insofar as it upholds the Reliance Provision but reverse it insofar as it strikes down the Inquiry Provision.

## I. BACKGROUND
In 2017, the City of Philadelphia enacted an ordinance to address the disparity in the pay of women and minorities that is often called the "pay gap." The Ordinance contains two provisions: the "Inquiry Provision," which prohibits an employer from asking about a prospective employee's wage history, and the "Reliance Provision," which prohibits an employer from relying on wage history at any point in the process of setting or negotiating a prospective employee's wage. The Greater Philadelphia Chamber of Commerce filed this suit, individually and on behalf of some of its members, alleging that both provisions of the Ordinance infringe on the freedom of speech of the Chamber and its members.

The Chamber concedes that the pay gap exists, and that the City has a substantial **\*122** governmental interest in addressing it. However, the Chamber argues that the City passed the Ordinance "with only the barest of legislative records" and, therefore, did not present sufficient evidence to establish that the Ordinance would satisfy the City's objective.[1]

Accordingly, the Chamber claims that the Ordinance cannot survive its First Amendment challenge under either strict or intermediate scrutiny.

The district court agreed that the Inquiry Provision violated the First Amendment speech rights of employers and invalidated that part of the Ordinance. But the court concluded that the Reliance Provision withstood the Chamber's First Amendment challenge because it did not impact speech.

As we explain below, we conclude that the district court erred in holding that the Inquiry Provision was unconstitutional. We believe the court's analysis of that provision applied a much higher standard than required. The Supreme Court has not demanded that the enacting authority achieve legislative certainty or produce empirical proof that the adopted legislation would achieve the stated interest even when applying strict scrutiny. Rather, the appropriate inquiry requires courts to determine whether the legislature "has drawn reasonable inferences based on substantial evidence."[2] The Supreme Court has even "permitted litigants to justify [analogous] speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'"[3] In short, the Supreme Court has upheld similar restrictions based on much less evidence than the City presented here.

## A. The Disparity And The Ordinance
According to the 2015 census, women in Pennsylvania earned 79 cents for every dollar earned by similarly situated men.[4] For women of color, the wage gap is even more profound. Black women earn 68 cents for every dollar paid to similarly situated men, and Latina women earn 56 cents for every dollar paid to similarly situated men.[5] The gap begins for women as soon as they enter the workforce. In just the first year after college, full-time working women earn, on average, just 82% of what their male peers earn.[6] Overall, women under the age of 35 earn 88-91% of **\*123** what their male peers earn.[7] Rather than improve, as women gain experience in the work force the situation gets worse. Women aged 35 and over earn only 77-81% of what male peers earn.[8]

In response to this persistent wage disparity, the City of Philadelphia enacted the Ordinance at the center of this dispute. The Ordinance states:

> It is an unlawful employment practice for an employer ...
>
> (i) To inquire about a prospective employee's wage history, require disclosure of wage history, or condition employment or consideration for an interview or employment on disclosure of wage history, or retaliate against a prospective employee for failing to comply with any wage history inquiry.

(ii) To rely on the wage history of a prospective employee from any current or former employer of the individual in determining the wages for such individual at any stage in the employment process, including the negotiation or drafting of any employment contract, unless such applicant knowingly and willingly disclosed his or her wage history to the employer, employment agency, employee or agent thereof.

(c) For purposes of this Section 9-1131, "to inquire" shall mean to ask a job applicant in writing or otherwise. ...[9]

Employers who violate the Ordinance are subject to civil and criminal penalties, including compensatory damages, up to $2,000 in punitive damages per violation, and an additional $2,000 and 90 days' incarceration for a repeat offense.[10]

## B. Legislative Background

The City seeks to justify the Ordinance by relying on the testimony of witnesses who testified before the City Council prior to the enactment of the Ordinance and an affidavit by Dr. Janice Madden that the City submitted to the district court in response to the Chamber's constitutional challenge. Dr. Madden reviewed thousands of peer-reviewed research studies and concluded, among other things, that "there is wage discrimination in the labor market, suppressing the prior wages of women and minorities" and this "is consistent with the findings of thousands of research studies."[11] She concluded that "these scholarly studies show ... that significant and substantial wage differentials by race and gender, *which are not explained by credentials or qualification*, persist."[12] The Chamber presented no evidence challenging any of Dr. Madden's conclusions or the studies those conclusions were based on.

### 1. Testimony Before the City Council

#### a. Barbara Price

Barbara Price, the Public Policy Chair of the American Association of University Women, testified before the Council and submitted written testimony. She reiterated that "the [wage] gap still exists today at 80 cents nationally and 79 cents for Pennsylvania, which ranks [Pennsylvania] 27th as a state in the country."[13] She

confirmed **124** that "[t]he gap remains consistent across age groups, levels of education, and for full-time workers across a number of occupations."[14] She discussed research that showed, after accounting for choice of occupation, hours worked, economic sector, experience, grade point average, undergraduate institution, marital status and other factors, a significant gap between the earnings of men and women remained—beginning one year after graduation and widening in the years thereafter.[15] For example, in Philadelphia, "[t]he single most common occupation for Latinas is that of maids, housekeepers, janitors or building cleaners where they make up 22 percent of the people employed in those jobs."[16] However, "Latinas who work full time in these occupations, year round, are paid just 58 cents for every dollar paid to White, non-Hispanic men in the same occupations."[17] She testified that the pay gap "costs a typical woman in Pennsylvania about $918,120 over the course of her career."[18]

#### b. Terry Fromson

Terry L. Fromson, the Managing Attorney for the Women's Law Project, testified before the City Council that the practice of obtaining and using wage history to set pay is one contributor to the pay gap.[19] She told the City Council that "a sizable wage gap exists between men and women in Pennsylvania, one that is substantially larger for women of color."[20] She testified that unequal pay "has persisted despite the existence of equal pay laws banning sex discrimination [in] wages for five decades."[21]

She explained that discrepancy in pay continues, in part, because current laws targeting discrimination, such as "the Equal Pay Act[,] specifically[ ] allow[ ] employers to justify paying women less than men based on what is described as a factor other than sex."[22] Ms. Fromson explained that "many courts have interpreted prior wages as a factor other than sex, when in fact, it is typically not. It is not gender neutral."[23] She elaborated, "[a] woman's prior pay may very well be based on a sex discriminatory assessment of her worth. It reflects historical market forces based on sex stereotypes and assumptions about the value of the equal work of one sex over the other."[24]

Fromson also gave a detailed explanation of how wage history perpetuates and institutionalizes wage discrimination. "Wage policies challenged in recent years **125** show how this happens."[25] One's initial salary at a given employer is based in part upon the salary of the employee's most recent job. "The wage gap data tells us that the woman's salary is most likely less than the man

*who is equally situated to her.*"[26] Subsequent pay is then based on that starting salary "plus an increment that would be applied equally to the men and the women. ... [E]very time a salary increase happens, an equal percentage of prior pay is applied. And so, women ... remain paid less than men."[27] In other words, the initial discrepancy in pay is baked into all future pay increases, even in workplaces in which pay is increased at the same percentage for similarly situated men and women.

Fromson told the Council: "[b]y specifically outlawing the practice of relying on prior wages to set a new employee's pay, this [O]rdinance will provide clarity that will relieve women of having to gamble on whether a court will properly interpret this practice as unlawful" discrimination.[28] It will therefore help ensure that wage growth and wage decisions are based on qualifications and job requirements "rather than a factor that likely reflects longstanding gender-based wage disparities in the labor market."[29] She also noted that the EEOC recognizes prior salaries of job candidates can reflect sex-based compensation discrimination.[30]

Fromson informed the Council that Massachusetts had approved a similar ban on inquiries into wage history and New York City had adopted an executive order to that effect insofar as public employees were concerned.[31] She added that similar legislation was then pending in several jurisdictions including New Jersey, the District of Columbia, and New York City (to expand to all employers in the city and not just municipal employers).[32]

Fromson also suggested that the Council consider adding two clarifications to the proposed Ordinance based on provisions in the Massachusetts law and New York City executive order. The first provision would have prohibited employers from seeking an employee's wage history from current or former employees. She noted that "while [the Ordinance] prohibits an employer from asking a job applicant for wage history, it does not bar inquiries directly to current and former employers." **126** [33] The second suggested change was to allow reliance on wage history after an offer of employment and compensation had been made.[34] She explained that without the second change, the proposed legislation allowed employers to consider wage history if the employee volunteered it before an offer was made.[35] Fromson suggested that this "place[d] applicants in an untenable position of having to choose between protecting what is biased information that may adversely affect their future wages or [ ] risk being denied a job."[36] In her opinion, that was "an inherently coercive situation for someone to be in."[37]

Ultimately, these added provisions were not incorporated into the Ordinance. Councilman William Greenlee,

Chairman of the Committee of Law and Government, noted that, in declining to include these added provisions, the Philadelphia Ordinance did not go as far as other proposed wage history bans around the country. He told the committee, "the Massachusetts law goes a little wider than we do. We're trying to keep it real basic[;] ... you'll hear from a witness that thinks we don't make it strong enough, but we're trying to find that great balance that we always try to in legislation. ..."[38] We are trying "at this point [to] limit it to stopping the employer from asking, directly asking, the prospective employee what they make."[39] He also noted "for the record, as far as the Chamber of Commerce goes, the Boston Chamber of Commerce supported the Massachusetts law. ... [T]hey obviously did not believe it was that injurious to businesses."[40]

### c. Marianne Bellesorte

Marianne Bellesorte, Vice President of Advocacy at Pathways PA,[41] analyzed wage gap data and concluded that the wage gap for women and men of color "are compounded" when these individuals are asked to share their wage history.[42] She told the Council "[o]ne step in addressing wage inequality is ensuring that a history of low salaries does not follow women into a new workplace."[43] She emphasized that "the wage gap is not just about women. It is also about people of color, men and women."[44] She explained how wage inquiries perpetuate discrimination for women and minorities: "Inequitable wages start right out of college, and they're compounded when women and [minorities] apply for new jobs and are asked to share their pay history. Instead of starting their job on an equal footing, they enter with a lower salary because it was based on previous employment."[45] She continued: "Not surprisingly as women get older, the wage gap continues to grow and continues to affect women in retirement."[46] Bellesorte also explained: **127** "By preventing potential employers [from] asking for salary history, Philadelphia's workers gain the ability to earn what their work is actually worth. A woman who starts her career at the low end of a salary range will not be held to that standard for the rest of her work life."[47]

### d. Rue Landau

Rue Landau, the Executive Director of the Philadelphia Commission on Human Relations, told the committee

that, "as the agency charged with enforcing the Fair Practices Ordinance ... the PCHR understand[s] that the wage gap is real."[48] According to Ms. Landau, "women working in Pennsylvania are paid only 79 cents for every dollar a man earns.[49] In real numbers, median annual earnings in Pennsylvania are $51,212 for a man and $40,742 for a woman."[50] She testified "the practice of asking about an applicant's wage history during the hiring process can perpetuate wage inequality, low wages, and poverty. ... [A] jobseeker who has suffered from the wage gap can only be harmed when required to disclose her salary history."[51] She concluded "the PCHR strongly believes[ ] that taking out any obstacles that employers could use ... to discriminate is a very important thing to do. This is one of these barriers."[52]

### 2. Other Testimony Before City Council

The Chamber did not present any witnesses in opposition to the Ordinance, but it did submit written testimony from Rob Wonderling, President and CEO of the Chamber. He wrote that the Ordinance "goes too far in dictating how employers can interact with potential hires."[53] Rather surprisingly, he submitted that employers use wage history to "have a better understanding of whether a candidate is worth pursuing based on previous compensation levels as well as the market value or salaries for comparable positions."[54] That of course is exactly why the City Council was considering the Ordinance. It was trying to cut the Gordian knot that continues to tie past discriminatory wages to future job opportunities and wages so that employers would not decide if a given employee was "worth pursuing based on previous compensation levels." Wonderling also asserted that "[i]n speaking with our members ... we hear that compensation decisions are based on a number of different factors such as market value, internal equity, funding limitations and competition. It is not made based on a candidate's past salary history, gender or race."[55] As discussed below, however, this claim was contradicted by the Chamber members' own submissions to the district court in which they confirmed that they use wage history to **128** set wages.[56]

The Chamber offered no testimony to refute the existence of the wage gap, the role of discrimination in the wage gap, or the conclusion that prohibiting inquiry into one's wage history could help mitigate the wage gap. Based on this record, on December 8, 2016, after weighing the testimony and submissions, the City Council unanimously passed the Ordinance.[57]

### C. The Legal Challenge

In April 2017, the Chamber filed a Complaint and Motion for Preliminary Injunction alleging the Ordinance violated the First Amendment.[58] The district court dismissed the original complaint for lack of standing. The Chamber addressed that deficiency in a subsequently filed Amended Complaint and refiled Motion for a Preliminary Injunction.[59]

The City responded to the Amended Complaint by submitting the affidavit of Dr. Janice Madden.[60]

### 1. The Madden Affidavit

The City retained Dr. Madden, a highly respected labor economist, to summarize the research in each of the following areas: (1) the extent to which salaries of qualified job applicants have historically differed by race or gender; (2) the effect of starting salaries on the overall salary differentials of comparable qualified employees by race or gender–information that can be provided by an applicant's salary history; and (3) whether there are "alternative sources of such information" to support the need for, and potential effectiveness of, the Ordinance. Her affidavit corroborated the testimony of the witnesses who had testified before the City Council.[61]

She concluded in her affidavit that "there is wage discrimination in the labor market[ ] suppressing the prior wages of women and minorities" and that this "is consistent with the findings of thousands of research studies."[62] Dr. Madden reviewed the research on pay differentials by **129** race and gender for workers with equivalent skills and experience. She stated that "[h]undreds, possibly thousands, of scholarly studies over the years have decomposed the overall gender and racial pay gaps into the proportion arising from gender and racial differences in experience, education, training, work hours, occupations and industries."[63] Madden concluded that "these scholarly studies show that the pay gap remains when comparing only men and women or minorities and non-minorities *with the same education, experience, training, work hours, occupations and industries.*"[64] These studies found "significant and substantial wage differentials by race and gender, which are not explained by credentials or qualification, persist."[65]

Dr. Madden reached several other conclusions based on her survey of the voluminous research supporting the need for the Ordinance, including that:

• "Labor market researchers are in general agreement that women and/or members of racial and ethnic minorities have received and currently receive lower wages than comparably qualified and performing men and/or members of majority racial and ethnic groups."[66]

• "Antidiscrimination laws, including the Civil Rights Act and the Equal Pay Act, have not eliminated the lower wages generally received by women and minority workers relative to men and majority workers of equivalent skill, ability, experience, and performance."[67]

• "Starting salaries typically differ by race and gender for workers of equivalent skills and abilities."[68]

• "The available evidence shows that when employers do not have access to salary history, they easily obtain information on past performance and skills of applicants and they select hires with this information as effectively as those using salary histories."[69]

According to Dr. Madden, denying employers information about a perspective employee's wage history does not deprive a perspective employer of information needed to make an informed employment decision, including determining an appropriate wage. Concomitantly, putting such wage history beyond the reach of new employers helps break the discriminatory chain linking an employee's new salary to past salaries and any discriminatory judgments that may have influenced those past salaries.[70] The studies cited in Dr. Madden's affidavit included comprehensive reviews of scores of other studies. For example, she cites Stanley and Jarrell who performed a meta-regression analysis of fifty-five other studies and concluded that there is a "wide consensus that gender wage discrimination exists" and the "vast empirical economic literature, containing hundreds of studies, reveals that women are 'underpaid' disproportionate to their observed skills."[71] That study focused on **130 determining the extent of the reported gaps. Dr. Madden also relied upon the research of Blau and Kahn, who found in their review of data from 1980 to 2010, "an unexplained gender wage gap in each year['s data]."[72] They explained that the "finding of such an unexplained gap is fairly standard in the literature" and is "taken as an estimate of labor market discrimination."[73]

Dr. Madden also cited Wilson and Rodgers who concluded "discrimination has consistently played a major role" in "the widening of racial wage gaps since 1979."[74] This study focused on the minority wage gap and the causes of the gap for specific minority sub-groups. It concludes, among other things: "Between the Great Recession of 2007–2009 and 2015, gaps among new-entrant women expanded more than among any other experience/gender group. The same factor that dominated prior to 2000—growing labor market discrimination—is the primary source of the erosion."[75] Additionally, "[a]mong black college graduates, growing discrimination was essentially the sole cause of the [wage] gap's expansion, far outweighing the advantages black college graduates gained as a result of being slightly older (*i.e.*, more experienced) than their white counterparts."[76]

Her distilled conclusions of these studies were that "labor market discrimination continues to contribute to the wage gap;" "discriminatory wages persist;" and the "racial wage gap [is] increasing."[77]

To eliminate the effect of variables other than race or gender such as: education, experience, training, occupation, and industry, which could explain the wage gap, Madden also cited the studies relied on by Blau and Kahn whose reviews focused on homogenous populations within the same industry. For example, they analyzed studies within a group of lawyers and MBAs that were able to control for very detailed characteristics, including, for example, grade point averages while in school.[78] "The studies of lawyers and MBAs ... find that, even if one accounts for variables related to family status, like work force interruption and fewer hours worked, unexplained gender earnings differences remain which are potentially due to discrimination."[79] Among lawyers, "men earned 11 percent more, controlling for an extensive list of worker qualifications and other factors, including grades while in law school, detailed work history data, and type and size of employer."[80] Among MBAs, "men earned nearly 7 percent more even accounting for work force interruptions, fewer hours worked, and gender differences in business school GPAs and finance courses taken."[81]

**131 Blau and Kahn also reviewed experimental studies that similarly concluded discrimination is a primary cause of the wage gap. The authors believed that experiments "provide[ ] particularly persuasive evidence of discrimination ... [because] they offer estimates of the role of discrimination that are potentially less contaminated by unmeasured factors."[82] For example, the authors describe an experimental study that not only replicated the gender wage gap in otherwise identical candidates, but also showed that starting salaries for women in the study were set far lower than the (otherwise identical) male candidates. In the experiment, employers reviewed "the application materials of (fictitious) [applicants] who[m] they were told ... applied for a science laboratory manager position."[83] Study participants "rated the male applicant as

significantly more competent and suitable for the position than the (identical) female applicant. Participants also set a starting salary for male applicants that was almost $4,000 higher than the salary offered to female applicants and offered more career mentoring to the male applicants."[84] Blau and Kahn conclude this research "strongly suggests that discrimination cannot be discounted as contributing to the persistent gender wage gap."[85]

In addition to synthesizing the conclusions reached in various studies, some of which are highlighted above, Dr. Madden's affidavit relies on her "consulting experience with a wide range of employers over forty years."[86] That experience corroborates that "gender and racial pay gaps between otherwise equivalent workers largely arise from gender and racial differences in the salary set at hire."[87]

### 2. Declarations Filed by Chamber Members

Members of the Chamber filed declarations in support of their Motion for Preliminary Injunction. Those declarations asserted that a wage history ban would harm businesses because they use wage history as a factor in making salary offers and for other purposes.[88] For example, Chamber Member Bittenbender stated that "[w]age history information is essential to salary offers in positions where [it] is unaware of the market wage."[89] Similarly, Comcast asserted it "frequently inquires" about an applicant's "previous compensation and wage history," among other things, to "understand the level of responsibility the applicant had," evaluate the value the prior employer placed on the candidate, and "determine market wage for similar positions."[90] Similarly, the Children's Hospital of Philadelphia submitted that it "relies on wage history in making a salary offer."[91] The Chamber and its members, however, presented no evidence that refuted or challenged the testimony before the City before passing the Ordinance. That evidence showed that prior wages of women and minorities is more indicative of compounded discrimination than an accurate assessment of the individual's value to their prior employer. Thus, information obtained to *132 assess the applicant's market value only perpetuates wage disparity.

### D. The District Court Opinion

As we noted at the outset, the district court granted the Chamber's motion for a preliminary injunction as to the

Inquiry Provision. The court held that it likely violated the Chamber's and its members' free speech rights. However, it found that the Reliance Provision–which prohibits relying on an applicant's wage history at any point in the process–regulated conduct rather than speech. Accordingly, the court refused to enjoin that provision.[92]

The court reasoned that the Reliance Provision, is "not subject ... to First Amendment scrutiny" because the provision "does not 'on its face, implicate the spoken or written word.' "[93] Instead, "[t]o the extent the Reliance Provision is content- or speaker-based," the court found the Reliance Provision "targets conduct and not speech."[94] Because the Chamber did not meet its burden of showing that the provision implicates speech, no First Amendment analysis was required.[95]

However, the court found that the Inquiry Provision did implicate speech and that it could not survive even the less stringent intermediate scrutiny required under the First Amendment.[96] Thus the court did not discuss the actual level of scrutiny required to withstand the Chamber's First Amendment challenge.[97] Rather, the court held that the Ordinance was unconstitutional under the less stringent standard of 📖 *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*.[98] That decision rested on the court's belief that the City had not presented substantial evidence to support a conclusion that the Inquiry Provision would help close the wage gap.[99]

The district court determined that the requirements for a preliminary injunction were met with respect to the Inquiry Provision because "the Chamber ha[d] alleged a real and actual deprivation of its and its members' First Amendment rights through declarations."[100] Accordingly, it found, "the City cannot claim a legitimate interest in enforcing an unconstitutional law" because "there is a significant public interest in upholding First Amendment principles."[101]

This appeal and cross appeal followed. The Chamber argues that the district *133 court erred in refusing to enjoin the Reliance Provision and that both provisions should have been reviewed under strict scrutiny. The City alleges the district court erred in enjoining the Inquiry Provision.

## II. DISCUSSION

[1]  [2] A preliminary injunction "is an extraordinary

remedy, which should be granted only in limited circumstances."[102] As the district court explained, the moving party must establish four factors to get a preliminary injunction:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) [that] the public interest [weighs in favor of granting the injunction].[103]

Generally, the moving party must establish the first two factors and only if these "gateway factors" are established does the district court consider the remaining two factors.[104] The court then determines "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."[105]

[3] [4]In First Amendment cases the initial burden is flipped. The government bears the burden of proving that the law is constitutional; thus, the plaintiff "must be deemed likely to prevail" if the government fails to show the constitutionality of the law.[106] This is because " 'the burdens at the preliminary injunction stage track the burdens at trial,' " and the burden of proving the constitutionality of a law rests with the government.[107]

[5]Therefore, in First Amendment cases, the moving party must first "mak[e] a colorable claim" that the law restricts some form of speech.[108] The government must then "justify its restriction on speech under whatever level of scrutiny is appropriate (intermediate or strict) given the restriction in question."[109] If the government succeeds in showing constitutionality, "then the motion for a preliminary injunction fails because there is no likelihood of success on the merits."[110] If the government cannot establish that the law is constitutional, the challenger must still demonstrate irreparable harm, though that is generally presumed where the moving party's freedom of speech right is being infringed.[111]

[6] [7]We review the grant or denial of a preliminary injunction for "an abuse of **134** discretion, an error of law, or a clear mistake in the consideration of proof."[112] We review de novo the lower court's conclusions of law but review its findings of fact for clear error.[113]

## A. The Reliance Provision

### 1. The District Court Correctly Concluded that an Injunction as to the Reliance Provision Fails Because the Provision Does Not Implicate Speech

[8]As explained above, the Reliance Provision makes it illegal for employers to "rely on the wage history of a prospective employee from any current or former employer of the individual in determining the wages for such individual at any stage in the employment process, including the negotiation or drafting of any employment contract."[114] The district court correctly concluded that this provision does not regulate speech. Accordingly, the court did not need to conduct a First Amendment analysis. As the court explained, the Reliance Provision does not "on its face, implicate the spoken or written word."[115] In arguing to the contrary, the Chamber claimed that the "Provision restricts [the] ability to communicate and/or convey a message."[116] The court found that here, unlike the situation in *Wollschlaeger v. Governor of Florida*[117] and *Holder v. Humanitarian Law Project*,[118] the conduct that the Reliance Provision regulates "is not executed through speech."[119]

In *Wollschlaeger*, certain provisions of the Florida Firearms Owners' Privacy Act (FOPA), prohibited medical professionals from, among other things, entering information about a patient's gun ownership into medical records, or inquiring about gun ownership, and discriminating against a gun owner, unless the action was relevant to the patient's care. In explaining why the case was not helpful, the district court correctly distinguished the "more specific actions" of "physical entry... into a patient log, making a written inquiry[ ] [and] asking a question" which "implicate[ ] speech on their face" from prohibiting reliance in the Ordinance.[120] The district court also explained that not all of the provisions in *Wollschlaeger* were subject to First Amendment scrutiny. Like the Reliance Provision here, the *Wollschlaeger* court had concluded that the anti-discrimination provision of the FOPA did not "on its face, implicate the spoken or written word," and therefore scrutiny under the First Amendment was not appropriate.[121]

The statute at issue in *Humanitarian Law Project* banned providing "material support" to terrorist organizations.[122] The Supreme Court found that the statute did implicate speech because it prohibited legal training and advice, which was support **135** given "in the form of speech."[123] In rejecting the Chamber's challenge to the

Reliance Provision, the district court correctly concluded that "[h]ere, unlike in [ *Humanitarian Law Project*], the conduct is not executed through speech. Reliance on wage history does not demand speech the way that providing legal advice necessarily does."[124]

### 2. None of the Chamber's Arguments Call into Question the District Court's Conclusion

The Chamber does not present any arguments before us that seriously challenge the district court's reasoning or analysis of the Reliance Provision. The district court's discussion of that provision is thorough, accurate, and persuasive. As the district court explained, the Reliance Provision does not restrain any expressive message.

The Chamber argues that in "formulating a proposed salary," a prospective employer is "communicating a message about how much that applicant's labor is worth to the employer."[125] But the Reliance Provision does not restrict an employer from communicating an applicant's worth. An employer may still discuss an applicant's value based on his or her qualifications and abilities. The Ordinance simply attempts to prevent the employer from unknowingly incorporating past wage discrimination into the terms of an applicant's job offer. The employer remains free to communicate its own valuation of the employee by making as many offers at whatever salary it deems appropriate. The Ordinance merely attempts to ensure that any such offers are not unwittingly tethered to past discriminatory wage discrepancies.

The Chamber also argues that because the Reliance Provision is "triggered" during the negotiation of a contract, it necessarily implicates speech.[126] Consequently, the Chamber cites *Valle Del Sol Inc. v. Whiting*,[127] and *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,[128] for the well settled proposition that negotiating the terms of an employment arrangement–either orally or in writing–is speech subject to the protections of the First Amendment.

This argument relies upon a misreading of the Ordinance. The Reliance Provision is triggered not during negotiation but by the employer's reliance on the employee's wage history "at any stage in the employment drafting process."[129] The Chamber focuses on the phrase, "including the negotiating or drafting of the employment contract," but that is merely one of the many "stage[s] of the employment process" during which the provision applies. It is not, as the Chamber argues, the conduct that

makes the provision applicable.

***136** Moreover, even if the Chamber is correct that the Reliance Provision is "triggered" by negotiation, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."[130] As explained by the Supreme Court in *National Institute of Family & Life Advocates v. Becerra*,[131] regulations that have an incidental impact on speech are not unconstitutional violations of the freedom of speech. The district court recognized that, to the extent that the Reliance Provision has an arguable effect on speech, it is incidental to the targeted reliance and does not place the provision under First Amendment scrutiny.

Moreover, *Valle Del Sol* and *Centro de la Comunidad Hispana de Locust Valley* both dealt with ordinances that regulated day laborers' abilities *to advertise* their availability for work.[132] Advertising is prototypical speech that depends on spoken or written communication. Here, by contrast, the only activity being regulated by the Reliance Provision is the act of *relying* on wage history to set a salary. Under the Ordinance, the speech component of the negotiation process, i.e., the communication of a wage offer and any resulting discussion, is left intact. Other courts have reached similar results in analogous contexts.[133]

Accordingly, as the Chamber has not shown a likelihood of success on the merits of its constitutional challenge to this part of the Ordinance; the district court correctly refused to enjoin enforcement of the Reliance Provision.

### B. The Inquiry Provision

As discussed above, the Inquiry Provision of the Ordinance prohibits "ask[ing] a job applicant in writing or otherwise ... about [the applicant's] wage history, requir[ing] disclosure of wage history, or condition[ing] employment or consideration for an interview or employment on disclosure of wage history[.]"[134] Unlike the Reliance Provision, the Inquiry Provision clearly regulates speech because it prevents employers from asking potential applicants specific questions. The district court was therefore correct in concluding that it was first necessary to determine the appropriate level of scrutiny to apply to that provision.

## 1. The Legal Standard

[9]The City argues that the speech at issue is commercial speech and therefore intermediate scrutiny under the test outlined in ▯ *Central Hudson* is appropriate. The Chamber argues that even if the speech at issue is commercial speech, we should apply strict scrutiny because the Inquiry Provision restricts expression **\*137** based on content and speaker. We agree with the district court that the Inquiry Provision regulates commercial speech and that intermediate scrutiny under ▯ *Central Hudson* is the appropriate level of review.

### a. Commercial Speech

The Supreme Court has described commercial speech as "expression related solely to the economic interests of the speaker and its audience."[135] A "proposal of possible employment ... [is a] classic example[ ] of commercial speech."[136] Additionally, courts have recognized commercial speech in a range of employment-related contexts, including communications that advertise labor availability and terms of employment,[137] as well as agreements "under which services will be exchanged for compensation."[138]

[10]We have recognized three factors that aid the inquiry into whether speech is commercial: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech[?] ... An affirmative answer to all three questions provides 'strong support' for the conclusion that the speech is commercial."[139] However, all three characteristics need not be present for a given expression to qualify as commercial speech.[140]

Expression pertaining to a possible offer of employment involves (1) an advertisement by the prospective employee to the employer; (2) the focus of the employee's services for hire; and (3) by definition, an economic motive. The district court appreciated that the Inquiry Provision pertains only to communications between an employer and prospective employee and implicates no interests beyond the contract of employment. Because the speech occurs in the context of employment negotiations, the economic motive is clear. The regulated speech is part of a "proposal of possible employment." Thus, the district court correctly concluded:

> [T]he Inquiry Provision prohibits Philadelphia-based employers from asking potential hires about their previous wage history. This inquiry occurs in the context of a job application or job interview, both of which propose a commercial transaction ... [where] "all affected speech is either speech soliciting a commercial transaction or speech necessary to the consummation of a commercial transaction."[141]

### b. Intermediate Scrutiny under ▯ *Central Hudson* Is Appropriate

[11]"The ▯ *Central Hudson* analysis is commonly referred to as 'intermediate **\*138** scrutiny.' "[142] Because commercial speech is "linked inextricably with the commercial arrangement it proposes, ... the State's interest in regulating the underlying transaction may give it a concomitant interest in the expression itself."[143] "The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."[144]

[12]In ▯ *Central Hudson,* the Public Service Commission of New York City had attempted to address a fuel shortage in New York by promulgating an ordinance banning electricity-supply utilities from placing advertisements that promoted the use of electricity.[145] A utility company challenged the ordinance arguing that it infringed on the company's free speech rights because the ordinance banned speech based on the specific content of the speech and the identity of the speaker. In resolving the First Amendment issue, the Supreme Court "articulated a test for determining whether a particular commercial speech regulation is constitutionally permissible[.]"[146] Courts must determine whether: (1) the speech concerns lawful activity and is not misleading; (2) the asserted governmental interest is substantial; (3) the regulation directly advances the governmental interest asserted; and (4) "whether it is not more extensive than is necessary to serve that interest."[147] As elaborated on below, under this test, the "fit" between the proposed restriction and the government's interest need not be the least restrictive means. It need only be a "reasonable fit between the legislature's ends and the means chosen to accomplish those ends."[148]

### c. Strict Scrutiny Is Inappropriate Here

The Chamber argues that because the Ordinance only applies to employers and is focused squarely on content

(wage history), strict scrutiny should have been applied.[149] But as we described above, the Supreme Court has consistently applied intermediate scrutiny to commercial speech restrictions, even those that were content- and speaker-based, particularly when the challenged speech involves an offer of employment.[150]

**\*139** [13]We realize, of course, that it may be appropriate to apply strict scrutiny to a restriction on commercial speech that is viewpoint-based.[151] If the regulation has the practical effect of promoting some messages or some speakers based on the content of the speech or the identity of the speaker, something more than intermediate scrutiny may be necessary to survive a First Amendment inquiry. "[S]peaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)."[152]

The Supreme Court addressed this in *R.A.V. v. City of St. Paul, Minnesota.*[153] It explained that the rule that content-based speech restrictions are subject to strict scrutiny is "not absolute" and is inapplicable when the restriction does not " 'raise[ ] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.' "[154]

Here, the Inquiry Provision precludes *all* employers from inquiring into wage history, without focusing on any particular viewpoint or favoring any particular employer or job. It also applies to all employees without regard to the employee's prior salary or job title. It does limit the prospective employer's speech, but only because that limitation prevents the tentacles of any past wage discrimination from attaching to an employee's subsequent salary. This simply does not implicate the kind of viewpoint or speaker discrimination that the Chamber relies on in its attempt to distinguish *Central Hudson* and have us apply strict scrutiny.

The Chamber points to *Sorrell v. IMS Health, Inc.,*[155] in support but *Sorrell* is unhelpful because the restriction there was viewpoint-based and "heightened scrutiny" was therefore necessary. In *Sorrell,* Vermont had passed a law restricting the sale, disclosure, and use of pharmacy records that revealed the prescribing practices of individual doctors.[156] However, the law contained exceptions that, for example, allowed entities engaging in "educational communications" to purchase the information, but barred disclosure when the recipients would use the information for marketing.[157] Additionally, "Vermont could supply academic organizations with prescriber-identifying information to use in countering the

messages of brand-name pharmaceutical manufacturers and in promoting the prescription of generic drugs," but the law prevented pharmaceutical manufacturers from using the information for their own marketing purposes.[158] Thus, the statute "disfavor[ed] marketing, *i.e.,* speech with a particular content, as well as particular speakers, *i.e.,* entities engaged in marketing **\*140** on behalf of pharmaceutical manufacturers."[159] Strict scrutiny was therefore required.

Moreover, even though the statute there was neither viewpoint neutral nor speaker neutral, it is not even clear that the Court applied strict scrutiny there. As the district court astutely recognized here, *Sorrell* merely stands for the proposition that some level of scrutiny above rational basis review applied. The district court explained: "*Sorrell* references a 'heightened scrutiny,' but it is just as likely that this is the same as intermediate scrutiny, which is stricter than rational basis scrutiny."[160] Moreover, after *Sorrell*, courts have continued to apply *Central Hudson* intermediate scrutiny to commercial speech restrictions and rejected the notion that *Sorrell* requires strict scrutiny in these cases just as the district court explained.[161] That said, we need not resolve that issue here because it is clear that the restrictions in the Ordinance are viewpoint neutral and do not merit strict scrutiny. Accordingly, we agree with the district court's decision to subject the Ordinance only to intermediate scrutiny under *Central Hudson*.

## 2. The Inquiry Provision Satisfies *Central Hudson* Intermediate Scrutiny

[14] [15]Under *Central Hudson,* speech "at least must concern lawful activity and not be misleading[ ]" to qualify for protection.[162] If the speech concerns illegal activity or is misleading, then it is not subject to First Amendment protection at all and our inquiry ends.[163] If the subject is not unlawful and the message is not misleading, we must then determine whether the government has a substantial interest in the restriction. If it does, the challenged restriction must directly advance that interest.[164] If it does directly advance the interest, the final prong of the *Central Hudson* inquiry requires us to decide if the restriction is nevertheless more extensive than necessary to serve the government's substantial interest.[165] The last two elements of the analysis are related because they "basically involve a consideration of the 'fit' between the legislature's ends and the means

chosen to accomplish those ends."[166] Determining whether the restriction is more extensive than necessary, is not to be confused with the "least restrictive alternative" inquiry required to survive strict scrutiny.[167]

## *141 a. The Speech at Issue Is Not "Related to Illegal Activity"

[16]The City has argued that inquiring about wage history is "related to illegal activity" because the Inquiry Provision prohibits acquiring information that cannot be legally used because of the restrictions in the Reliance Provision. In rejecting that argument, the district court explained that not all uses of wage history are illegal: "For example, acquisition of wage history is allowed in other contexts such as for gathering market information;" and, "the existence of a wage history is not in and of itself illegal."[168] The district court correctly concluded: "[s]imply because wage history could be relied upon in fashioning a salary in violation of the Reliance Provision does not render *all other legal activity related to wage history* illegal."[169] Accordingly, the Court held that the language the provision targets does not "concern unlawful activity."[170] We agree.

The City relies in part upon 🔖 *Pittsburgh Press v. Human Relations Commission,*[171] in arguing that speech can be "related to unlawful activity" if only some of its uses are prohibited. In 🔖 *Pittsburgh Press,* one of the provisions in a Pittsburgh Ordinance prohibited discrimination in employment and another prohibited "any notice or advertisement relating to 'employment' or membership which indicates any discrimination because of ... sex."[172] The Pittsburgh Commission on Human Relations was in charge of implementing the Ordinance. The Commission concluded that Pittsburgh Press had violated the Ordinance through its practice of placing "help-wanted" advertisements in sex-specific columns (*i.e.*, "Male Help Wanted," "Female Help Wanted"). The final Commission Order, however, did not prohibit all sex-specific advertisements; it exempted certain jobs such as: "employment in domestic service," and "jobs for which the Commission ha[d] certified a bona fide occupational exception," and allowed exempted entities to advertise in a sex-specific manner.[173] Pittsburgh Press sued, arguing that the Commission's Order violated the First Amendment by restricting its editorial choices.

The Supreme Court agreed, concluding that "[t]he advertisements, as embroidered by their placement, signaled that the advertisers were likely to show an illegal

sex preference in their hiring decisions."[174] Accordingly, the Court found that "any First Amendment interest [that] might be served by [the advertisements] ... [wa]s *142 altogether absent when the commercial activity itself [wa]s illegal."[175]

The City argues 🔖 *Pittsburgh Press* is analogous because even though there were legal uses for sex-specific advertisements—*i.e.*, the specific exemptions recognized by the Commission—the Court still concluded that sex-specific advertising was related to illegal activity and was therefore not protected by the First Amendment. Similarly, here, the City would have us decide that even though every inquiry into a prospective applicant's wage history would not necessarily lead to a violation of law, reliance on that history would be illegal. Thus, the City urges us to hold that the Ordinance "concerns unlawful activity."

We, however, agree with the district court's conclusion that commercial speech should not lose the protection of the First Amendment simply because a legislature has prohibited one of many uses of the regulated speech.[176] As the district court reasoned, and as the Chamber argues, if the City's position is upheld, a city could perform an easy end-run around First Amendment scrutiny by passing a speech restriction in conjunction with a law that made one use of the regulated speech illegal. The result would be that the prohibited speech would always "relate to unlawful activity" and therefore fail the first prong of the 🔖 *Central Hudson* analysis.

## b. The City has a Substantial Interest in Closing the Wage Gap

The Chamber does not dispute the district court's conclusion that remedying wage discrimination and promoting wage equity is a substantial government interest, and we agree. Accordingly, we need not discuss the second prong of the 🔖 *Central Hudson* inquiry.

## c. The Inquiry Provision Directly Advances the City's Interest in Pay Equity

[17] [18]The third prong of 🔖 *Central Hudson* requires us to determine whether the Inquiry Provision directly "advances the Government's interest in a direct and material way."[177] To survive that inquiry, the City must

show that the "the harms it recites are real and that its restriction will in fact alleviate each of them to a material degree."[178] "[S]peculation or conjecture" cannot satisfy this burden.[179] A court's inquiry under this prong "is not a license to reweigh the evidence *de novo*, or to replace [legislators'] factual predictions with our own."[180] Rather, a court's task is merely to determine whether the legislature has "drawn reasonable inferences based on substantial evidence."[181] This is the heart of the current dispute. The district court did not believe that the City produced sufficient evidence to establish that the Inquiry Provision would advance its substantial interest in mitigating the racial and gender-based pay gap. The court's skepticism is summed up in the following passage from its opinion:

> While the conclusion that a discriminatory wage gap could be affected by prohibiting wage history inquiries was characterized by respected professionals as a **\*143** logical, common sense outcome, more is needed. Like the *Rubin* case, the testimony in support of this theory is riddled with conclusory statements, amounting to "various tidbits" and "educated guesses." Importantly, aside from Dr. Madden's affidavit, *the information relied upon by the City does not address the possibility that disparate wages could also be based on factors having nothing to do with discrimination, such as qualifications, experience, or any number of other factors.*[182]

We disagree.

[19]It is clear to us that Dr. Madden's affidavit would, by itself, satisfy the inquiry. However, that is not the point. Dr. Madden's affidavit simply corroborated the testimony given to the City Council prior to it enacting the Ordinance with additional empirical evidence. The issue is the apparent failure by the district court to afford the testimony and studies presented to the City Council sufficient probative value given its equation of it with conclusory statements and educated guesses.

The Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, *in a case applying strict scrutiny*, to justify restrictions based

solely on history, consensus, and '*simple common sense*.' "[183] And it has often done so on records far less compelling than the record supporting the Inquiry Provision of this Ordinance. The Court has explained that "the quantum of empirical evidence [required]... var[ies] up or down with the novelty and plausibility of the justification raised."[184] And, especially relevant here, it has recognized that "[a] municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously."[185]

This record contains a plethora of evidence that (1) the wage gap is substantial and real (indeed, the parties concede this point); (2) numerous experiments have been conducted, which controlled for such variables as education, work experience, academic achievement, etc. and still found a wage gap; (3) researchers over many years have attributed the gap, in substantial part, to discrimination; (4) existing civil rights laws have been inadequate to close the wage gap; and, critically, (5) witnesses who reviewed the data concluded that relying on wage history can perpetuate gender and race discrimination. Based on that substantial evidence, the City Council made a reasonable judgment that a wage history ban would further the City's goal of closing the gap and ameliorating the discrimination inherent in the disparate wages.

The district court believed that the evidence before the City didn't account for **\*144** variables other than gender and race. However, Barbara Price presented the Council with evidence to the contrary, and the studies of Blau and Khan summarized in the Madden affidavit isolated out the variables of gender and race, thereby ensuring they did not affect the results.[186] This evidence showed that even after accounting for such variables as choice of occupation, hours worked, economic sector, experience, GPA, undergraduate institution, and marital status, there is a significant gap between the earnings of men and women beginning one year after graduation and widening in the years thereafter.[187]

The City merely "dr[ew] reasonable inferences based on substantial evidence[ ]' "[188] that the Inquiry Provision would address the wage gap, and the district court erred when it "reweigh[ed] the evidence" and "replace[d] [the City's] factual predictions with [its] own."[189]

### i. Caselaw Considering Whether a Legislature Relied on Substantial Evidence to Support a Speech

**Restriction Under 🚩 *Central Hudson* Demonstrates that the City Presented Sufficient Evidence to Support the Ordinance.**

Our review of caselaw examining whether a legislature had sufficient evidence to support a challenged legislative enactment demonstrates that the Inquiry Provision is constitutional. In 🚩 *Burson v. Freeman*,[190] *Central Hudson* itself, and 🚩 *Tennessee Secondary School Athletic Association v. Brentwood Academy*,[191] the Supreme Court upheld laws restricting commercial speech even though they were supported by much less evidence than the City produced to demonstrate the need for the Inquiry Provision.

In 🚩 *Burson*, the Court considered whether a 100-foot bubble zone that prohibited political speech outside of polling places was constitutional.[192] The Tennessee statute at issue implicated three fundamental First Amendment concerns because it regulated political speech, speech in a public forum, and the content of speech.[193] The Court subjected the ordinance to strict scrutiny but still upheld it.[194] We realize that the Court in 🚩 *Burson* relied upon a "modified 'burden of proof' " because the First Amendment right at issue there "threaten[ed] to interfere with the act of voting itself."[195] Nevertheless, the analysis in 🚩 *Burson* provides helpful guidance in determining whether the City's evidence was sufficient to survive the third prong of the 🚩 *Central Hudson* inquiry.

The 🚩 *Burson* court explained that it "never has held a State to the burden of demonstrating empirically the objective effects" of a speech regulation.[196] Accordingly, **\*145** the Court relied on history, common sense, and one witness, noting that it would be "difficult for the states to put on witnesses who [could] testify as to ... the exact effect" of the proposed law.[197] In fact, rather than demand strict empirical evidence that the challenged restriction on speech advanced the underlying governmental interest, the Court's analysis rested on the presumed logic of a 100-foot barrier around a polling place for the purpose of allowing voters fifteen seconds of uninterrupted contemplation before casting their ballots.[198] There was no empirical evidence that voters needed fifteen seconds of uninterrupted contemplation to cast an informed ballot, nor was there any evidence that voters would use the fifteen seconds it took to traverse the 100-foot buffer zone for contemplation, as opposed to conversation, daydreaming, or reading a newspaper.

The Supreme Court's decision in 🚩 *Tennessee Secondary*, is also informative. There, the Court accepted commonsense conclusions in the absence of empirical data in considering whether the enforcement of a rule governing interscholastic sports violated the First Amendment.[199] The rule under review prohibited high school coaches from using "undue influence" when recruiting middle school students for athletic programs.[200] Much like the record here, the evidence before the Court consisted of testimonial and documentary evidence, including letters sent by a school football coach to a group of unenrolled eighth-grade boys inviting them to participate in spring practice sessions.[201] In upholding the sanction imposed on the coach's speech, the Court noted that it "need[ed] no empirical data to credit [the agency's] commonsense conclusion" that the speech at issue—an inquiry by a would-be authority figure of a prospective team member—could exert the type of undue influence prohibited by the rule.[202]

Finally, in 🚩 *Central Hudson*, the Court held that a prohibition on advertising by utilities was supported by substantial evidence.[203] Rather than require strict empirical proof, the Court relied on the commonsense conclusion that "[t]here is an immediate connection between advertising and demand for electricity."[204]

As we have summarized, the City did offer substantial evidence in the form of testimony and metanalysis of relevant research to support the need for the Inquiry Provision. Reasonable minds can debate whether the City's evidence placed the need for, and potential effectiveness of, the Inquiry Provision beyond doubt. However, given the discussion in 🚩 *Burson*, 🚩 *Tennessee Secondary*, and 🚩 *Central Hudson*, certainty of proof or empirical data is not required here. Rather, substantial evidence of *the possibility* that the speech restriction *could* favorably impact a concern that the state actor had a fundamental interest in addressing is sufficient. The City easily **\*146** satisfied that standard. In concluding otherwise, the district court imposed too high a burden on the City.

As noted earlier, all parties agree that there is a longstanding disparity in the pay of women and minorities compared to wages of White males. The district court readily accepted the existence of this pay gap.[205] Moreover, the Chambers' CEO stated that Chamber members relied on wage history "to have a better understanding of whether a candidate is worth pursuing based on previous compensation levels."[206] Nevertheless, the district court relied primarily on four cases in concluding that the City failed to meet its burden:[207] 🚩 *Edenfield v. Fane*,[208] 🚩 *Rubin v. Coors Brewing Co.*,[209] 🚩 *Pitt News v. Pappert*[210] and 🚩 *Wollschlaeger*.

However, the City's proof here is much more robust than the records before those courts.

In *Edenfield* and *Rubin* the restrictions on commercial speech were facially based on unsubstantiated fears supported by conclusory statements. In *Edenfield*, a Certified Public Accountant challenged a rule created by the Florida Board of Accountancy that prohibited CPAs from soliciting clients in-person.[211] The Florida Board believed that in-person solicitation would lead to unethical conduct by CPAs.[212] In striking down the restriction on commercial speech, the Court reasoned that the only evidence presented in support of the Florida Board's position came from an affidavit by one of its former chairmen.[213] He stated the solicitation ban was necessary to "prevent overreaching and vexatious conduct by the CPA."[214] His conclusion in his affidavit depended on the unsubstantiated theory that a CPA who solicits clients would be beholden to the client and thus willing to bend the rules.[215] Consequently, the Court refused to credit his affidavit.[216]

In *Rubin*, the Federal Alcohol Administration Act prohibited beer labels from displaying alcohol content for fear of a "strength war" among brewers.[217] The justification for the law was the purported "common-sense" conclusion that if the alcohol content were not advertised, customers **\*147** would be less likely to buy the product based on the alcohol content.[218] The Court found that the Act did not directly advance the stated purpose because the government's regulatory scheme was "irrational."[219] Malt liquor, wine, and other alcohol sellers could and did label their bottles with the strength of the drink.[220] The government, the Court noted, had relied on "anecdotal evidence and educated guesses" in contending that competition based on alcohol content was occurring and found that these "various tidbits" could not overcome the irrationality of the scheme.[221] Thus, the very existence of a "strength war" was in doubt and no evidence was offered to establish that any such phenomena actually existed. Whereas, here, the wage gap that the Inquiry Provision seeks to address is a given, and the reasoned conclusions presented to the City Council were entitled to more credit than owed to the educated guesses before the Federal Alcohol Administration.

The law we struck down in *Pitt News*, was similarly based solely upon "speculation and conjecture." The law was premised on the assumption that prohibiting alcohol ads from appearing in university publications would "slacken the demand for alcohol by Pitt students" and help curb underage drinking.[222] We found that the legislature's conclusion was "counterintuitive and

unsupported by *any* evidence."[223] There was *no* evidence, for example, that the removal of the ads would make it harder to find places near campus to buy alcohol. Furthermore, not only were students able to see alcohol ads in many other publications and on television, more that 75% of the university population was of the legal drinking age.[224]

Finally, *Wollschlaeger* is similarly unpersuasive because of the tenuous reasoning supporting the restriction on commercial speech. There, the Court of Appeals for the Eleventh Circuit struck down a law that had been enacted based solely on a few anecdotes.[225] Certain Florida laws prevented doctors from asking patients "whether they own firearms or have firearms in their homes, or from recording answers to such questions."[226] The legislature asserted that the law was necessary to protect gun-owning Floridians from the "private encumbrances" on their Second Amendment Rights that allegedly came from being subject to such questions by physicians.[227] The legislature had relied on "six anecdotes and nothing more" to justify enacting the restrictions.[228] In striking down the legislation, the court observed that while anecdotes can provide evidence, there was "no other evidence, empirical *or otherwise*" presented by the legislature, and the six anecdotes could not show that the harms were "real, [and] not merely conjectural," such that the regulations "will in fact alleviate [the] harms in a direct and material way."[229] Thus the *Wollschlaeger* court required something more than anecdotal evidence and less **\*148** than empirical evidence if the restriction was to survive the third prong of the *Central Hudson* inquiry.

The City's proof of the nexus between its substantial interest in eliminating the real phenomenon of a racial and gender-based wage gap and the need for the limitations that are at the heart of the Inquiry Provision is in a different category than the cases we have just discussed. There is testimony here that the gender disparity in pay in Pennsylvania has existed for the past five decades despite the passage of laws over that period to remedy such discrimination.[230] Terry Fromson explained how this wage gap is compounded through institutional discrimination and explained how other states have addressed this issue.[231] Marianne Bellesorte researched the wage gap for women and men of color, and explained how the inequities began right out of college and continued to affect women, in particular, until retirement. Finally, Jovida Hill and Rue Landau provided empirical evidence that substantiated the distilled conclusions of Fromson and Bellesorte.[232] This testimony is much more than "conclusory statements, ... and 'educated guesses[.]' "[233] Moreover, Dr. Madden's affidavit amplified this

testimony by viewing it through the empirical lens of thousands of studies she summarized.[234] There is therefore ample evidence to establish the fit between the Inquiry Provision and the societal evil it was intended to address.

Our conclusion that the district court imposed too high a burden on the City's proof is consistent with the *en banc* opinion of the Court of Appeals for the Ninth Circuit in *Rizo v. Yovino*.[235] There, the *en banc* court held that an employer's reliance on the plaintiff's prior salaries to justify paying a female less than her male cohort's salary was a violation of the Equal Pay Act.[236] The court's explanation was straightforward. "The question before us is ... simple: can an employer justify a wage differential between male and female employees by relying on prior salary? ... [T]he answer is clear: No."[237] There, the employer had argued that the plaintiff's disparate salary was not barred by The Equal Pay Act because, in paying her a wage based on her prior salaries, the differential was based on a factor other than sex which is explicitly allowed under the Equal Pay Act.[238] The court held that that consideration of salary history "*allow[s] employers to capitalize on the persistence of the wage gap and perpetuate that gap ad infinitum.*"[239] Other courts have reached the same conclusion.[240]

**\*149** Notwithstanding our recitation of the impressive record that supports this Ordinance, we think it important to emphasize that neither scores of empirical studies nor proof to scientific certainty is necessary to carry the City's burden here. Even though we find the City's evidence here more than sufficient to carry its burden under the third prong of *Central Hudson*, it is important not to lose sight of the fact that where a legislature presents an "innovative solution," the Supreme Court has recognized that it "may not have data that could [conclusively] demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously."[241] Nevertheless, the City did produce such evidence here and clearly carried its burden.

However, as we held in *King v. Governor of the State of New Jersey*,[242] and as we recount in detail below, legislatures are not "constitutionally required to wait for conclusive scientific evidence before acting to protect [their] citizens from serious threats of harm."[243]

In *Alameda Books*, the City of Los Angeles enacted legislation that prohibited "more than one adult entertainment business" from inhabiting "the same building, structure or portion thereof."[244] The Court of Appeals for the Ninth Circuit invalidated this restriction on speech finding that "the city failed to present evidence upon which it could reasonably rely to demonstrate that

its regulation of multiple-use establishments [wa]s 'designed to serve' the city's substantial interest in reducing crime."[245] The Supreme Court disagreed.

The Court concluded that the City had presented sufficient evidence upon which to base the speech restriction. Justice O'Connor, joined by the Chief Justice, Justice Scalia and Justice Thomas, explained that the respondents "ask[ed] the city to demonstrate, not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully lower crime."[246] But they concluded that "[o]ur cases have never required that municipalities make such a showing, certainly not without actual and convincing evidence from plaintiffs to the contrary."[247]

Here, as in *Alameda Books*, the Plaintiff has offered no proof to counter the City's conclusion about the need for, or effectiveness of, the Inquiry Provision. In fact, as we have explained, some of the Plaintiff's proof substantiates the City's position. A **\*150** lack of contrary evidence lightens the legislature's burden.[248]

The substantial legislative record here is simply not analogous to the "irrational," "conclusory," "speculative," and purely anecdotal evidence presented in *Edenfield*, *Rubin*, *Pitt News* and *Wollschlaeger*. Nonetheless, the Chamber argues, that even though "conclusive scientific evidence of the Ordinance's effect is not required, 'substantial evidence' means 'some concrete evidence is required.'"[249] In support, the Chamber cites to "a 106-page summary of [a] 2-year study,"[250] relied upon in *Florida Bar* and the "empirical judgments" of "a number of well-known, reputable professional and scientific organizations," from our decision in *King*.[251]

### ii. The Evidence Here is Stronger Than the Evidence Supporting the Restrictions in *Florida Bar* and *King*

The Chamber makes much of *Florida Bar*, and the district court cited it as demonstrative of the type of "extensive" record necessary to sustain a speech infringement.[252] There, the Florida Bar Association enacted rules banning direct-mail solicitation of clients in the 30 days following an accident or disaster. Members of the Florida bar sued, claiming that the law infringed their right of commercial speech. In rejecting that challenge, the Court relied upon the Bar Association's citation to a

106-page study purporting to show the harm that the Bar was attempting to mitigate.[253] However, a closer look at the study reveals that it contained information that was less relevant, less methodologically sound, and much less informative than the evidence supporting the Inquiry Provision here.

The Majority of the Court described the study as "contain[ing] ... statistical and anecdotal [data] ... supporting the Bar's contentions" that the direct-mail solicitations in the wake of accidents "reflects poorly on the profession."[254] The Court accepted that evidence as sufficiently probative even though much of the data in the surveys did not address the specific issues the restriction was supposed to address. The Court pointed to a subset of the findings from the study: it cited one survey of Florida adults that "indicated ... Floridians 'have negative feelings about those attorneys who use direct mail advertising.' "[255] It also provided a handful of statistics about Floridians' views of lawyer advertising.[256] However, only one question referred to the reputation of the legal community–the harm that the law was apparently aiming to remedy.[257] It appeared from the responses to that question that direct mail solicitation in general, rather than solicitation in the 30 days following an accident, was what lowered the views of **151** the legal profession (and did so in only one quarter of those surveyed).[258] The primary evidence relied upon by the Court, did not squarely address the harm that the rule was enacted to remedy.

Despite the fact that the study gave "few indications of the sample size or selection procedures employed" and even though "no copies of the actual surveys employed," were presented to the Court, the Court held that the Bar adequately supported the law.[259] In dissent, Justice Kennedy noted that the record: (1) contained no explanation of methodology, sampling or framework; (2) dealt primarily with television and phone book advertising, which were not at issue; and (3) only two pages of the more than 100 focused on direct-mail solicitation.[260] He concluded by saying that the "few pages of self-serving and unsupported statements by the State" should have been clearly insufficient to "demonstrate that a regulation directly and materially advances the elimination of a real harm."[261] Yet the Court upheld the statute on the basis of this evidence.[262]

Even if we view the supporting evidence in *Florida Bar* in the most favorable light possible, we still conclude that the City has made a stronger evidentiary showing here. The studies presented by the City address the specific issue that the Ordinance was enacted to remedy—discriminatory wage gaps. And, unlike the study

before the Court in *Florida Bar*, the studies the City relied upon are peer-reviewed research studies, many of which were meta-studies that summarized the findings of hundreds of other such studies.[263] The studies support the City's conclusion that the wage gap is not attributable to "legitimate" factors such as education, experience or qualifications.[264] Moreover, researchers' conclusions that discrimination is the likely cause of the gaps has been present in the academic literature for decades.[265] The conclusion that the wage gap is most likely the result of discrimination is also consistent with voluminous unrebutted independent evidence of workplace discrimination.[266]

**152** The Chamber also cites our decision in *King v. Governor of the State of New Jersey*[267] as another case in which the legislature presented substantial evidence to support a law. The Chamber argues, unconvincingly, that the showing in *King* was more robust than the City's evidentiary showing here. In *King*, we upheld a New Jersey law prohibiting sexual orientation change efforts ("SOCE") therapy to persons under the age of 18 over a challenge by individuals and organizations providing such counseling.[268]

The legislative record there "demonstrate[d] that over the last few decades a number of well-known, reputable professional and scientific organizations ha[d] publicly condemned the practice of SOCE."[269] And we, in reviewing that record, specifically noted that the American Psychological Association, the American Psychiatric Association, and the Pan American Health Organization "have warned of the 'great' or 'serious' health risks accompanying SOCE counseling, including depression, anxiety, self-destructive behavior, and suicidality."[270] We also noted, "[m]any such organizations have also concluded that there is no credible evidence that SOCE counseling is effective."[271]

We also found, that "the bulk of empirical evidence regarding the ... harmfulness of SOCE counseling currently falls short of the demanding standard imposed by the scientific community."[272] We recognized there was a "limited amount of methodologically sound research" on the counseling and that "the few early research investigations ... refus[ed] to make a definitive statement about whether SOCE is safe or harmful ... due to a lack of scientifically rigorous studies."[273] Nevertheless, we concluded the legislature was not "constitutionally require[d] to wait for conclusive scientific evidence before **153** acting to protect its citizens from serious threats of harm."[274] Instead, we were convinced by the legislature's "highly plausible" judgment that SOCE

could be harmful to minors, and concluded that the statute "directly advanced" New Jersey's stated interest.[275]

Here, the district court concluded that many of the studies cited by the City did not conclusively prove that discrimination is the *sole* cause of the wage gap. That level of certainty is not required. The City made a well-reasoned judgment based on the testimony presented to it and the unrefuted existence of the wage gap that banning wage history inquiries would prevent further perpetuation of gender and race discrimination in this context.

Moreover, we won't ignore the fact that the very nature of discrimination in employment is such that showing discrimination by negative inference is often necessary. As the Supreme Court has recognized in the context of gender discrimination in the workplace, "[a]s should be apparent, the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by."[276] We, too, have previously recognized, "the instances in which employers ... openly [discriminate against] employees appear to be declining. Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end."[277] "It has become easier to coat various forms of discrimination with the appearance of propriety, *or to ascribe some other less odious intention to what is in reality discriminatory behavior.*"[278]

Accordingly, demonstrating discrimination by controlling for legitimate factors like education, training, experience, age, skills, and other factors that could otherwise "legitimately" explain wage gaps, and through experimental evidence, are essential means of showing discrimination. Because "direct evidence ... is hard to come by," negative inferences can be persuasive evidence of discrimination, especially where they are entirely unrebutted.[279]

As some of the studies on subliminal or implicit bias which we have discussed establish, bias is often not even something that that the actor is aware of.[280] This makes it exceedingly difficult to address such issues as wage disparity because simply educating employers about the pay gap will not deter an employer who is not even aware of the fact that s/he is setting a discriminatory salary. Indeed, without challenging the existence of the pay gap, the CEO for the Chamber without pause admitted that Chamber members gain a "better understanding of whether a candidate is worth pursuing based on previous compensation." Consequently, as the Court **\*154** of Appeals for the Ninth circuit recognized in in *Rizo v.*

*Yovino,* and as the Managing Attorney for the Women's Law Project, Ms. Fromson, testified here, criteria that may at first appear to be race and gender neutral (such as wage history) may be proxies for race or gender.

### d. The Inquiry Provision is Not More Extensive Than Necessary

[20] [21]"The last step of the *Central Hudson* analysis complements the third step, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it."[281] However, " 'the least restrictive means' is not the standard; instead, the case law requires a reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends, ... a means narrowly tailored to achieve the desired objective.' "[282] The "scope" of the law must be "in proportion to the interest served."[283] The Court does not "impose upon [regulators] the burden of demonstrating that ... the manner of restriction is absolutely the least severe that will achieve the desired end."[284] Instead, the legislation must provide "a fit that is not necessarily perfect, but reasonable;" one that "represents not necessarily the single best disposition" but a "proportion[ate]" one.[285] Understandably, the district court here did not reach the third or fourth prong of the *Central Hudson* inquiry because it found that the Ordinance failed under prong two.

However, the last two prongs "are not entirely discrete."[286] These two prongs "have been considered, somewhat in tandem, [as courts must] determine if there is a sufficient 'fit between the [regulator's] ends and the means chosen to accomplish those ends[.]' "[287] Given our conclusion that the City has satisfied its burden of establishing the relationship between the legislative objective of mitigating the wage-gap and the remedy afforded by the Inquiry Provision, we will address the fourth prong.

[22]The Inquiry Provision is narrowly tailored. It only prohibits employers from inquiring about a single topic, while leaving employers free to ask a wide range of other questions, including qualifications, work history, skills and any other job-related questions relevant to performance or fit with the company.[288] Additionally, **\*155** the provision does not prohibit employers from obtaining market salary information from other sources. The Ordinance simply seeks to insulate any discriminatory impact of prior salary levels on subsequent wages. The Ordinance is thus more narrowly tailored than similar wage history Ordinances that have been passed

since 2017.[289] As enacted, it simply prohibits employers from inquiring about wage history at a specific point in time—after a prospective employee has applied for a job and before s/he is hired and a wage is set—when the City has determined that the risk is greatest for conduct that perpetuates discrimination. Moreover, applicants can voluntarily provide salary history *if they feel it is in their best interest.*[290]

The Chamber argues that the Ordinance is not sufficiently tailored because it indisputably "regulate[s] speech that poses no danger to the asserted [governmental] interest."[291] According to the Chamber, the Ordinance does not achieve its interest "when it is applied to White male job applicants, whose salaries the City acknowledges are not tainted by past discrimination."[292] At oral argument, the Chamber even went so far as to argue that the Ordinance should therefore not apply to White men. The suggestion was offered in all seriousness, and it shows the difficulty of, and very limited avenues for, addressing this persistent problem.

Counsel for the Chamber actually suggested that the City set up a system in which employers are free to ask salary histories of White male job applicants but are precluded from doing the same for women and minorities. Aside from the clear equal protection implications, the suggestion for such a carve-out fails to understand the nature of the wage gap. As *amici* point out, a system that perpetuates higher salaries for men based on their higher salary histories is no better than one that perpetuates lower salaries for women and minorities based on their lower salary histories.[293] Indeed, it is the very same system. Asking White men their prior salary and allowing it to impact an offer of employment would ensure that the historic salary advantage enjoyed by White males would continue. Employers operating under such a scheme would unwittingly be helping White males to continue to enjoy salary advantages on new jobs because they would be carried over from their prior jobs.

More importantly, even were we to credit the Chamber's suggestion, we would nevertheless not be free to ignore the Supreme Court's decision in 📄 *Florida Bar* where the Court considered and rejected a similar overbreadth argument. The Respondents in 📄 *Florida Bar* argued that the ban on communications to all accident victims within 30 days of an accident was **\*156** overbroad because it did not distinguish between those whom the provision was aiming to protect—injury victims who were especially vulnerable—and "those accident victims who are ready, willing and able to utilize a lawyer's advice."[294] Rather than require the Bar Association to "draw[ ] difficult lines," the Court concluded that the

blanket "ban applicable to all post-accident or disaster solicitations for a brief 30–day period" was sufficiently narrowly tailored.[295]

Thus, even if we were to credit the Chamber's argument that the law is overbroad, it would not prevent the Inquiry Provision from surviving intermediate scrutiny. The Supreme Court has refused to invalidate restrictions on commercial speech "that [go] only marginally beyond what would adequately have served the governmental interest."[296] We have no trouble concluding that the City has demonstrated a "proportionate" fit between its substantial interest and its legislative attempt to advance that interest.

The Chamber also argues that "underinclusiveness plagues the Ordinance. Despite the City's assumption that the wage history of female and minority applicants is 'tainted' by past discrimination, the Ordinance permits employers to base a salary offer on wage-history information that an applicant voluntarily discloses."[297] However, underinclusiveness is only important to our inquiry if it "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."[298] There is no suggestion of such insincerity here. Moreover, the alleged underinclusiveness is more of a strength than an infirmity. It allows a female or minority who may have historically been paid above the normal salary levels because of extraordinary qualifications to inform a potential employer of that salary history rather than remain silent and risk forfeiting the higher salary that s/he may well deserve.

**[23]**Even when this is not the case, 📄 *Central Hudson* does not require that the Ordinance "redress the harm completely."[299] The City may choose to regulate only "part" of the speech that causes harm.[300] Here, as part of the regulatory scheme, the City has chosen to allow owners of their own prior salary data to remain in control of that information and thereby allow the employee to decide whether s/he wants to disclose it.

**[24]**The Chamber also suggests that more rigorous enforcement of current antidiscrimination laws is an alternative that the City must attempt *before* passing an Ordinance such as this. Intermediate scrutiny, however, does not require that the City adopt such regulatory measures only as a last alternative or that the City demonstrate **\*157** that the legislation is the least restrictive response.[301] Moreover, it is clear on this record and from some of the cases we have discussed (*see Rizo*) that the wage gap has survived other remedial measures, including the Equal Pay Act.[302] The testimony supporting

the Inquiry Provision establishes that, despite the presence of antidiscrimination laws, that "[t]he gender wage gap has narrowed by less than one-half a penny per year in the United States since 1963."[303]

The City enacted the Inquiry Provision in an attempt to address this persistent problem and the record is clearly sufficient to withstand this First Amendment challenge to it.

For the foregoing reasons, we will affirm the district court's denial of a preliminary injunction as to the Reliance Provision and we will vacate the district court's grant of a preliminary injunction as to the Inquiry Provision and remand with directions to the district court to deny the preliminary injunction as to the Inquiry Provision.

### All Citations

949 F.3d 116, 170 Lab.Cas. P 62,023

## III. CONCLUSION

### Footnotes

1    Chamber Br. at 1.

2    *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (" *Turner II*") (internal quotation marks and citation omitted).

3    *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (internal citations omitted). *See also* City Br. at 43-44 (citing *Heffner v. Murphy*, 745 F.3d 56, 92 (3d Cir. 2014), *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 303–04 (4th Cir. 2009), *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 608 (9th Cir. 2010) (illustrating recent decisions reflecting the Supreme Court's flexible approach to speech restrictions under intermediate scrutiny. As we explain below, we conclude that the Ordinance need only satisfy intermediate scrutiny.)

4    *See* JA119–20 (discussing the City Council's legislative findings supporting the Ordinance).

5    *Id.*

6    *See, e.g.*, Christianne Corbett & Catherine Hill, Am. Ass'n of Univ. Women ("AAUW"), *Graduating to a Pay Gap: The Earnings of Women and Men One Year After College Graduation*, at 9 (Oct. 2012), https://www.aauw.org/files/2013/02/graduating-to-a-pay-gap-the-earnings-of-women-and-men-one-year-after-coll ege-graduation.pdf.

7    U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2017*, at 9 (Aug. 2018), https://www.bls.gov/opub/reports/womens-earnings/2017/pdf/home.pdf.

8    *Id.*

9    Phila. Code § 9-1131.

10    *Id.* §§ 9-1105(1)(c)–(d), 9-1121(2).

11    JA297.

12    JA298 (emphasis added).

13    *Council of the City of Philadelphia Committee on Law and Government: Hearing on Bill No. 160840*, (Nov. 22, 2016) (hereinafter "Hearing Transcript" or "H'rg Tr.") at 70, available at http://legislation.phila.gov/transcripts/Public%20Hearings/lawngov/2016/lg112216.pdf; *see also* JA272-277.

14    JA273.

15    JA275 (citing AAUW, *The Simple Truth About the Gender Pay Gap*, at 17 (Fall 2014)), https://fortunedotcom.files.wordpress.com/2014/12/the-simple-truth_fall.pdf ("After accounting for college major, occupation, economic sector, hours worked, months unemployed since graduation, GPA, type of undergraduate institution, institution selectivity, age, geographical region, and marital status, *Graduating to a Pay Gap* found that a 7 percent difference in the earnings of male and female college graduates one year after graduation was still unexplained.").

16    JA273.

17    *Id.*

18    *Id.*

19    JA268; *see also* H'rg Tr. at 63-69.

20    H'rg Tr. at 65.

21    *Id.* at 65–66.

22    *Id.* at 66.

23    *Id.*

24    *Id.*

25    *Id.*

26    *Id.* at 66–67 (emphasis added). This testimony does not distinguish between salary and wage discrepancy and the text of the Ordinance refers only to a wage discrepancy. However, we can discern no significant distinction for the purposes of our discussion and much of the testimony strongly suggests that the compensation gap that Fromson and others referred to for salaries is indistinguishable from the compensation gap in wages.

27    *Id.* at 67.

28    *Id.*

29    *Id.*

30    *Id.* at 66.

31    *Id.* at 64.

32    *Id.* The state of New Jersey has since passed a similar wage history inquiry and reliance ban. *See* Act of July 25, 2019, Pub. L. No. 2019, c.199 (N.J. 2019). That act states: "it shall be an unlawful employment practice for any employer:

(1) to screen a job applicant based on the applicant's salary history, including, but not limited to, the applicant's prior wages, salaries or benefits; or (2) to require that the applicant's salary history satisfy any minimum or maximum criteria." As Fromson's testimony suggests, New Jersey's recently enacted law appears to be part of an emerging trend that recognizes the extent to which reliance on wage history inevitably perpetuates historic wage disparity.

33    H'rg Tr. at 68.

34    *Id.*

35    *Id.*

36    *Id.* at 68–69.

37    *Id.* at 69.

38    *Id.* at 15.

39    *Id.*

40    *Id.* at 80.

41    "PathWays PA works to end the cycle of poverty, homelessness, and abuse in the Philadelphia region." *Id.* at 74.

42    JA276.

43    H'rg Tr. at 74.

44    *Id.* at 75.

45    *Id.*

46    *Id.*

47    *Id.* at 76.

48    *Id.* at 8.

49    Jovida Hill, the Executive Director of Philadelphia's Commission on Women, affirmed the testimony of Ms. Landau with nationwide empirical evidence. She testified that, "[a]ccording to calculations by the National Committee on Pay Equity, for a woman with a high school education, the difference [in pay arising from the pay gap] can amount to $700,000, $1.2 million for a woman with a college degree, and $2 million for women with advanced degrees." H'rg Tr. at 12.

50    *Id.* 6.

51    *Id.* at 8.

52    *Id.* at 23.

53    JA124.

54    *Id.*

55    *Id.* This testimony is also surprising since, if salary history is not a factor in setting compensation levels, it is not at all clear how employers would be harmed or prejudiced by the Inquiry Provision.

56    *See e.g.*, JA130 (Chamber Member Bittenbender: "Wage history information is essential to salary offers in positions where Bittenbender is unaware of the market wage.").

57    JA283–89. On January 23, 2017, the bill was signed into law. JA122.

58    JA072-117.

59    JA74. The City has agreed that the Chamber and its members have standing to bring suit here. *See* JA250, ¶ 18; *see also* JA081-117.

60    *See* Affidavit of Janice F. Madden, Ph.D. JA291–306. Dr. Madden is a labor economist "with extensive experience in the analysis of labor markets and, in particular, gender and racial differentials in labor markets." JA292. She attended the Wharton School after completing an M.A. and Ph.D. at Duke University and previously earned her B.A. in economics and mathematics at the University of Denver. She is a tenured faculty member of the University of Pennsylvania and teaches undergraduate and graduate "courses dealing with economics, labor markets, and ... relevant statistical methods." *Id.* In addition, Dr. Madden has authored five books on economics and discrimination and has testified as an expert witness in over 45 cases in federal and state courts. JA292–93.

61    Although her affidavit was not before the Council when the Ordinance was passed, it was appropriately considered by the district court. As we have previously recognized, "[i]f a legislative body can produce in court whatever justification is required of it under the applicable constitutional doctrine, we perceive little to be gained by incurring the expense, effort, and delay involved in requiring it to reenact the legislative measure after parading its evidence through its legislative chamber." *Phillips v. Borough of Keyport*, 107 F.3d 164, 178 (3d Cir. 1997). The district court was therefore correct in "consider[ing] post-enactment evidence offered in support of City Council's decision." *Id.*

62    JA297.

63    JA298.

64    *Id.* (emphasis added).

65    *Id.*

66    JA294.

67    *Id.*

68    *Id.*

69    JA295.

70    JA305-06.

71    T.D. Stanley & Stephen B. Jarrell, *Gender Wage Discrimination Bias? A Meta-Regression Analysis*, 33 J. Hum.

Resources 947, 948 (Fall 1998) (hereinafter "Stanley & Jarrell").

72      Francine D. Blau & Lawrence M. Kahn, *The Gender Wage Gap: Extent, Trends, and Explanations*, 31, NBER Working
        Paper No. 2193, National Bureau for Economic Research (2016), http://www.nber.org/papers/w21913 (published in
        55 J. of Econ. Lit. 789 (2017)) (hereinafter "Blau & Kahn").

73      *Id.*

74      Valerie Wilson & William M. Rodgers III, *Black-White Wage Gaps Expand with Rising Wage Inequality*, 4, Economic
        Policy Inst., (September 19, 2016) https://www.epi.org/files/pdf/101972.pdf (hereinafter "Wilson & Rodgers").

75      *Id.* at 5.

76      *Id.* at 27.

77      JA298 n.3.

78      Blau & Kahn at 32.

79      *Id.*

80      *Id.*

81      *Id.*

82      *Id.*

83      *Id.* at 33.

84      *Id.*

85      *Id.* at 50.

86      JA300.

87      *Id.*

88      *See* JA126–247.

89      JA130.

90      JA137–38.

91      JA147.

92      *See* 🚩 *Chamber of Commerce v. City of Philadelphia*, 319 F. Supp. 3d 773, 779 (E.D.Pa. 2018).

93      🚩 *Id.* at 801, 803.

94      🚩 *Id.* at 803–04.

Greater Philadelphia Chamber of Commerce v. City of Philadelphia, 949 F.3d 116 (2020)

170 Lab.Cas. P 62,023

95    *Id.* at 804.

96    *Id.* at 785.

97    *Id.* ("[B]ecause I conclude infra that the Inquiry Provision does not pass muster under the *Central Hudson* framework, I need not determine whether the *Central Hudson* test has been broadened for content- or speaker-based restrictions. I will thus apply *Central Hudson's* intermediate scrutiny to the Inquiry Provision.").

98    447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

99    *Chamber of Commerce,* 319 F. Supp. 3d at 800 ("I conclude that there is insufficient evidence to establish the alleged harm of discriminatory wages being perpetuated in subsequent wages such that they contribute to a discriminatory wage gap.").

100   *Id.* at 807 (citing e.g., Wonderling Decl. ¶¶ 16, 22 ("If the Ordinance is allowed to stand, it will harm the Chamber's members named in the First Amended Complaint as well as other members within the Chamber's broader membership by preventing them from making wage-history inquiries that they otherwise normally would make.")).

101   *Id.* 807–08.

102   *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989) (internal citations omitted).

103   *A.T.&T. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994) (internal citations omitted) (quoting *Merch. & Evans, Inc. v. Roosevelt Bldg. Prods.,* 963 F.2d 628, 632–33 (3d Cir. 1992)).

104   *Reilly v. City of Harrisburg,* 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).

105   *Id.*

106   *Id.* at 180 (quoting *Ashcroft v. ACLU,* 542 U.S. 656, 666, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004)).

107   *Id.* (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 429, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006)).

108   *Id.* at 180 n.5 (quoting *Thalheimer v. City of San Diego,* 645 F.3d 1109, 1116 (9th Cir. 2011)).

109   *Id.*

110   *Id.*

111   *Id.*

112   *Doe by & through Doe v. Boyertown Area Sch. Dist.,* 897 F.3d 518, 526 (3d Cir. 2018) (citing *Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004)).

113    *Id.*

114    Phila. Code. § 9-1131.

115    *Chamber of Commerce*, 319 F. Supp. 3d at 803.

116    *Id.*

117    848 F.3d 1293 (11th Cir. 2017).

118    561 U.S. 1, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010).

119    *Chamber of Commerce*, 319 F. Supp. 3d at 803–04.

120    *Id.* at 803–04.

121    *Id.* at 803.

122    561 U.S. at 28, 130 S.Ct. 2705.

123    *Id.*

124    *Chamber*, 319 F. Supp. 3d. at 804 (The "provisions [at issue] prohibited significantly more specific actions that implicated speech on their face[,] to the extent the Reliance Provision is content- or speaker-based, it targets conduct and not speech.").

125    Chamber Br. at 29.

126    Chamber Br. at 29 ("[T]he conduct triggering coverage under the statute consists of communicating a message.").

127    709 F.3d 808, 819 (9th Cir. 2013).

128    868 F.3d 104 (2d Cir. 2017).

129    Phila Code § 9-1131. "To rely on the wage history of a prospective employee from any current or former employer of the individual in determining the wages for such individual at any stage in the employment process, including the negotiation or drafting of any employment contract, unless such applicant knowingly and willingly disclosed his or her wage history to the employer, employment agency, employee or agent thereof." *Id.*

130    *Expressions Hair Design v. Schneiderman*, ––– U.S. ––––, 137 S. Ct. 1144, 1151, 197 L.Ed.2d 442 (2017) (quoting *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 62, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006)). During oral argument, the City Solicitor for the City of Philadelphia offered a very good analogy: An anti-discrimination Ordinance that prohibits hiring discrimination based on race does not implicate speech even though it may cause an establishment to remove a "Colored Applicants Only" sign.

131    ––– U.S. ––––, 138 S. Ct. 2361, 201 L.Ed.2d 835 (2018).

132   709 F.3d at 823; 868 F.3d at 113.

133   *See, e.g.,* *International Franchise Association, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (explaining that the minimum wage law at issue there was an "economic regulation that does not target speech or expressive conduct").

134   Phila. Code. § 9-1131.

135   *Central Hudson*, 447 U.S. at 561, 100 S.Ct. 2343.

136   *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) ("Each is no more than a proposal of possible employment. The advertisements are thus classic examples of commercial speech."); *see also* *Bigelow v. Virginia*, 421 U.S. 809, 821, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (finding the speech at issue "classic examples of commercial speech, for each was no more than a proposal of possible employment") (internal quotations omitted).

137   *Valle Del Sol Inc.*, 709 F.3d at 818–19.

138   *Nomi v. Regents for Univ. of Minn.*, 796 F. Supp. 412, 417 (D. Minn. 1992) *vacated on other grounds*, 5 F.3d 332 (8th Cir. 1993).

139   *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)).

140   *Id.*

141   *Chamber of Commerce*, 319 F. Supp. 3d at 783 (citing *Valle Del Sol*, 709 F.3d at 818).

142   *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 844 (9th Cir. 2017) (citing *Florida Bar*, 515 U.S. at 623, 115 S.Ct. 2371).

143   *Chamber of Commerce,* 319 F. Supp. 3d at 784 (citing *Edenfield v. Fane*, 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)).

144   *Central Hudson*, 447 U.S. at 562–63, 100 S.Ct. 2343.

145   *Id.* at 559, 100 S.Ct. 2343.

146   *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002).

147   *Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343.

148   *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 528, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001).

149   Chamber Br. at 24. The Ordinance's speech restrictions, the Chamber argues, are content-based due to their "appli[cation] to particular speech because of the topic discussed—namely, wage history." *Id.*

Greater Philadelphia Chamber of Commerce v. City of Philadelphia, 949 F.3d 116 (2020)

170 Lab.Cas. P 62,023

150      *See, e.g.,* ⚑ *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 176, 183–84, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (applying intermediate scrutiny to prohibition on broadcast advertising of legal casino gambling); ⚑ *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 478, 482, 488, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (applying intermediate scrutiny to law prohibiting display of alcohol content on beer labels); ⚑ *Florida Bar*, 515 U.S. at 620, 635, 115 S.Ct. 2371 (1995) (applying intermediate scrutiny to prohibition on attorneys sending written solicitations to prospective clients relating to an accident or disaster).

151      *See* ⚑ *Turner Broadcasting System, Inc. v. F.C.C. ("Turner I")*, 512 U.S. 622, 658, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("Congress may not abridge the rights of some persons to engage in political expression in order to enhance the relative voice of other segments of our society.") (internal quotations omitted).

152      ⚑ *Id.*

153      ⚑ 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

154      ⚑ *Id.* at 387–88, 112 S.Ct. 2538 (quoting ⚑ *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)).

155      ⚑ 564 U.S. 552, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011).

156      ⚑ *Id.* at 557, 131 S.Ct. 2653.

157      ⚑ *Id.* at 564, 131 S.Ct. 2653.

158      ⚑ *Id.*

159      ⚑ *Id.* at 552, 131 S.Ct. 2653.

160      🚩 *Chamber of Commerce*, 319 F. Supp. 3d at 784; *see also Prieto*, 861 F.3d at 847 ("There is nothing novel in ⚑ *Sorrell*'s use of the term 'heightened scrutiny' to distinguish from rational basis review.").

161      *See, e.g., Prieto*, 861 F.3d at 848–49 (rejecting notion that ⚑ *Sorrell's* reference to "heightened" scrutiny was intended to apply a standard to commercial speech cases that is greater than intermediate scrutiny; *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1055 (8th Cir. 2014) ("The upshot is that when a court determines commercial speech restrictions are content- or speaker-based, it should then assess their constitutionality under ⚑ *Central Hudson*.").

162      ⚑ *Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343.

163      ⚑ *Id.*

164      ⚑ *Id.*

165      ⚑ *Id.*

Greater Philadelphia Chamber of Commerce v. City of Philadelphia, 949 F.3d 116 (2020)

170 Lab.Cas. P 62,023

166    *Posades de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986).

167    See *Lorillard Tobacco*, 533 U.S. at 556, 121 S.Ct. 2404 ("[I]t [is] clear that 'the least restrictive means' is not the standard; instead, the case law requires a reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends, ... a means narrowly tailored to achieve the desired objective' "). Under strict scrutiny the government faces a more difficult burden, it "must show that the 'regulation is necessary to serve a compelling state interest,' " *Burson v. Freeman*, 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), and the regulation must be the least restrictive means of achieving the interest. *McCullen v. Coakley*, 573 U.S. 464, 478, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014).

168    *Chamber*, 319 F. Supp. 3d at 786.

169    *Id.* (emphasis added); *see also Dunagin v. City of Oxford*, 718 F.2d 738, 743 (5th Cir. 1983) (en banc) ("The commercial speech doctrine would disappear if its protection ceased whenever the advertised product might be used illegally.").

170    *Chamber*, 319 F. Supp. 3d at 787. Under the district court's reasoning, on the other hand, a law that prohibited the advertising of the sale of cocaine, for example, would present a speech restriction that *always* and *only* related to illegal activity because there are no other legal uses/purposes behind the sale of cocaine.

171    413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973).

172    *Id.* at 378, 93 S.Ct. 2553. The Ordinance also prohibited "aid[ing] ... in the doing of any act declared to be an unlawful employment practice under the Ordinance."

173    *Id.* at 380, 93 S.Ct. 2553.

174    *Id.* at 389, 93 S.Ct. 2553.

175    *Id.*

176    *Chamber of Commerce*, 319 F. Supp. 3d at 787.

177    *Florida Bar*, 515 U.S. at 625, 115 S.Ct. 2371 (internal citations omitted).

178    *Id.* at 626, 115 S.Ct. 2371.

179    *Id.*

180    *Turner I*, 512 U.S. at 666, 114 S.Ct. 2445.

181    *Turner II*, 520 U.S. at 195, 117 S.Ct. 1174 (internal quotation marks and citation omitted).

182    *Chamber of Commerce*, 319 F. Supp. 3d at 797–98 (emphasis added) (internal quotation marks omitted).

183    *Florida Bar*, 515 U.S. at 628, 115 S.Ct. 2371 (citing *Burson v. Freeman*, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)) (Blackmun, J., plurality opinion) (emphases added). *See also* City Br. at 43–44 (citing *Heffner v. Murphy*, 745 F.3d 56, 92 (3d Cir. 2014), *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 303–04 (4th Cir. 2009), *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 608 (9th Cir. 2010) to show recent decisions reflecting the Supreme Court's flexible approach to speech restrictions under intermediate scrutiny).

184    *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000).

185    *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439–40, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002).

186    Blau and Khan at 32; *see also* fn. 60, 75, *supra*.

187    *See* JA275.

188    *Turner II*, 520 U.S. at 181, 117 S.Ct. 1174 (internal quotation marks and citation omitted).

189    *Turner I*, 512 U.S. at 666, 114 S.Ct. 2445.

190    504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992).

191    551 U.S. 291, 127 S.Ct. 2489, 168 L.Ed.2d 166 (2007).

192    *Burson*, 504 U.S. at 211, 112 S.Ct. 1846.

193    *Id*. at 196, 112 S.Ct. 1846.

194    *Id*. at 197, 211, 112 S.Ct. 1846.

195    *Id*. at 208 n.11, 112 S.Ct. 1846.

196    *Id*. at 208, 112 S.Ct. 1846 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)) (internal quotations omitted).

197    *Id*. at 208-211, 112 S.Ct. 1846.

198    *Id*.

199    551 U.S. at 294, 127 S.Ct. 2489.

200    *Id*.

201    *Id*. at 294-95, 127 S.Ct. 2489.

202    *Id*. at 300, 127 S.Ct. 2489.

203    447 U.S. at 568, 100 S.Ct. 2343.

204    *Id.*, 447 U.S. at 569, 100 S.Ct. 2343. Although the Court eventually found, under the fourth prong, that the law at issue was overbroad because it "suppresse[d] speech that in no way impairs the State's interest in energy conservation," *id.* at 570, 100 S.Ct. 2343, under the third prong, the Court simply recognized the "immediate connection" that limiting advertising would have on demand for electricity. *Id.* at 569, 100 S.Ct. 2343.

205    *Chamber of Commerce*, 319 F. Supp. 3d at 792 ("[P]ractically all of the ... testimony amplifies a point that really is not in dispute – that there is a gender pay disparity.") Although this excerpt from the district court opinion refers specifically only to the gender disparity, it is clear that the court also accepted the existence of a racial disparity. The court's concern was not with the existence of these disparities, but with whether the City had established a sufficient "fit" between the Inquiry Provision and these disparities to support its conclusions that the Inquiry Provision was necessary to address the disparities.

206    JA124.

207    *Chamber of Commerce*, 319 F. Supp.3d at 794 (" *Edenfield*, *Rubin*, *Pitt News*, and *Wollschlaeger* instruct that some evidence is required for the legislature to conclude that the law at issue will directly advance the government's substantial interest. Theories and unsupported opinions will not suffice to demonstrate that the asserted harms are real.").

208    507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).

209    514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995).

210    379 F.3d 96, 107–08 (3d Cir. 2004).

211    *Edenfield*, 507 U.S. at 764, 113 S.Ct. 1792.

212    *Id.*

213    *Id.* at 764, 771-72, 113 S.Ct. 1792.

214    *Id.* at 765, 113 S.Ct. 1792.

215    *Id.*

216    *Id.* at 775-76, 113 S.Ct. 1792.

217    514 U.S. at 478–79, 115 S.Ct. 1585.

218    *Id.* at 487, 115 S.Ct. 1585.

219    *Id.* at 488, 115 S.Ct. 1585.

220    *Id.* at 486–89, 115 S.Ct. 1585.

Greater Philadelphia Chamber of Commerce v. City of Philadelphia, 949 F.3d 116 (2020)

170 Lab.Cas. P 62,023

---

221    *Id.* at 490, 115 S.Ct. 1585.

222    379 F.3d at 107.

223    *Id.* (emphasis added).

224    *Id.* at 108.

225    848 F.3d at 1319.

226    *Id.* at 1303.

227    *Id.* at 1312.

228    *Id.* (emphasis added).

229    *Id.* (quoting *Turner I,* 512 U.S. 622 at 664, 114 S.Ct. 2445).

230    H'rg Tr. at 66.

231    *Id.* at 75.

232    *Id.* at 8-12.

233    *Chamber of Commerce*, 319 F. Supp.3d at 798.

234    JA297.

235    887 F.3d 453, 460–61 (9th Cir. 2018) (en banc) (holding that a female employee's prior salary does not qualify as a "factor other than sex" under the federal Equal Pay Act that can justify paying her less than a male employee who performs substantially equal work), *vacated on other grounds by Yovino v. Rizo,* —— U.S. ——, 139 S. Ct. 706, 203 L.Ed.2d 38 (2019).

236    *Id.* at 456 (citing 29 U.S.C. § 206(d)(1)).

237    *Id.*

238    29 U.S.C. § 206(d)(1)(iv) allows "a differential based on any factor other than sex."

239    *Rizo,* 887 F.3d at 456–57 (emphasis added).

240    *See, e.g., Irby v. Bittick,* 44 F.3d 949, 955 (11th Cir. 1995) ("if prior salary alone were a justification, the exception would swallow up the rule and inequality in pay among genders would be perpetuated"); *Riser v. QEP Energy,* 776 F.3d 1191, 1199 (10th Cir. 2015) (Equal Pay Act "precludes an employer from relying solely upon a prior salary to justify pay disparity") (citation omitted); *but see, e.g., Wensing v. Dep't of Human Servs.,* 427 F.3d 466, 468-70 (7th Cir. 2005) (holding that prior salary alone can justify wage disparities).

Greater Philadelphia Chamber of Commerce v. City of Philadelphia, 949 F.3d 116 (2020)

170 Lab.Cas. P 62,023

241    *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439–40, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002).

242    767 F.3d 216 (3d Cir. 2014), *abrogated on other grounds by* *Nat'l Inst. of Family & Life Advocates v. Becerra*, ––– U.S. ––––, 138 S. Ct. 2361, 201 L.Ed.2d 835 (2018).

243    767 F.3d at 239.

244    *Alameda Books,* 535 U.S. at 429, 122 S.Ct. 1728.

245    *Id.* at 433, 122 S.Ct. 1728.

246    *Id.* at 439, 122 S.Ct. 1728.

247    *Id.* The court noted, "Respondents' claim assumes that the ... study proves that all adult businesses, whether or not they are located near other adult businesses, generate crime. This is a plausible reading of the results from the 1977 study, but respondents do not demonstrate that it is a compelled reading. Nor do they provide evidence that refutes the city's interpretation of the study, under which the city's prohibition should on balance reduce crime." *Id.* at 438, 122 S.Ct. 1728. Accordingly, the Court concluded that the City had supported the law with sufficient evidence.

248    *See* *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 394, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) ("[t]here might, of course, be need for a more extensive evidentiary documentation if respondents had made any showing of their own to cast doubt on the apparent implications of [the government's] evidence and the record here").

249    Chamber Br. at 49.

250    *Id.*

251    767 F.3d at 238.

252    *Chamber*, 319 F. Supp.3d at 796, 800 ("Unlike in *Florida Bar*, there are no comprehensive studies demonstrating the alleged harm.").

253    *Florida Bar*, 515 U.S. at 627, 115 S.Ct. 2371.

254    *Id.* at 626, 115 S.Ct. 2371.

255    *Id.* at 626-27, 115 S.Ct. 2371.

256    *Id.*

257    *Id.*

258    The report did include "excerpts from complaints of direct-mail recipients," *id.* at 627, 115 S.Ct. 2371, some of whom complained about solicitation in the wake of an injury or accident, but the Bar presented no evidence that a solicitation ban only in the first 30 days after an accident would do anything to mitigate these complaints.

Additionally, the comments included favorable statements about direct mail solicitation as well.  *Id.* at 641, 115 S.Ct. 2371.

259    *Id.* at 640, 115 S.Ct. 2371 (Kennedy, J. dissenting).

260    *Id.* at 640–41, 115 S.Ct. 2371 (Kennedy, J. dissenting) ("[N]o actual surveys, few indications of sample size or selection procedures, no explanations of methodology, and no discussion of excluded results [were presented]. ... [N]o description of the statistical universe or scientific framework that permits any productive use of the information [was presented].").

261    *Id.*

262    *Id.* at 641, 115 S.Ct. 2371.

263    *See, e.g.*, Stanley & Jarrell (meta-analysis of more than 50 studies investigating the wage gaps).

264    *See, e.g., id.* at 948 (concluding there is a "wide consensus that gender wage discrimination exists" and the "vast empirical economic literature, containing hundreds of studies, reveals that women are 'underpaid' disproportionate to their observed skills").

265    *See, e.g.*, Blau & Kahn at 32 (finding from 1980 to 2010, "an unexplained gender wage gap in each year['s data]," and explaining that the "finding of such an unexplained gap is fairly standard in the literature" and is "taken as an estimate of labor market discrimination").

266    *See e.g.*, Arin N. Reeves, "*Written in Black and White: Exploring Confirmation Bias in Racialized Perceptions of Writing Skills*," Nextions Yellow Paper Series (2014) (concluding from the results of a controlled experiment on law firm partners reviewing an identical memo from African-American Thomas Meyer and Caucasian Thomas Meyer that the greater number of negative comments and a .9 reduction in score on a scale of 5 for African-American Thomas Meyer was the result of "commonly held racially-based perceptions about writing ability ... unconsciously impact [law firm partners'] ability to objectively evaluate a lawyer's writing. Most of the perceptions uncovered in research thus far indicate that commonly held perceptions are biased against African Americans and in favor of Caucasians."). The results of this controlled experiment are consistent with others like it conducted in various fields designed to ensure that the only variable that could explain the more positive reaction to White employees was the perceived race or gender of the person they were being compared to. In a similar, well publicized experiment published under the title: "Are Emily and Greg More Employable Than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination," researchers Marianne Bertrand and Sendhil Mullainathan of the University of Chicago and MIT, found "large racial differences in callback rates. Applicants with White names need[ed] to send about 10 resumes to get one callback whereas applicants with African-American names need[ed] to send about 15." The fictional White applicant therefore had a 50 percent greater probability of getting a call back than the fictional African-American applicant. Marianne Bertrand & Sendhil Mullainathan, *Are Emily and Greg More Employable Than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination*, NBER Working Paper No. 9873, National Bureau for Economic Research (2003), https://www.nber.org/papers/w9873.pdf.

267    767 F.3d at 216.

268    *Id.* at 221.

269    *Id.* at 238.

Greater Philadelphia Chamber of Commerce v. City of Philadelphia, 949 F.3d 116 (2020)
170 Lab.Cas. P 62,023

270   *Id.*

271   *Id.*

272   *Id.* at 239.

273   *Id.* (emphasis added) (citation omitted).

274   *Id.*

275   *Id.* at 239.

276   *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) superseded by statute as stated in *Burrage v. U.S.*, 571 U.S. 204, 214 n. 4, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014) (permitting a showing that discrimination was a "motivating" or "substantial" factor to shift the burden of persuasion to the employer, which was made moot after Congress amended the statute to remove but-for causality).

277   *Aman v. Cort Furniture*, 85 F.3d 1074, 1081 (3d Cir. 1996).

278   *Id.* at 1082 (emphasis added).

279   *Price Waterhouse*, 490 U.S. at 272, 109 S.Ct. 1775.

280   For a thorough discussion of the prevalence and impact of such subliminal bias, *see* Mahzarin R. Banaji and Anthony G. Greenwald, Blind Spot: Hidden Biases of Good People (2013).

281   *Lorillard Tobacco*, 533 U.S. at 556, 121 S.Ct. 2404 (internal quotations omitted).

282   *Id.* (citing *Florida Bar*, 515 U.S. at 632, 115 S.Ct. 2371).

283   *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 479–80, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (citing *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982)); *see also* *Matal v. Tam*, —— U.S. ——, 137 S. Ct. 1744, 1764, 198 L.Ed.2d 366 (2017) ("[t]he regulatory technique may extend only as far as the interest it serves.") (citing *Central Hudson*, 447 U.S. at 565, 100 S.Ct. 2343).

284   *Board of Trustees*, 492 U.S. at 480, 109 S.Ct. 3028.

285   *Id.* The Court does not invalidate a commercial speech restriction "that went only marginally beyond what would adequately have served the governmental interest," rather "almost all of the restrictions disallowed under *Central Hudson*'s fourth prong have been substantially excessive ...." *Id.* at 479, 109 S.Ct. 3028.

286   *Greater New Orleans Broadcasting Ass'n, Inc. v. United States,* 527 U.S. 173, 183, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999).

287   *Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 98 (2d Cir. 1998) (quoting *Puerto Rico Assocs.,* 478 U.S. at 341, 106 S.Ct. 2968).

288     We caution, however, that, as the discussion of the Court of Appeals for the Ninth Circuit in 🚩 *Rizo* makes clear, some questions may raise the specter of a wage inquiry, even though not expressed in so many words.

289     *See e.g.,* H'rg Tr., at 15–16 ("Actually, the Massachusetts law goes a little wider than we do. We're trying to keep it real basic, and I think you'll hear from a witness that thinks we don't make it strong enough, but we're trying to find that great balance that we always try to in legislation and at least at this point limit it to stopping the employer from asking, directly asking, the prospective employee what they make. Massachusetts law goes a little farther as far as how far the employer can inquire, and we're not ready to go there yet and we think that could have added more controversy to the bill. ... [W]e want to try to keep it real basic as far as the inquiry of past wages.").

290     This, of course, does not suggest that an employer can goad or cajole an employee into disclosing prior wages or salary.

291     *Central Hudson*, 447 U.S. at 565, 100 S.Ct. 2343.

292     Chamber Br. at 55.

293     *See* Br. of Amicus City of NY et al.

294     515 U.S. at 632, 115 S.Ct. 2371.

295     *Id.* at 633, 115 S.Ct. 2371.

296     *Fox*, 492 U.S. at 479, 109 S.Ct. 3028.

297     Chamber Br. at 57-58.

298     *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 801–02, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011). *See also R.A.V.,* 505 U.S. at 387, 112 S.Ct. 2538 ("[T]he First Amendment imposes not an 'underinclusiveness' limitation but a 'content discrimination' limitation upon a State's prohibition of proscribable speech. There is no problem whatever, for example, with a State's prohibiting obscenity (and other forms of proscribable expression) only in certain media or markets, for although that prohibition would be 'underinclusive,' it would not discriminate on the basis of content.").

299     *Mariani v. United States*, 212 F.3d 761, 774 (3d Cir. 2000).

300     *Id.*

301     *See Fox*, 492 U.S. at 476–78, 109 S.Ct. 3028.

302     The Chamber also cited to our recent decision in *Bank of Hope* in its Rule 28(j) letter to argue that the City was required to attempt a host of other alternatives before implementing the Ordinance. *Central Hudson* scrutiny does not require the City to adopt the least restrictive means to achieve its goal. Moreover, in *Bank of Hope v. Miye Chon*, 938 F.3d 389 (3d Cir. 2019). We concluded that there "neither the magistrate judge nor the district court considered a single alternative." *Id.* at 396. In contrast, the City here, considered and appropriately rejected a number of alternatives, including the patently deficient alternatives suggested by the Chamber, such as simply enforcing current antidiscrimination laws, which have been insufficient to meaningfully close the wage gap.

[303]   § 9-1131(1); *see also* JA299-300 (summarizing testimony before the City regarding existing laws that have insufficiently closed the pay gap).

---

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT C

2020 WL 5224348
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

MIURA CORPORATION, et al
v.
Muntu DAVIS

Case No. 2:20-cv-05497-SVW-ADS
|
Filed 06/25/2020

**Attorneys and Law Firms**

Christian Elias Kernkamp, Kernkamp Law APC, Los Angeles, CA, for Miura Corporation, et al.

Amnon Z. Siegel, Andrew Louis Schrader, Jason H. Tokoro, Tiffany Tejeda-Rodriguez, Miller Barondess LLP, Los Angeles, CA, for Muntu Davis.

**Proceedings:** ORDER DENYING PLAINTIFFS' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER [5]

The Honorable STEPHEN V. WILSON, U.S. DISTRICT JUDGE

**I. Introduction**
**\*1** Plaintiffs Miura Corporation d/b/a Sasabune Beverly Hills ("Plaintiff Sasabune") and Nargiza Lutz ("Plaintiff Lutz") filed an *ex parte* Application for a Temporary Restraining Order ("TRO") on June 20, 2020. For the reasons articulated below, Plaintiffs' application is DENIED.

**II. Factual and Procedural Background**
Plaintiffs filed both this lawsuit and their *ex parte* application for a TRO on Saturday June 20, 2020. Dkt. 1;

Dkt. 5. Plaintiffs filed this lawsuit against Defendant Muntu Davis ("Davis" or "the County") in his official capacity, as Health Officer for the County of Los Angeles' Department of Health. Dkt. 1 at 4. Plaintiff Sasabune is a corporation operating a sushi restaurant located in Beverly Hills, and Plaintiff Lutz is an individual residing in Los Angeles County. *Id.* at 4.

Plaintiffs' lawsuit arises from an Order ("the Order" or "the County's Order") issued by Defendant Davis in conjunction with the County of Los Angeles' ("the County") phased reopening plan created in response to the ongoing COVID-19 health crisis. *See* Centers for Disease Control and Prevention, "Cases in the U.S." June 23, 2020 https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. Plaintiffs allege two causes of action, under the First and Fourth Amendments. *Id.* at 9–11. Plaintiffs argue that the provision in the Order that took effect on June 18, 2020 and instructed places of worship, office worksites, restaurants, and other types of businesses and organizations to collect contact information from visitors and participants during the course of their activities constitute an unconstitutional warrantless search regime (in violation of the Fourth Amendment) and infringe upon Plaintiff Lutz' freedom of association (in violation of the First Amendment). *See* Dkt. 1-1 (County's Revised Order).

The relevant portions of the County's Order can be easily summarized. They instruct businesses affected by the Order to collect "contact information," in some cases defined to include names, phone numbers, and email addresses from visitors, participants, and patrons, as are relevant for the type of business or activity in question. *See* Dkt. 1 at 6–7 (collecting relevant language from the Order). Violation or failure to comply with the Order is "a crime punishable by fine, imprisonment, or both." Dkt. 1-1 at 1; *see also* Cal. Health & Safety Code § 120295. The Order also specifically references the County's plans to utilize "contact tracing," which seeks to isolate confirmed cases of COVID-19 and "trace" those individuals who have been in contact with those confirmed cases in order to quarantine them effectively. *Id.* at 8. Both parties agree that the contact information recordkeeping requirements in the Order are directly linked to the County's efforts to conduct effective contact tracing in order to combat further COVID-19 outbreaks, although they disagree on the constitutionality of those efforts. *See* Dkt. 5-1 at 11 ("There is no contact tracing exception to the Fourth Amendment."); Dkt. 16 at 6 ("The record-keeping requirements of the Order will allow the County to conduct effective contact tracing, when

Miura Corporation v. Davis, Slip Copy (2020)

necessary.")

**\*2** Plaintiffs filed their TRO on Saturday June 20, 2020, Dkt. 5, and the County filed an Opposition on June 23, 2020. Dkt. 16.

### III. Legal Standard

The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm until a hearing may be held on the propriety of a preliminary injunction. *See* *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995); *see* *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brushy and Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2011).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("*Winter*"). The Ninth Circuit employs the "serious questions" test, which states " 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "A preliminary injunction is an 'extraordinary and drastic remedy.' It should never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690 (2008) (citation omitted). The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury, *Simula, Inc. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999), that must be imminent in nature. *Caribbean Marine Serv. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).

### IV. Analysis

**a.** *Application of* <u>*Jacobson v. Massachusetts*</u> *to Plaintiff's claims given the current public health emergency caused by COVID-19.*

In addressing suits filed seeking injunctive relief against local government action in response to the COVID-19 crisis, district courts, appellate courts, and the Supreme Court have found the holding of *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) relevant. *See* *Prof'l Beauty Fed'n of California v. Newsom*, No. 2:20-CV-04275-RGK-AS, 2020 WL 3056126, at \*5 (C.D. Cal. June 8, 2020); *Gish v. Newsom*, No. 2:20-CV-755-JGB-KKX, 2020 WL 1979970, at \*4 (C.D. Cal. Apr. 23, 2020); *In re Abbott*, 956 F.3d 696, 704 (5th Cir. 2020); *Elim Romanian Pentecostal Church v. Pritzker*, 2020 WL 3249062, at \*5 (7th Cir. June 16, 2020); *S. Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613 (2020) (Roberts, CJ., concurring in denial of application for injunctive relief).

In *Jacobson*, the Supreme Court considered the constitutionality of Massachusetts' compulsory vaccination law, which was enacted during a smallpox epidemic. 197 U.S. at 12–13. The plaintiff in the case, a minister, refused to be vaccinated and was fined $5, and brought a Constitutional challenge to the law. The Supreme Court rejected this argument on appeal, stating that "the court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case." *Id. at 28*.

**\*3** The Court then described the scope of judicial authority to review emergency measures such as the vaccination mandate narrowly, explaining that "[i]f there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can *only* be when...a statute purporting to have been enacted to protect the public health...*has no real or substantial relation to those objects*, or is, beyond all question, *a plain, palpable invasion of rights secured by the fundamental law*[.]" *Id. at 31* (emphasis added). Accordingly, this Court concludes that unless (1) the measure has no real or substantial relation to public health, or (2) the measure is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law," the Court should apply an especially strong presumption of constitutionality to the County's Order. *Id.*; *see also* *Prof'l Beauty Fed'n*, 2020 WL 3056126, at \*5 (applying a similar test under *Jacobson*).

The Court finds, given the evidence before it, that the County's Order satisfies both prongs of this requirement. First, the measures Plaintiffs seek an injunction against clearly have a "substantial relation" to the COVID-19 crisis, as Plaintiffs acknowledge in their motion and could not seriously dispute. Additionally, for the reasons stated below in this Court's analysis of the *Winter* factors applicable here, the portions of the County's Order related to gathering contact information and potential disclosure to the County to assist in contact tracing efforts do not constitute "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. The Court therefore finds that at this juncture, and in light of the current public health crisis related to COVID-19, *Jacobson* requires the Court to apply an especially strong presumption of constitutionality to the County's Order.

**b.** *Application of the* Winter *Factors*

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Under *Winter*, a plaintiff "must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (applying *Winter*, 555 U.S. at 29).

**1. Likelihood of Success on the Merits**

The Ninth Circuit considers the likelihood of success on the merits "the most important *Winter* factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation marks omitted). However, even if likelihood of success is not established, "[a] preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships ... tips sharply towards' it, as long as the second and third *Winter* factors are satisfied." *Id.* (quoting *Cottrell*, 632 F.3d at 1134–35).

*i. First Amendment Claim*

Plaintiff Lutz argues the Order will violate her First Amendment rights by forcing her to disclose her patronage of restaurants[1] complying with the County's Order. "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed ... at which point the burden shifts to the government to justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115–16 (9th Cir. 2011). As presented by Plaintiff Lutz, it is not clear that the contested action, collecting contact information from businesses such as bars and restaurants, implicates the First Amendment at all. "If the government's actions do not implicate speech protected by the First Amendment, we need go no further." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1194 (9th Cir. 2018) (internal quotation mark omitted). Plaintiff does not and cannot reasonably argue that dining at a restaurant constitutes speech or expressive conduct as contemplated by the First Amendment, and a restriction on "nonspeech, nonexpressive conduct ... does not implicate the First Amendment" and receives rational basis scrutiny. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019). However, Lutz also argues that mandating third-party restaurants to collect her "contact information,"[2] which may potentially be disclosed to the County, unconstitutionally burdens her First Amendment Right of Association.

**\*4** Plaintiff Lutz argues that the disclosure of her business patronage burdens her First Amendment Right of Association because "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, *economic*, educational, religious, and cultural ends." *Roberts v. Jaycees*, 468 U.S. 609, 622 (1984) (emphasis added). However, *Roberts* dealt specifically with the state of Minnesota's attempt to force women to be admitted into a private civic organization that was exclusively male. *Id.* at 621. The Court noted that gender segregation in an otherwise-open-club was impermissible because it perpetuated "barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women." *Id.* at 626. In concurrence, Justice O'Connor distinguished expressive political associations from routine commercial activity, noting "there is only minimal constitutional protection of the freedom of commercial association." *Id.* at 634 (O'Connor, J., concurring in part). Justice O'Connor reasoned that "[t]he First Amendment is offended by direct state control of the

membership of a private organization engaged exclusively in protected expressive activity, but no First Amendment interest stands in the way of a State's rational regulation of economic transactions by or within a commercial association." *Id.* at 638 (O'Connor, J., concurring in part). Here, Plaintiffs patronage of local businesses, and the accompanying identifying information she may be required to disclose, is purely commercial, and therefore does not raise First Amendment concerns.

Plaintiff's compelled disclosure argument is similarly unavailing. The Supreme Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo,* 424 U.S. 1, 64, 96 (1976). But Plaintiff fails to show that disclosing her contract information to a business will place any burden on her associational rights. Plaintiff relies on *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 460–62 (1958) and *Gibson v. Fla. Legislative Investigation Comm.,* 372 U.S. 539, 546 (1963) to show that disclosure of identifying information to the government creates a burden under the First Amendment. In *N.A.A.C.P.* and *Gibson,* the Supreme Court concluded that government investigation of a political advocacy group's membership list required strict scrutiny. However, Plaintiff's patronage at a restaurant is a far cry from the political membership list examined in either *N.A.A.C.P.* or *Gibson.* Similarly inapposite is Plaintiff's reliance on *Americans for Prosperity Foundation v. Becerra,* 919 F. 3d 1177, 1179 (9th Cir. 2019), where the Ninth Circuit held that "[c]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as more direct restrictions on speech." Again, *Americans for Prosperity* related specifically to organizations engaged in clearly protected political activity, not basic commercial transactions. Unlike the case discussed above, the patronage of local businesses does not involve any political activity. Accordingly, Plaintiff Lutz has failed to raise a serious question that her First Amendment rights are burdened by the Order, and she is unlikely to be successful on the merits of her claim.

### ii. Fourth Amendment

Both Plaintiffs argue that the Ordinance violates their rights under the Fourth Amendment. Plaintiff Sasabune argues that under *City of Los Angeles, Calif. v. Patel,* 576 U.S. 409 (2015), to the extent that the County Order requires Plaintiff Sasabune to turn over contact information provided by patrons of the restaurant, it is facially invalid under the Fourth Amendment because it does not expressly require precompliance review of such a demand for information from affected businesses and organizations in the County. Dkt. 5 at 11. Plaintiff Lutz argues only that she "has a privacy interest in her data as it is collected across the County." *Id.* at 11.

Plaintiff Lutz' claim is not cognizable under the Fourth Amendment, because she has no reasonable expectation of privacy with regard to information that she may (prospectively) disclose to businesses operating under the County's Order. Her contact information, once provided to any of the entities subject to the County's Order, constitutes business records of those businesses, no longer subject to her privacy interest. *See Patel v. City of Los Angeles,* 738 F.3d 1058, 1062 ("To be sure, the *guests* lack any privacy interest of their own in the hotel's records."); *see also United States v. Cormier,* 220 F.3d 1103, 1108 (9th Cir. 2000) ("a person does not possess a reasonable expectation of privacy in an item in which he has no possessory or ownership interest").

**\*5** If, as Plaintiff Lutz declares, she "do[es] not desire or consent to the collection of [her] private information," she is under no obligation to do so because the County's Order only requires businesses to seek disclosure of contact information from individuals and places no direct requirements on individuals. *See generally* Dkt. 1-1, Appendix D, F, I, J, N, R, S (instructing various types of businesses to collect contact information to assist in contact tracing). Plaintiff Lutz therefore lacks a continuing Fourth Amendment-protected privacy interest in any contact information that she voluntarily discloses to a business or organization covered by the Order.

With regard to Plaintiff Sasabune[3], the County argues in response that (1) the Order does not expressly mandate maintaining information or compel businesses to turn over such records, and (2) in the event that a business did not voluntarily consent to turn over their contact information, the County would seek an administrative warrant in order to gain access to this information. Dkt. 16 at 12–14, 17.[4]

Focusing narrowly on the provision relevant to Plaintiff Sasabune as a restaurant, Appendix I states in relevant part that:

> On-site dining made by reservation or customers notified to call in advance to confirm seating/serving

capacity, where possible. Contact information for each party is collected either at time of reservation booking or on site to allow for contact tracing should this be required.

Dkt. 1-1, Appendix I at 4. The Court finds that the language of the County's Order is reasonably susceptible to the interpretation that the County would potentially seek disclosure of these records to assist in contract tracing efforts related to COVID-19 (the County's brief also acknowledges this), and will presume for the following analysis that the County intends to seek disclosure of such contact information when it deems it necessary to assist in contact tracing efforts by public health officials.

Because this disclosure requirement is clearly not related to any criminal investigative purpose, any such government effort pursuant to the Order is properly analyzed under the Fourth Amendment's "administrative search" exception to the warrant requirement for government searches and seizures. *See* *Patel*, 576 U.S. 409, 420. In *Patel*, the Supreme Court held that Section 41.49(3)(a) of the Los Angeles Municipal Code, which required hotel operators to make hotel guest records available to any officer of the Los Angeles Police Department on demand (and punished failure to do so with fines and imprisonment), was facially invalid because it did not satisfy the administrative search exception to the Fourth Amendment. *Patel*, 576 U.S. at 419–421. In particular, the Supreme Court held that "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.*

**\*6** Unlike in *Patel*, the County here specifically argues that "[i]n the unlikely event that a business refused to provide its records to County health officials, they could seek an administrative warrant." Dkt. 16 at 17. The County then cites to Cal. Civ. Proc. Code §§ 1822.50 *et seq.*, which articulates the process for issuing an administrative warrant under California law that would clearly satisfy the "precompliance review before a neutral decisionmaker" requirement articulated by *Patel.* 576 U.S. at 420.

The language of the Order is relatively vague and does not clearly state procedures for seeking disclosure of

contact information, in the event that the County attempts to utilize contact tracing in response to a COVID-19 outbreak. Dkt. 1-1, Appendix I at 4. But unlike in *Patel*, where the City of Los Angeles did not even attempt to argue that the disputed municipal code section "affords hotel operators any opportunity" for precompliance review, the County argues here that it will in practice provide for such an opportunity.[5] Compare *Patel*, 576 U.S. at 421 *with* Dkt. 16 at 3, 17.

Although the language of the Order is vague regarding this process, the Court finds a low probability of success on the merits here, given that Plaintiffs are raising a facial challenge to the Order's constitutionality on this basis, which requires the Court to find that the Order be "unconstitutional in all of its applications." *Patel*, 576 U.S. at 418 (citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008). The Court cannot find a substantial likelihood of success on the merits based on the arguments Plaintiff Sasabune has made on this claim, because there is no current evidence that the County will unconstitutionally apply the terms of the Order in practice. In connection with the preliminary injunction briefing the Court outlines below, Plaintiffs may present additional evidence that in application, the City's Order will result in unconstitutional administrative searches without precompliance review by a neutral decisionmaker, or that the plain language of the Order cannot be reasonably be interpreted in a constitutional manner.

### 2. Likelihood of Irreparable Harm

Although the Court cannot conclude that Plaintiffs are likely to be successful on either of their constitutional claims, the Court must still analyze the remaining *Winter* factors to determine if a TRO is appropriate. *See* *Doe v. Harris*, 772 F.3d 563, 582 (9th Cir. 2014) ("Even though a plaintiff has demonstrated a likelihood of success on the merits of a First Amendment claim, it must also demonstrate that he is likely to suffer irreparable injury in the absence of a preliminary injunction, and that the balance of equities and the public interest tip in his favor.") (internal quotation marks omitted).

In considering a preliminary injunction, the deprivation of First Amendment rights "even for minimal periods of time, unquestionably constitute[s] irreparable injury." *Elrod v. Burns*, 427 U.S. 373 (1976); *see also* *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir.

2012) (adopting the proposition); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (adopting *Elrod* in the Fourth Amendment context). However, since Plaintiffs have failed to show such a constitutional injury is likely, they may not rest on that presumptive showing of harm. Plaintiffs also allege they may suffer harm in the form of potential loss of business customers and the "charges and fines" that may be imposed by the County. Dkt. 5 at 13. This is a monetary harm compensable by money damages, which is not considered irreparable for the purposes of a TRO. *Inv'rs v. Bank of Am.*, NA, 585 F. App'x 742 (9th Cir. 2014) (describing the difference between irreparable harm and that which can be "adequately remedied through money damages."). The Order also provides that a resident may face criminal penalties, but Plaintiffs have not shown any reasonable possibility of criminal enforcement. Indeed, Plaintiffs only address the potential of criminal penalties in the most cursory of terms, arguing: "[t]he County has made it clear that violations of the Order are punishable by criminal and civil penalties. These sanctions can be very significant as charges and fines can be stacked on a per day and per violation basis." Dkt. 5 at 13. **Plaintiff does not argue that criminal penalties are likely.** The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury *is likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). The mere possibility of criminal penalties, however remote, is insufficient to imply likely irreparable harm. *Id.* Accordingly, Plaintiffs have failed to show any likelihood of irreparable harm.

### 3. Balance of the Equities

\*7  In considering a TRO, the "the district court must balance the harms to both sides ...." *VidAngel, Inc.*, 869 F.3d at 867. Even if Plaintiffs were to be successful on their constitutional claims, proving likelihood of success alone does not tip the balance of equities. *Gresham v. Picker*, 705 Fed. App'x. 554 (9th Cir. 2017). As discussed above, Plaintiffs have failed to demonstrate that they will suffer any irreparable harm by enforcement of the Order. In contrast, the County has made an ample showing that its efforts to combat COVID-19 could be inhibited by a TRO. *See* Dkt. 16 at 2–6. Examining the evidence presented on this record, the Court finds that the balance of the equities tips sharply in favor of the County.

### 4. Public Interest

"Finally, the court must 'pay particular regard for the public consequences in employing the extraordinary remedy of injunction.' " *VidAngel*, 869 F.3d at 867 (citing *Winter*, 555 U.S. at 24). Here, the public interest weighs strongly in favor of the County. Generally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal quotation marks omitted). But Plaintiff has failed to show their constitutional rights are likely to be violated by the Order. Conversely, if the County's efforts are judicially thwarted, the damage to the public could extend far beyond these individual Plaintiffs. The public interest is therefore overwhelming served by denying the TRO.

### c. Balancing the *Winter* factors

Considering all of the *Winter* factors in concert, the Court finds that a TRO is not warranted in this instance. Plaintiffs have failed to show a likelihood of success on their constitutional claims, and the remaining *Winter* factors all weigh in favor of the County. Even if Plaintiffs' constitutional claims were likely to succeed, Plaintiffs have still failed the Ninth Circuit's "serious question" test because they have not shown "that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Cottrell*, 632 F.3d at 1135. Further, the Court must consider that this Order comes in response to the ongoing COVID-19 crisis, as discussed *supra* Part IV.a with regard to *Jacobson*, where the County's "latitude" to address the public health crisis " 'must be especially broad.' " *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). Taking all of these factors into account, the Court concludes Plaintiffs have not met their burden in justifying the "extraordinary relief" of a TRO. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). The application for a TRO is therefore DENIED.

### V. Conclusion

The Court DENIES the application for a TRO. The Court sets a briefing schedule for a preliminary injunction hearing in this lawsuit on the following schedule:

Plaintiff's motion is due July 13th, Defendant's Opposition brief is due July 23rd, Plaintiff's Reply brief is due July 27th, at which time the Court will take the motion under submission.

**All Citations**

Slip Copy, 2020 WL 5224348

**Footnotes**

1   Plaintiff summarily lists other ways Lutz might "go[ ] about her business within the County," beyond restaurant patronage, including "traveling to religious and political organizations, to her doctor, her lawyer, and so forth." Dkt. 5 at 13. Although disclosure of associations with political and religious organizations might raise different concerns, Plaintiff provides no detail as to how the Order would apply to these organization, nor does she describe how these businesses would be compelled to disclose her information to the government. Plaintiff presents no evidence or argument of how the disclosure requirement for contract tracing would extend beyond commercial organizations, such as bars, restaurants, and other commercial space. Accordingly, the Court cannot grant the TRO on such a minimalistic showing. *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 56 (1974) ("in the absence of a concrete fact situation in which competing associational and governmental interests can be weighed, [the Court] is simply not in a position to determine whether an effort to compel disclosure of such records would or would not be barred").

2   The Order does not define "Contact Information" in any precise way. Plaintiff does not raise a vagueness challenge here, but the issue may require clarification at the preliminary injunction stage.

3   Both parties address the language of the County's Order in its entirety, including sections regarding places of worship, office worksites, entertainment productions, and other types of businesses. Plaintiff Sasabune is a sushi restaurant. *See* Dkt. 5-7 at 2. Because only Appendix I of the County's Order governs restaurants, and there is no indication in the record that Plaintiff Sasabune is subject to any of the other referenced portions of the Order, the Court's Fourth Amendment analysis will solely focus on the provisions contained in Appendix I.

4   Although the City's Opposition brief directly raises the administrative warrant argument with regard to Plaintiff Sasabune, the body of the Opposition only raises this point with regard to Plaintiff Lutz' First Amendment claims. The Court concludes that this was likely an oversight (because *Patel* is highly relevant to this claim and calls for such precompliance review before an administrative search), and incorporates this argument in its analysis.

5   The Court notes that the County uses the phrases "can seek" and "could seek" in its briefing related to obtaining an administrative warrant before seeking contact information from a business owner who declines to provide it voluntarily. *See* Dkt. 16 at 3, 17. While this language is unclear, the Court (accepting the teaching of *Jacobson*) will presume at this juncture that the County will follow that procedure whenever a business declines to voluntarily disclose contact information.

                                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

2020 WL 3146584
Only the Westlaw citation is currently available.
United States District Court, D. Hawai'i.

THINH TRAN, Plaintiff,

v.

DEPARTMENT OF PLANNING FOR the
COUNTY OF MAUI; County of Maui; Mayor
Michael Victorino, successor in interest; Michele
McLean, in her capacity as Director of the
Department of Planning; Does 1–20; Jane Does
1–20; Doe Partnerships 1–20; Doe Corporations
1–20; Doe Entities 1–20; Doe Governmental Units
1–20, Defendants.

CIVIL NO. 19-00654 JAO-RT
|
Signed 06/12/2020

**Attorneys and Law Firms**

Terrence M. Revere, Amanda Dutcher, Revere &
Associates, LLLC, Kailua, HI, for Plaintiff.

Kristin K. Tarnstrom, Department of the Corporation
Counsel Maui, Wailuku, HI, for Defendants.

**ORDER (1) GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND (2) STAYING THE
ACTION**

Jill A. Otake, United States District Judge

**\*1** In this action, Plaintiff Thinh Tran ("Plaintiff")
presents multiple challenges to the legality of Maui
County Ordinance No. 3941, which regulates short-term
rental homes. Defendants Department of Planning for the
County of Maui; the County of Maui; Mayor Michael
Victorino; and Michele McLean, Director of the
Department of Planning (collectively, "Defendants") seek
dismissal of this action for failure to state a claim. For the
following reasons, the Court HEREBY GRANTS IN
PART AND DENIES IN PART Defendants' Motion to

Dismiss Complaint for Declaratory and Injunctive Relief
with Prejudice, ECF No. 18, ABSTAINS pursuant to
*Railroad Commissioner v. Pullman*, 312 U.S. 496, 61
S.Ct. 643, 85 L.Ed. 971 (1941), and STAYS this action.

**BACKGROUND**

**I. Factual History**
In early 1990, the County of Maui and the State of
Hawai'i approved the development of the Kaanapali
Beach Resort, South Mauka, more commonly known as
Kaanapali Golf Estates ("KGE"). Compl. ¶ 24. The
subdivision approval included a review of the Declaration
of Covenants, Conditions and Restrictions for KGE
("CC&R"), and according to Plaintiff, a determination
that the uses of the property were consistent with the
Maui County Code ("MCC"). *See id.* ¶ 26. Section 27 of
the CC&R authorizes owners to lease their units for an
initial term of not less than 30 days, unless the board of
directors shortens the term. *See id.* ¶ 27. At the inception
of KGE, short-term/transient rentals were for terms of less
than 30 days under the MCC. *See id.* ¶ 28. Since then, the
CC&R and MCC have permitted KGE owners to rent
their units for a minimum of 30 days, up to 12 times per
year. *See id.* ¶ 31.

In 2012, the County of Maui (the "County") adopted
Ordinance 3941 to address short-term rental homes. *See
id.* ¶ 54. It provides:

> "Short-term rental home" means a residential use in
> which overnight accommodations are provided to
> guests for compensation, for periods of less than one
> hundred eighty days, in no more than two detached
> single-family dwelling units, excluding bed and
> breakfast homes[.]

> "Transient vacation rentals or use" means occupancy of
> a dwelling or lodging unit by transients for any period
> of less than one hundred eighty days, excluding bed
> and breakfast homes and short-term rental homes[.]

Compl. Ex. A, ECF No. 1-1 at 5 (editorial notations
omitted).

Plaintiff alleges that the County has identified approved
properties unaffected by Ordinance 3941—KGE is not
one of them—including condominium projects and

planned residential developments located in resort destination areas that are the same nature as KGE, with single family homes, project instruments creating vested short-term rental rights, with many subject to the same residential zoning (R-3) as KGE. *See* Compl. ¶¶ 47–49. Other planned communities within the Kaanapali Beach Resort—whether or not they appear on the approved properties list—have been grandfathered or are not subject to Ordinance 3941, such as the adjacent Masters at Kaanapali, and nearby Kaanapali Planation and International Colony Club. *See id.* ¶ 50.

**\*2** According to Plaintiff, a vocal minority within KGE sought to enforce the 180-day restriction and urged the County and Defendant Department of Planning ("DP") not to issue short-term rental permits to KGE owners, misrepresenting that the CC&R do not allow rentals of less than 180 days. *See id.* ¶ 55. A group of KGE owners then undertook efforts to amend the CC&R to prohibit (1) all rentals less than 180 days and (2) owners from obtaining permits under Ordinance 3941. *See id.* ¶ 58.

In 2013, KGE's developer relinquished control over Kaanapali Golf Estates Community Association, Inc. ("KGECA") to the homeowners. *See id.* ¶ 59. Using a purportedly illegal voting member process, a small group of KGE owners that opposed transient vacation rentals assumed control of KGECA and began enforcing the minimum 180-day rental period. *See id.* ¶ 60. Employing the same illegal voting process—voting 66% of owners' votes without receiving a signed proxy from the owners—the owners group adopted a 2014 Rental Amendment, which changed the minimum rental period from 30 to 180 days.¹ *See id.* ¶ 61. Plaintiff claims that this owners group now insists that the MCC has never authorized rentals for periods of 30 days or more in resort communities and interferes with any owner seeking a permit for short-term transient rentals. *See id.* ¶ 62.

Plaintiff represents that he purchased property within KGE in reliance on the CC&R zoning, and structured financing with the intention to lease his unit for periods of 30 days or more. *See id.* ¶ 66. He believes that DP, acting independently or at the direction of Director Michele McLean or at the request of the owners group, may enforce Ordinance 3941 against him for renting his units for less than 180-day periods and fine him up to $10,000 per day. *See id.* ¶ 69.

Plaintiff alleges that DP has issued violation notices to him and others, imposing excessive fines based on internet searches that produced links to potential vacation rental advertisements, which Ordinance 3941 treats as prima facie evidence of an unlawful short-term rental home, thereby impermissibly placing the burden on property owners to prove that violations did not occur. *See id.* ¶¶ 72–73. Plaintiff challenges Ordinance 3941's failure to recognize the daily rate presentation on hosting platforms for rentals exceeding 30 day or even 180 days—both of which are legal—and using such information to cite him and others for illegal advertising and impose related fines, which chills free speech. *See id.* ¶¶ 74–75. Plaintiff also challenges Ordinance 3941's failure to provide a pre-deprivation hearing before the imposition of fines, as well as the lack of any prompt and independent post-deprivation review. *See id.* ¶ 75.

II. <u>Procedural History</u>

Plaintiff commenced this action on December 6, 2019, asserting the following claims: (1) declaratory relief pursuant to 28 U.S.C. § 2201 (Count I); (2) due process violations of the Fifth Amendment and Hawai'i Constitution, Article I, § 5 (Counts II and III); (3) excessive fines in violation of the Eighth Amendment and the Hawai'i Constitution, Article I, § 12 (Counts IV and V); (4) free speech violations under the First Amendment and Hawai'i Constitution, Article I, § 4 (Counts VI and VII); (5) violation of Hawai'i Revised Statutes ("HRS") § 46-4 (Count VIII); and (6) violation of the Hawai'i Administrative Procedures Act (Count IX). Compl. at 28–40. Plaintiff prays for declaratory, equitable, and injunctive relief, along with attorneys' fees and costs. *Id.* at 40–41. Plaintiff invokes jurisdiction pursuant to 42 U.S.C. §§ 1331, 1332, 1343, and 1367. *Id.* ¶¶ 18–20.

<u>LEGAL STANDARD</u>

**\*3** Federal Rule of Civil Procedure ("FRCP") 12(b)(6) authorizes dismissal of a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a Rule 12(b)(6) motion to dismiss, "the court accepts the facts alleged in the complaint as true," and "[d]ismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)) (alteration in original). However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are

Thinh Tran v. Department of Planning for County of Maui, Slip Copy (2020)

2020 WL 3146584

insufficient to defeat a motion to dismiss. *See* *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) (citation omitted). Furthermore, the court need not accept as true allegations that contradict matters properly subject to judicial notice. *See* *Sprewell*, 266 F.3d at 988.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). The tenet that the court must accept as true all of the allegations contained in the complaint does not apply to legal conclusions. *See* *id.* As such, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id. at 679*, 129 S.Ct. 1937 (citing Fed. R. Civ. P. 8(a)(2)) (some alterations in original). If dismissal is ordered, the plaintiff should be granted leave to amend unless it is clear that the claims could not be saved by amendment. *See* *Swartz v. KPMG LLP*, 476 F.3d 756, 760 (9th Cir. 2007) (citation omitted).

## DISCUSSION

Defendants argue that Plaintiff fails to state a claim upon which relief can be granted because all claims are premised on the flawed theory that he has been and continues to be entitled to use his properties for short-term rentals within KGE. Defendants also challenge Plaintiffs' reliance on multiple exhibits that are not properly before the Court. Plaintiff responds that the County essentially approved the CC&R, thereby creating vested rights for KGE owners.

## I. Judicial Notice

As a preliminary matter, the Court addresses Defendants' request to take judicial notice of documents they attached to their Motion and to strike Plaintiff's arguments regarding and reliance on the exhibits attached to the Opposition, which are not readily subject to judicial notice. Pursuant to Federal Rule of Evidence ("FRE") 201, courts can take judicial notice of facts not subject to reasonable dispute because they are generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Under Rule 12(b)(6), review is ordinarily limited to the contents of the complaint. *See* *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Sprewell*, 266 F.3d at 988. A Rule 12(b)(6) motion is treated as a motion for summary judgment if matters outside the pleadings are considered. *See* *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). However, courts may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). In addition, courts may consider evidence necessarily relied upon by the complaint if "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448 (citations omitted).

**\*4** The Court finds that taking judicial notice of the exhibits attached to the Motion is appropriate because they are publicly available ordinances and rules, most of which are available online, and can be readily determined from accurate sources. Moreover, Plaintiff himself challenges Ordinance 3941 and references multiple of the other ordinances in his Complaint. The Court therefore takes judicial notice of the documents without converting the Motion into a motion for summary judgment.

However, Plaintiff has *not* requested judicial notice of the exhibits attached to his Opposition and the Court declines to take judicial notice of the same. Nor has Plaintiff attempted to authenticate the exhibits or explain how they qualify for judicial notice. Instead, he introduced the exhibits through another KGE owner. Defendants contend that the owner is not a custodian of records and cannot properly authenticate the exhibits. Given Plaintiff's failures and Defendants' objection, the Court declines to

Thinh Tran v. Department of Planning for County of Maui, Slip Copy (2020)

2020 WL 3146584

consider the exhibits.[2]

## II. Standing
Defendants did not initially challenge Plaintiff's standing. Because "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citation omitted), it is well established that "whether or not the parties raise the issue, '[f]ederal courts are *required* sua sponte to examine jurisdictional issues such as standing.'" *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008) (alteration in original) (citations and some internal quotation marks omitted). In response to the Court's inquiry about standing, Defendants argue that Plaintiff has not pled an injury in fact and without one, there can be no causal connection to their conduct, nor a likelihood of redressability.

*Article III of the Constitution* limits federal courts' jurisdiction to cases "Cases" and "Controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). A plaintiff must demonstrate three elements to establish that he or she has "standing" to sue in federal court: (1) "injury in fact" that is "concrete and particularized" and "actual and imminent"; (2) the injury must be fairly traceable to the defendant's conduct; and (3) the injury can be redressed through adjudication. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130; see *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). As the party invoking federal jurisdiction, the plaintiff must establish these elements. See *Spokeo*, ––– U.S. ––––, 136 S. Ct. at 1547, 194 L.Ed.2d 635 (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). At the pleading stage of a case, "the plaintiff must 'clearly ... allege facts demonstrating' each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343, (1975)) (footnote omitted). To determine standing for a plaintiff asserting facial claims, courts "'accept as true all material allegations in the complaint' and 'construe the complaint in favor of the complaining party.'" *Carson Harbor Vill. Ltd. v. City of Carson*, 37 F.3d 468, 476 (9th Cir. 1994) (quoting *Pennell v. San Jose*, 485 U.S. 1, 7, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988)), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A plaintiff exclusively seeking declaratory and injunctive relief must additionally "show a very significant possibility of future harm." *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (citation omitted). A plaintiff facially challenging a statute in a declaratory judgment action must also "demonstrate that he 'has sustained or is imminently in danger of sustaining a direct injury' as the result of the statute." *Carson Harbor*, 37 F.3d at 475–76 (citation omitted).

### A. Injury in Fact
**\*5** "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, ––– U.S. ––––, 136 S. Ct. at 1548, 194 L.Ed.2d 635 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130); see *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011). Allegations of possible future injury are insufficient; the "threatened injury must be *certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 (citations omitted). A plaintiff may comply with the injury-in-fact requirement by alleging a future injury, but only if he or she "is *immediately* in danger of sustaining some *direct* injury as the result of the challenged ... conduct and the injury or threat of injury is both real and immediate, not conjectural or hypothetical." *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142 (9th Cir. 2010) (alteration in original) (citation omitted).

Here, Plaintiff asserts contradictory allegations—on the one hand (in the background section of his Complaint) stating that DP *has issued violation notices to him and others, imposing excessive fines* based on internet searches that produced links to potential vacation rental advertisements, Compl. ¶¶ 72–73, but on the other hand (in Counts IV and V) requesting declaratory and injunctive relief *before* fines can be imposed. *Id.* ¶¶ 110, 116. And with respect to his free speech claims (Counts VI and VII), Plaintiff claims to have

> a reasonable belief and apprehension that the Director **will** deem illegal what is actually legal

2020 WL 3146584

rental activity and advertising of units ... subjecting [him] to fines of $10,000 per day, create uncertainty and a chilling impact on the free speech of Plaintiff, and others similarly situated, and the Court should issue declaratory and injunctive relief against [Ordinance 3941's] enforcement.

*Id.* ¶ 121 (emphases added). Plaintiff also accuses Defendants of applying Ordinance 3941 while simultaneously alleging that Defendants *may* enforce Ordinance 3941 against him. *Compare id.* ¶¶ 63, 67, *with id.* ¶ 69. Although these allegations are contradictory and demonstrate that Plaintiff has yet to suffer an actual injury, accepting his allegations as true and construing the Complaint in his favor, he nevertheless asserts injuries that are sufficiently imminent.

Not only is Plaintiff subject to Ordinance 3941 as a property owner of KGE, which Defendants do not dispute, if he rents the unit for a minimum of 30 days and advertises such a rental—which he argues he is entitled to do pursuant to the CC&R—he will violate the Ordinance and risk the imposition of penalties. If Plaintiff continues to rent his property for a minimum of 30 days, in contravention of Ordinance 3941, it is not "unadorned speculation" to expect that the Ordinance will be enforced against him. *Pennell, 485 U.S. at 8, 108 S.Ct. 849* (citation omitted). These circumstances constitute a sufficient threat of actual injury "to satisfy Art. III's requirement that '[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.' " *Id.* (alteration in original) (citation and footnote omitted) (finding a sufficient threat of actual injury where there was a "likelihood of enforcement, with the concomitant probability that a landlord's rent will be reduced below what he or she would otherwise be able to obtain in the absence of the Ordinance").

B. Fairly Traceable/Redressability
The causation inquiry focuses on "whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court." *Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1152 (9th Cir. 2000)* (citations

omitted). In other words, "the causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would succeed on the merits." *Id.* (citation omitted); *see Canyon County. v. Syngenta Seeds, Inc., 519 F.3d 969, 975 n.7 (9th Cir. 2008)* (identifying "less rigorous" causation threshold at the dismissal stage of the proceedings). When a "chain of causation 'involves numerous third parties' whose 'independent decisions' collectively have a 'significant effect' on plaintiffs' injuries, the Supreme Court and [the Ninth Circuit] have found the causal chain too weak to support standing at the pleading stage." *Maya, 658 F.3d at 1070* (citations omitted).

**\*6** Plaintiff is also required to demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); see Mayfield v. United States, 599 F.3d 964, 971 (9th Cir. 2010).*

As already discussed, the threat of Plaintiff's alleged injuries is sufficiently imminent. Because the injuries are fairly traceable to Defendants' challenged conduct—promulgation and enforcement of Ordinance 3941—and the injuries would be redressed by a determination that the Ordinance is unconstitutional, Plaintiff has satisfied the elements necessary to establish standing. *See Columbia Basin Apartment Ass'n v. City of Pasco, 268 F.3d 791, 798 (9th Cir. 2001).*

III. Abstention
The Court raised, sua sponte, the issue of whether it should abstain from exercising jurisdiction pursuant to *Pullman* or *Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).* Federal courts may consider both *Pullman* and *Burford* abstention sua sponte. *See Columbia Basin, 268 F.3d at 802* (stating that it "may sua sponte consider *Pullman* abstention at any time" (citation omitted)); *Int'l Coll. of Surgeons v. City of Chicago, 153 F.3d 356, 360 (7th Cir. 1998)* ("It is well established that this court may raise the doctrines of *Burford* and *Pullman* abstention sua sponte and that the failure of the parties to raise those doctrines at any point in the proceedings is no impediment to our

consideration of the applicability of those doctrines." (footnote and citations omitted)); *Forde v. First Horizon Home Loan Corp.*, No. CIV 10-01922 PHX MEA, 2010 WL 5758010, at *2 (D. Ariz. Dec. 6, 2010) ("The propriety of Burford abstention may be raised sua sponte." (citations omitted)); *cf. Adams v. W. Marine Prods., Inc.*, 958 F.3d 1216, 1223 (9th Cir. 2020) ("We may raise abstention sua sponte." (citations omitted)).

Conflating ripeness and jurisdiction with abstention, Plaintiff argues that abstention is not warranted because he is entitled to bring his claims pursuant to federal question and diversity jurisdiction. ECF No. 38 at 3–4. Defendants argue that both abstention doctrines apply, though they believe *Burford* abstention is most appropriate.

### A. *Pullman* Abstention

The *Pullman* abstention doctrine, which the Court finds applicable under the facts of this case, authorizes district courts to postpone "the exercise of federal jurisdiction when 'a federal constitutional issue ... might be mooted or presented in a different posture by a state court determination of pertinent state law.' " *C-Y Dev. Co. v. City of Redlands*, 703 F.2d 375, 377 (9th Cir. 1983) (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959)). "And it is not even necessary that the state adjudication 'obviate the need to decide all the federal constitutional questions' as long as it will 'reduce the contours' of the litigation." *Smelt v. County of Orange*, 447 F.3d 673, 679 (9th Cir. 2006) (quoting *id.* at 380).

*Pullman* abstention is appropriate where:

> (1) the case touches on a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open, (2) constitutional adjudication plainly can be avoided if a definite ruling on the state issue would terminate the controversy, and (3) the proper resolution of the possible

determinative issue of state law is uncertain.

*\*7 Courthouse News Serv. v. Planet*, 750 F.3d 776, 783–84 (9th Cir. 2014) (citation omitted); *see Smelt*, 447 F.3d 673, 679 (citation omitted).[3] The Court lacks discretion to abstain when the foregoing requirements are not met. *See Courtney v. Goltz*, 736 F.3d 1152, 1163 (9th Cir. 2013) (citation omitted). The Court finds that the foregoing requirements are satisfied here.

Plaintiff asserts that *Pullman* abstention is improper because his claims are federal claims and *Knick v. Township of Scott*, ––– U.S. ––––, ––– U.S. ––––, 139 S. Ct. 2162, 204 L.Ed.2d 558 (2019), significantly impacts the abstention analysis. ECF No. 38 at 4. But Plaintiff's counsel conceded at the hearing that *Knick* did not abrogate the abstention doctrines or affect the applicable *Pullman* abstention factors.

In his Response to the Court's abstention inquiry, Plaintiff disregards the fact that five of his nine[4] claims are state law claims and he misinterprets the holding of *Knick*, which concerned ripeness, i.e., when a plaintiff can bring a takings claim under § 1983 in federal court. Plaintiff has not pointed to any cases—and the Court has not found any—adopting his interpretation of *Knick*. That a case is properly before a federal court does not deprive the court from abstaining in appropriate circumstances. *Knick* has not affected the Court's ability to apply *Pullman* here.

### 1. Sensitive Area of Social Policy

To begin, the Court acknowledges that civil rights claims are at issue. Because "[t]he Civil Rights Act protects property rights no less than individual liberties," "[f]ederal courts should be reluctant to abstain in civil rights cases regardless of the type of constitutional interest at stake; abstention can delay the redress of significant constitutional wrongs." *Pearl Inv. Co. v. City & County of San Francisco*, 774 F.2d 1460, 1463 (9th Cir. 1985) (citations omitted). However, while the practical effect of abstention in such cases might "impose an exhaustion requirement not appropriate to 42 U.S.C. § 1983," abstention may nevertheless "be proper in a civil rights case to avoid unnecessary interference

with an important state program." *Id.* (citations omitted). Indeed, "there is no *per se* civil rights exception to the abstention doctrine." *C-Y Dev. Co.*, 703 F.2d at 381 (citation omitted).

### a. First Amendment Claim

The United States Supreme Court has been reluctant to abstain in cases involving voting rights, racial equality, and First Amendment rights of expression, but not land use matters asserted under § 1983. *See C-Y Dev. Co.*, 703 F.2d at 381. One of Plaintiff's challenges to Ordinance 3941 is that it violates his First Amendment right to free speech. Generally, *Pullman* abstention is "inappropriate when First Amendment rights are at stake" "because the guarantee of free expression is always an area of particular federal concern." *Courthouse News*, 750 F.3d at 784 (citations omitted). But Plaintiff's First Amendment claim is not central to this litigation; it is merely one facet of his broader challenge to Ordinance 3941. Even Plaintiff has characterized this case as a takings action, both at the hearing and in his supplemental briefing. ECF No. 38 at 1 ("In his Complaint, Plaintiff alleges that the application of Ordinance No. 3941 (2014) to his property is effectively taking of the real property interests that were granted by the county of Maui and conveyed to him in recorded covenants.").

**\*8** In any event, Plaintiff's First Amendment claim is not viable. Plaintiff alleges that Ordinance 3941 penalizes speech "by imposing restrictions on the content of advertisements concerning the rental of real property on Maui." Compl. ¶ 119. However, Ordinance 3941 regulates commercial conduct, not speech. "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct. [And] the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011); *see Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015).

The threshold question in determining if the First Amendment applies is "whether conduct with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect of 'singling out those engaged in expressive activity.' " *HomeAway.com, Inc. v. City of Santa Monica*, 918

F.3d 676, 685 (9th Cir. 2019) (" *HomeAway III*") (citation omitted). Courts may consider both the "inevitable effect of a statute on its face," as well as a statute's "stated purpose" but "may not conduct an inquiry into legislative purpose or motive beyond what is stated within the statute itself," absent limited circumstances. *Id.* (citations omitted).

This case does not implicate the First Amendment because advertising unlawful vacation rentals is nonexpressive conduct. Ordinance 3941 regulates short-term rentals and with respect to advertising, provides:

> B. Advertising that offers a property as a short-term rental home shall constitute prima facie evidence of the operation of a short-term rental home on the property and the burden of proof shall be on the owner, operator, or lessee of record to establish that the subject property is being used as a legal short-term rental home or is not in operation as a short-term rental home.
>
> C. Any communication by a property owner, operator, or lessee to any person where the owner, operator, or lessee offers their home for rent as a short-term rental home on the property shall constitute prima facie evidence of the operation of a short-term rental home on the property and the burden of proof shall be on the owner, operator, or lessee to establish that the subject property is being used as a legal short-term rental home or is not in operation as a short-term rental home.
>
> D. Advertising for a short-term rental home without a valid permit number is prohibited and constitutes a violation of this title and may result in enforcement action pursuant to section 19.530.030 of this title; provided that:
>
> > 1. The alleged violator and the property owner shall be notified that all advertising without a valid permit number shall be terminated within seven days of the notice.
> >
> > 2. Enforcement action, including fines, may commence pursuant to section 19.530.030 of this title if advertising without a valid permit number continues after such warning.

MCC § 19.65.080. By their plain terms, the provisions at issue regulate conduct lacking a "significant expressive element"—the advertisement of short-term rentals that are not validly permitted. *See, e.g.,* *HomeAway III*, 918 F.3d at 685 (holding that "the Ordinance is plainly a housing and rental regulation. The ' 'inevitable effect of

the [Ordinance] on its face' is to regulate nonexpressive conduct—namely, booking transactions—not "speech" (alteration in original) (citation omitted)); *Rentberry, Inc. v. City of Seattle*, 374 F. Supp. 3d 1056, 1063 (W.D. Wash. 2019) (finding a rental transaction to "lack a significant expressive element"); *Homeaway.com, Inc. v. City of Santa Monica*, Case Nos. 2:16-cv-06641-ODW AFM, 2018 WL 1281772, at \*6 C.D. Cal. Mar. 9, 2018 (" *HomeAway I*") (finding "that the conduct banned by the Ordinance—booking transactions for residential properties not listed on the City's registry—does not have such a 'significant expressive element' as to draw First Amendment protection"); *Airbnb, Inc. v. City & County of San Francisco*, 217 F. Supp. 3d 1066, 1076 (N.D. Cal. 2016) (finding that an ordinance restricting the booking of rentals for unregistered units—directed at commerce or conduct—was "not conduct with a significant expressive element" (citation omitted)); *Int'l Franchise Ass'n*, 803 F.3d at 408 (concluding that "[t]he conduct at issue—the decision of a franchisor and a franchisee to form a business relationship and their resulting business activities—'exhibits nothing that even the most vivid imagination might deem uniquely expressive' " (citation omitted)). Indeed, Ordinance 3941 does not prohibit advertising altogether; it proscribes advertising for unlawful short-term rentals and establishes that advertisements and/or communications offering a property as a short-term rental constitute prima facie evidence of the operation of a short-term rental home.

**\*9** The purpose of Ordinance 3941 "is to establish a permitting process for short-term rental homes, subject to appropriate restrictions and standards." MCC § 19.65.010. The intent is "to implement land use policies consistent with the County's general plan and the State's land use laws; to retain the character of residential neighborhoods; to provide varied accommodations and experiences for visitors; and to allow small businesses to benefit from tourism." *Id.* Therefore, its implementation was "not motivated by a desire to suppress speech" and does not have "the effect of targeting expressive activity." *Int'l Franchise Ass'n*, 803 F.3d at 409. Instead, the only inevitable effect of Ordinance 3941 is to prohibit advertisements of unlawful short-term rental homes.

Ordinance 3941 also does not have the effect of "singling out those engaged in expressive activity." It regulates advertisements and communications about unlawful short-term rentals and imposes the burden of proving the legality of short-term rentals. That an incidental impact on speech might result does not subject Ordinance 3941 to scrutiny under the First Amendment. *See Int'l*

*Franchise Ass'n*, 803 F.3d at 408 ("[S]ubjecting every incidental impact on speech to First Amendment scrutiny 'would lead to the absurd result that any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation, would require analysis under the First Amendment[.]' " (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 708, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (O'Connor, J., concurring))); *HomeAway III*, 918 F.3d at 686 (quoting *id.*). "[T]o the extent that the speech chilled advertises unlawful rentals, '[a]ny First Amendment interest ... is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.' " *HomeAway III*, 918 F.3d at 686 (second and third alterations in original) (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)).

For these reasons, Plaintiff's First Amendment claim (Count VI) is DISMISSED. *See Homeaway.com, Inc. v. City of Santa Monica*, Case Nos. 2:16-cv-06641-ODW AFM, 2018 WL 3013245, at \*6–7 C.D. Cal. June 14, 2018 (" *HomeAway II*"), aff'd, *HomeAway III*, 918 F.3d 676 (dismissing with prejudice the plaintiffs' First Amendment claims because "the First Amendment does not protect speech proposing an illegal transaction" and cannot be used as a shield "to communicate offers to rent illegal units" (citations omitted)). Because no amendment could cure the claim's defects, the Court declines to authorize leave to amend.

b. Land Use Is a Sensitive Area of Social Policy

The dismissal of Plaintiff's First Amendment claim eliminates concerns about the propriety of *Pullman* abstention. Turning now to the crux of this action—whether Ordinance 3941 and/or its enforcement against Plaintiff results in an unconstitutional taking of his property—the Ninth Circuit has long "held that land-use planning questions 'touch a sensitive area of social policy' into which the federal courts should not lightly intrude." *Columbia Basin*, 268 F.3d at 802 (citations omitted); *see also San Remo Hotel v. City & County of San Francisco*, 145 F.3d 1095, 1105 (9th Cir. 1998); *Sinclair Oil Corp. v. County of Santa Barbara*, 96 F.3d 401, 409 (9th Cir. 1996); *Pearl Inv. Co.*, 774 F.2d at 1463–64; *Bank of Am. Nat'l Tr. & Sav.*

*Ass'n v. Summerland Cty. Water Dist.*, 767 F.2d 544, 546 (9th Cir. 1985); *Kollsman v. City of Los Angeles*, 737 F.2d 830, 833 (9th Cir. 1984); *Santa Fe Land Improvement Co. v. City of Chula Vista*, 596 F.2d 838, 839–40 (9th Cir. 1979); *Sederquist v. City of Tiburon*, 590 F.2d 278, 281 (9th Cir. 1978); *Rancho Palos Verdes Corp. v. City of Laguna Beach*, 547 F.2d 1092, 1094–95 (9th Cir. 1976). Moreover, the short-term rental issue has been and continues to be a hot-button topic and a sensitive issue of social policy throughout the State. *Cf. Kendrick v. Planning Dep't*, Civ. No. 19-00024 HG-KJM, 2020 WL 736245, at *7 (D. Haw. Feb. 13, 2020) (invoking *Burford* abstention and finding that "[p]olicies governing residential vacation rentals are subject to significant local interest and important public policy"). Accordingly, the first factor is met.

## 2. Avoidance of Federal Constitutional Adjudication

**\*10** The second factor requires "[a] state law question that has the potential of at least altering the nature of the federal constitutional questions." *C-Y Dev. Co.*, 703 F.2d at 378. "For *Pullman* purposes ... it is sufficient if the state law issues might 'narrow' the federal constitutional questions." *Sinclair Oil*, 96 F.3d at 409 (citation omitted). The Ninth Circuit has consistently found this requirement satisfied in land use cases "where a favorable decision on a state law claim would provide plaintiff with some or all of the relief he seeks." *VH Prop. Corp. v. City of Rancho Palos Verdes*, 622 F. Supp. 2d 958, 963 (C.D. Cal. 2009).

The resolution of the state/municipal issues here can avoid or narrow the adjudication of the federal constitutional issues.[5] Indeed, Plaintiff has admitted that if his property rights are grandfathered and/or KGE is not subject to Ordinance 3941, his constitutional claims would no longer be at issue and this case would end. *See* ECF No. 34 at 2. As earlier discussed, Plaintiff mischaracterizes all of his claims as federal in order to avoid the application of *Pullman* abstention. ECF No. 38 at 4. But even if Plaintiff's characterizations were accurate, the federal claims turn on underlying questions of state law, the resolution of which could obviate the need for a determination of federal constitutional questions. *See Sederquist*, 590 F.2d at 282 (citation omitted). The second requirement is therefore satisfied.

## 3. Uncertainty of Determinative State Law Issues

The third *Pullman* factor can be satisfied in land use cases with "only a minimal showing of uncertainty" because "land use claims are local in nature and involve the interpretation of various state and local land use laws[.]" *Patel v. City of Los Angeles*, 455 F. App'x 743, 744–45 (9th Cir. 2011) (citing *Sinclair Oil*, 96 F.3d at 409–10; *Pearl Inv. Co.*, 774 F.2d 1460, 1465 (9th Cir. 1985)). "Uncertainty for purposes of *Pullman* abstention means that a federal court cannot predict with any confidence how the state's highest court would decide an issue of state law." *Pearl Inv. Co.*, 774 F.2d at 1465 (citation omitted). Resolution of state law issues "might be uncertain because the particular statute is ambiguous, or because the precedents conflict, or because the question is novel and of sufficient importance that it ought to be addressed first by a state court." *Id.*

Plaintiff interprets *Pullman* abstention to literally require the implication of *state* (versus municipal) law. ECF No. 38 at 5 ("The State of Hawaii does not regulate short term rentals of less than 180 days. Each County has its own zoning ordinances, Oahu regulates rental of less than 30 days. The Maui County zoning Ordinance No. 3941 ... is not state law. The State of Hawaii does not have any interest[6] in having its Courts decide the application of a County ordinance being applied in violation of the US [sic] Constitution."). But the governing case law cited herein demonstrates that "state law" considerations encompass municipal ordinances and rules.[7] Moreover, Plaintiff invokes state law (Counts III, V, and VII to IX) in challenging Ordinance 3941. Central to this challenge is that Ordinance 3941's "grandfathering" provision violates Hawaii's Zoning Enabling Act, HRS § 46-4. Compl. ¶¶ 126–130.

**\*11** Here, the Court cannot predict with any confidence how Hawaii's courts would decide Plaintiff's state law challenges to Ordinance 3941. *See, e.g., Richardson v. Koshiba*, 693 F.2d 911, 917 (9th Cir. 1982) (finding "no substantial indication of how Hawaii's courts would treat [the plaintiff's] state law claims"). Indeed, the applicable land use regulatory scheme is complicated, and the state law issues are novel and sufficiently important such that they should be addressed by the state courts first. For these reasons, the Court finds that the third requirement is met.

Because the three requirements are satisfied, the Court finds it appropriate to abstain under *Pullman*.[8] "A

2020 WL 3146584

district court abstaining under *Pullman* must dismiss the state law claim and stay its proceedings on the constitutional question until a state court has resolved the state issue." *Cedar Shake & Shingle Bureau v. City of Los Angeles*, 997 F.2d 620, 622 (9th Cir. 1993); *see Courtney*, 736 F.3d at 1164 (holding that "the district court should have retained jurisdiction over the case pending resolution of the state law issues, rather than dismissing the case without prejudice"); *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 940 (9th Cir. 2002) ("If a court invokes *Pullman* abstention, it should stay the federal constitutional question 'until the matter has been sent to state court for a determination of the uncertain state law issue.' " (citation and footnote omitted)); *Columbia Basin*, 268 F.3d at 802 ("If we abstain 'under *Pullman*, retention of jurisdiction, and not dismissal of the action, is the proper course.' " (quoting *Santa Fe Land Improvement Co.*, 596 F.2d at 841)).

The Court therefore dismisses the state law claims (Counts III, V, and VII to IX), and stays the remaining federal claims (Counts I, II, and IV). Plaintiff may refile the state law claims in circuit court. *See San Remo Hotel*, 145 F.3d at 1104 ("Once *Pullman* abstention is invoked by the federal court, the federal plaintiff must then seek a definitive ruling in the state courts on the state law questions before returning to the federal forum." (citing *Pullman*, 312 U.S. at 501–02, 61 S.Ct. 643; *Rancho Palos Verdes Corp.*, 547 F.2d at 1096)). The dismissal of the state law claims does not constitute a determination on the merits on any of the grounds advanced in the present Motion.

<u>CONCLUSION</u>

In accordance with the foregoing, Defendants' Motion is GRANTED IN PART AND DENIED IN PART. Plaintiff's state law claims (Counts III, V, and VII to IX) are DISMISSED for resolution in state court. Plaintiff's First Amendment claim (Count VI) is DISMISSED. The balance of the Motion is DENIED. This case—comprised of the remaining federal claims (Counts I, II, and IV)—is STAYED until the state court's determination of Plaintiff's claims related to Ordinance 3941. All pending deadlines are terminated.

Plaintiff may return to this forum after the state law questions are answered. The parties are to submit a joint status report every six months, beginning on December 1, 2020. The parties shall file a notice within seven days of the conclusion of the state court proceedings, attaching any relevant decision(s) and indicating whether the instant proceedings should recommence.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 3146584

**Footnotes**

1       An arbitration panel since determined that the Amendment was an invalid and unconscionable effort to change Plaintiff's entitlements. *See* Compl. ¶ 61.

2       Ultimately, the exhibits are unnecessary for the disposition of this Motion.

3       "*Pullman* abstention applies whether or not a state proceeding is pending[.]" *Gilbertson v. Albright*, 381 F.3d 965, 970 n.6 (9th Cir. 2004).

4       While Plaintiff asserts nine counts, there are only eight because Count I is for declaratory relief pursuant to § 2201, which is a remedy, not a standalone cause of action. *See County of Santa Clara v. Trump*, 267 F. Supp. 3d 1201, 1215–16 (N.D. Cal. 2017) ("The government correctly notes that the Declaratory Judgment Act creates a remedy for litigants but is not an independent cause of action." (citation omitted)).

5       Although the federal and Hawai'i constitutional claims would likely be evaluated similarly, *see Cammack v. Waihee*, 932 F.2d 765, 767–68 nn.4–5 (9th Cir. 1991), this is not a basis to refrain from abstaining here, where

2020 WL 3146584

decisions on other state law issues could narrow or dispose of the federal constitutional issues.

[6]   A state's interest is not part of the inquiry.

[7]   "When a court abstains in order to avoid unnecessary constitutional adjudication ... it is seeking to promote a harmonious federal system by avoiding a collision between the federal courts and state *(including local)* legislatures." *San Remo Hotel,* 145 F.3d at 1105 (emphasis added) (citation omitted).

[8]   Given this determination, the Court need not address whether to abstain under *Burford.*

---

**End of Document**                                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.